IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 CR 572-2 |
| | ) | |
| C. GREGORY TURNER, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

C. Gregory Turner ("Turner" or "Defendant") has been charged with (1) knowingly acting and conspiring to act as an agent of the Republic of Zimbabwe without notifying the Attorney General and (2) willfully conspiring to provide public relations, political consulting, and lobbying services to sanctioned Zimbabwean officials without obtaining a license from the Treasury Department. *See* Dkt. No. 38 ("Indictment").

Turner and the Government have filed cross motions *in limine* concerning the admissibility of a "Consulting Agreement" purportedly signed by two of his co-conspirators. For the reasons stated below, I deny Turner's motions to bar the Government from introducing the Consulting Agreement (Dkt. No. 141 at § IV, Dkt. No. 152, Dkt. No. 162) and provisionally grant the Government's cross motion (Dkt. No. 155 at § I) on the

1

assumption that it will introduce evidence at trial sufficient to support the factual assertions made in its motion.[1]

I.

The two-page "Consulting Agreement" dated November 26, 2008 purports to bear the signatures of Prince Asiel Ben Israel ("Ben Israel") and Monica Mutsvangwa ("Ms. Mutsvangwa"). *See* Dkt. No. 155 ("Govt.'s MILs") at Ex. A. Ben Israel was a co-Defendant in this case who pled guilty to willfully failing to file a registration statement while acting on behalf of Zimbabwean principals. *See* Dkt. No. 96. The Government represents that Ms. Mutsvangwa was a Zimbabwean senator affiliated with Robert Mugabe's political party, the Zimbabwe African National Union – Patriotic Front ("ZANU-PF"), at the time of the charged conspiracies. She is also married to Christopher Mutsvangwa, a member of the ZANU-PF party who served as Zimbabwe's ambassador to China during the charged conspiracies. Neither Ms. Mutsvangwa nor her husband is a Specially Designated National ("SDN") to whom U.S. persons may not provide services. *See* 31 C.F.R. § 541.405.

---

[1] *See* Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later.").

2

The Agreement identifies Ms. Mutsvangwa as the "Client" and Ben Israel as a "Consultant" who will perform unspecified "consulting services." Govt.'s MILs at Ex. A. The Agreement further states that the "Consultant" agrees "to consult with the Board of Directors, the officers of the Client, and the administrative staff, and to undertake for the Client consultation as to the direction of certain functions in said management structure." *Id*. The document contains no clues about why the purported "Client," Ms. Mutsvangwa, would have a board of directors, officers, or an administrative staff. The Consulting Agreement also refers to a "Corporation" without explaining its relationship, if any, to the "Client." *Id*.

The "Compensation" provision of the Consulting Agreement states that the "Client" will pay the "Contractor" (an undefined term that appears for the first time in this provision) a total of $3,405,000 plus expenses in four installments: "$90,000 USD at the signing of this contract; $1,105,000 USD upon completion of the Zimbabwe meeting (date to be determined); and $1,105,000 USD upon completion of the South Africa meeting (date to be determined) and $1,105,000 USD upon completion of is [sic] project. The project will be considered complete when the written report is submitted." *Id*.

On the signature line of the Consulting Agreement, the purported signatories reversed their roles, i.e., Ben Israel is

3

identified as the "Client" while Ms. Mutsvangwa is identified as the "Consultant."  *Id*.  There is no evidence before me suggesting that either signature is authentic.  The Government (1) acknowledges that Ben Israel has denied signing the Agreement and (2) does not attempt to show that the signature purporting to be his is authentic.  Meanwhile, the Government concedes that Ms. Mutsvangwa did not personally sign the document (indeed, three initials appear in parentheses following her signed name, suggesting that someone else purported to sign on her behalf) and admits that it does not know who penned her name.

On November 29, 2008, three days after Ben Israel and Ms. Mutsvangwa allegedly signed the Consulting Agreement, Turner e-mailed Ben Israel's assistant, Individual A, to obtain the routing information for Ben Israel's bank account.  *Id.* at Ex. B.  Turner reported that a transfer of $80,000 would be "executed" by Tuesday, December 2, 2008 at the latest.  *Id.*  The Government surmises that Turner was referring to the first installment payment of $90,000 called for in the Consulting Agreement.

On Thursday, December 4, 2008, the Government says that the African Banking Corporation of Botswana attempted to wire $90,000 from Ms. Mutsvangwa's account to Ben Israel's account at National City Bank in Chicago, Illinois.  *Id.* at Ex. C.

National City Bank's records from December 5, 2008 show a corresponding wire of $89,970 from Ms. Mutsvangwa's account to Ben Israel's account. *Id*. This attempted wire transfer prompted National City Bank to investigate the transaction.

As part of this investigation, the Government says that a person referred to as "Bank Employee A" asked Ben Israel to explain why Ms. Mutsvangwa was attempting to send him almost $90,000. In response to this inquiry, Ben Israel purportedly e-mailed a copy of the Consulting Agreement to Bank Employee A on December 9, 2008. *Id.* at Ex. A. National City Bank ultimately rejected the attempted wire transfer. Ms. Mutsvangwa's bank records show that almost $90,000 was returned to her account on December 23, 2008. *Id.* at Ex. C.

Meanwhile, the Government says that Chris Mutsvangwa wrote a letter to the African Banking Corporation with the subject line: "Withdrawal of Funds USD 90,000.00 Cash by Prince Asiel Ben Israel from Monica Mutsvangwa Account Number." *Id.* at Ex. E. Mr. Mutsvangwa stated: "This letter serves to authorize Prince Asiel Ben Israel...to collect USD 90,000.00 (Ninety Thousand Dollars) from our account in Botswana." *Id*. The Government intends to show that on December 16, 2008, Ben Israel personally withdrew $90,000 from Ms. Mutsvangwa's account in Botswana pursuant to this authorization. *Id*. at Ex. C.

On January 23, 2009, Turner wrote a confidential memo to SDN Gideon Gono, Governor of the Federal Reserve Bank of Zimbabwe, advising him "that the advocacy group from Illinois has had to make a few revisions regarding its phase three visit to Zimbabwe." *Id.* at Ex. F. The Government contends that Turner's use of the term "phase three visit to Zimbabwe" corresponds with the Consulting Agreement's payment schedule, under which the "Client" agreed to pay the "Contractor" $1,105,000 "upon completion of the Zimbabwe meeting (date to be determined)." *Id.* at Ex. A.

The Government intends to show that after arranging the South Africa and Zimbabwe meetings referenced in the Consulting Agreement, Turner made repeated efforts in 2009 to collect money owed under the Agreement. The Government's evidence includes (1) a February 2009 e-mail to Turner from one of his associates that describes preparations for clearing a wire transaction with an unspecified bank, *id.* at Ex. G; (2) a July 2009 e-mail from Turner to an associate stating that Turner was "busy closing in on the Cash," *id.* at Ex. H; (3) a July 2009 e-mail from Turner to an associate in which Turner wrote that he was "moving back to Zim next week to try and cut the Big piece loose," *id.* at Ex. I; (4) a September 2009 e-mail from Turner to an associate in which Turner said he had been "catching hell collecting from the RZB [Reserve Bank of Zimbabwe]," *id.* at Ex. J; and (5) an

6

October 2009 e-mail from Turner to an associate in which Turner reported that he was about to return to Zimbabwe for "THE PAY DAY," *id.* at Ex. K.

## II.

The Government contends that the Consulting Agreement is admissible under Federal Rule of Evidence 801(d)(2)(E) as a statement made by one of Turner's co-conspirators in furtherance of an alleged conspiracy to provide services to Zimbabwean SDNs.

The Government's theory of admissibility requires me to determine (1) whether the Government has authenticated the Consulting Agreement as the statement of a co-conspirator; (2) whether the statements, if made by a co-conspirator, were made in furtherance of the charged conspiracy; and (3) whether the Consulting Agreement should nonetheless be excluded under Federal Rule of Evidence 403. If the Consulting Agreement is deemed admissible, I must also address Turner's motion for leave to travel to Zimbabwe for the purpose of deposing Ms. Mutsvangwa.

### A.

To authenticate the Consulting Agreement, the Government must "produce evidence sufficient to support a finding that the item is what the [the Government] claims it is." Fed. R. Evid. 901(a). The Government does not contend that the Consulting Agreement is a legally binding contract between its purported

signatories or that the Agreement bound the Republic of Zimbabwe or any SDN listed in the indictment.  Turner misses the mark in trying to refute arguments that the Government has not made.

The Government's theory of admissibility rests on the narrower contention that the Consulting Agreement is a statement made by a co-conspirator to explain the purpose of the incoming wire from Ms. Mutsvangwa's bank account in Botswana to Ben Israel's account at National City Bank.

"Authentication can be established in a variety of ways, including by '[t]estimony of [a] witness with knowledge ... that a matter is what it is claimed to be[,]' Fed. R. Evid. 901(b)(1), and by distinctive characteristics such as '[a]ppearance, contents, substance, [or] internal patterns ... taken in conjunction with circumstances [,]' Rule 901(b)(4)." *Dumeisi*, 424 F.3d at 574.  "Only a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury." *U.S. v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012).

The Government acknowledges that none of its trial witnesses has personal knowledge of who drafted, signed, or sent the Consulting Agreement to Bank Employee A.  *See id*. (noting that recipient of an e-mail does not have personal knowledge of who sent it).  Nonetheless, the Government expects Bank Employee to testify that she (1) called Ben Israel on or around December

8

5, 2008 and "asked him to provide the bank with any documents that explained why he was being wired nearly $90,000," Govt.'s MILs at 6, and (2) received the Consulting Agreement from "princeasiel@aol.com" on December 8, 2008, as an attachment to an e-mail with no text.[2]  The Government argues this testimony, taken together with "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the [Consulting Agreement]" establish its authenticity as a co-conspirator statement.  Fed. R. Evid. 901(b)(4).

The Government's authentication argument calls for a two-part inquiry: whether the combination of (1) the Consulting Agreement's distinctive characteristics and (2) the circumstances surrounding its transmission to Bank Employee A support a finding that the statements contained therein were made by one of Turner's co-conspirators.  *See Dumeisi*, 424 F.3d at 575 (dividing Rule 901(b)(4) into a similar two-part inquiry).

---

[2] In a previous filing, the Government said that Ben Israel told National City Bank that "the wire transfer represented reimbursement of expenses incurred over the last eight months from a non-profit that [he] helped establish in Zimbabwe."  Dkt. No. 114 at 19.  It is not clear whether Bank Employee A or any other trial witness will testify about this purported conversation or National City Bank's basis for stopping the wire transfer.

9

a.

The most distinctive internal characteristic of the Consulting Agreement is its four-part payment structure keyed to specific events. *See U.S. v. Mokol*, 957 F.2d 1410, 1420 (7th Cir. 1992) (identifying payment schedule in handwritten list purporting to reflect bribe payments as a distinctive characteristic); *U.S. v. De Gudino*, 722 F.2d 1351, 1355 (7th Cir. 1982) (identifying payment schedule in lists purporting to show aliens who were illegally smuggled as a distinctive characteristic).

Moreover, the Consulting Agreement's distinctive payment structure corresponds with what the Government says it will prove were Ben Israel's and Turner's actions. The Government says its evidence will show that Turner worked with Individual A to prepare for the receipt of a $80,000 wire transfer into Ben Israel's bank account in early December 2008. *See* Pl.'s MILs at Ex. B. After the bank stopped the wire, Ben Israel allegedly withdrew $90,000 from Ms. Mutsvangwa's bank account in Botswana. *Id*. at Ex. C. The correspondence between the $90,000 initial payment called for in the Consulting Agreement and Ben Israel's and Turner's efforts to collect this sum from Ms. Mutsvangwa cannot be dismissed as pure coincidence.

Similarly, the Government's expected evidence will show that Ben Israel and Turner arranged meetings in South Africa and

10

Zimbabwe that appear to parallel the second and third tiers of the Consulting Agreement's payment structure. In the same November 28, 2008 e-mail in which Turner asked Individual A for Ben Israel's bank account information, he also referenced an upcoming meeting in Johannesburg, South Africa (echoing the "South Africa meeting" provided for in the Agreement) between "the Chicago delegation" and SDNs Mugabe and Gono. *Id.* at Ex. B (referencing "His Excellency and the Governor of the Reserve Bank"). The agenda items for this meeting included the establishment of "a perminite [sic] Advisory group to Remove the Economic sanctions" and "a back chanel [sic] [for] communications to the President Elect." *Id.* Later, in a January 23, 2009 memo to SDN Gono, Turner referenced a "phase three visit to Zimbabwe" (recall the Agreement's "Zimbabwe meeting") by "the advocacy group from Illinois." *Id.* at Ex. F.

After arranging these meetings, Turner made persistent efforts throughout 2009 to receive payment for "services rendered," *id.* at Ex. G; "clos[e] in on the Cash," *id.* at Ex. H; "cut the Big piece loose," *id.* at Ex. I; "collect[] from the [Reserve Bank of Zimbabwe], *id.* at Ex. J; and return to Zimbabwe for "THE PAY DAY," *id.* at Ex. K.

In sum, the high degree of correspondence between the Consulting Agreement's distinctive payment structure and Ben Israel's and Turner's alleged actions is prima facie evidence

11

that the author/declarant of the document was a co-conspirator. *See Mokol*, 957 F.2d at 1420 (holding that handwritten bribe sheets found in defendant's home containing dates, names, initials, and amounts corresponding to payments that defendant corroborated in recorded conversations with confidential informant were properly authenticated under Rule 901(b)(4)); *De Gudino*, 722 F.2d at 1355 (holding that lists found in headquarters of illegal alien smuggling operation showing "names of smuggled aliens and their sponsors, dates, telephone numbers, dollar figures, and records of payment" that corresponded with operation's smuggling techniques were properly authenticated under Rule 901(b)(4)).

b.

The second part of Rule 901(b)(4) requires me to consider the Consulting Agreement's distinctive payment structure in conjunction with circumstantial evidence regarding who sent the document to Bank Employee A.

In several reported Rule 901(b)(4) cases, the authenticity analysis turned on whether a distinctive document, discovered in a location uniquely associated with the alleged conspiracy, could reasonably be attributed to the defendant or a co-conspirator.[3] This case presents a slightly different question.

---

[3] *See e.g., U.S. v. Smith*, 223 F.3d 554, 570 (7th Cir. 2000) (affirming district court's authenticity finding under Rule

12

The Consulting Agreement was not discovered or seized from a physical location; instead, someone using the "princeasiel@aol.com" account sent the document to Bank Employee A. The relevant question for purposes of Rule 901(b)(4)'s second prong is whether the circumstances surrounding this transmission of the Consulting Agreement support a finding that the sender (i.e., the declarant of the statements contained therein) was one of Turner's co-conspirators.

Turner does not dispute that the December 9, 2008 e-mail from "princeasiel@aol.com" was sent in response to Bank Employee A's request to Ben Israel for documentation explaining the incoming wire from Ms. Mutsvangwa's account. The evidence the Government intends to submit indicates that Bank Employee A called Ben Israel on a Friday and received the Consulting Agreement via e-mail on the next business day. The absence of text in the body of the e-mail also suggests the sender was responding to a prior inquiry.

---

901(b)(4) where IRS agents seized document in question from the files of gang leader's girlfriend); *U.S. v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997) (same holding where "written materials were found in an isolated and remote area where law enforcement agents observed no one other than [defendant]"); *Mokol*, 957 F.2d at 1420 (same holding where documents in question were "seized from a [secret compartment inside] defendant's home"); *De Gudino*, 722 F.2d at 1355 (same holding where documents in question were seized from "headquarters of the [illegal alien smuggling] operation").

13

As for who sent the e-mail, Turner has presented no reason to doubt that the person to whom Bank Employee A directed her request for supporting documentation--i.e., Ben Israel--was the same person who responded on the next business day. *See Fluker*, 698 F.3d at 999-1000 (affirming authentication of e-mail based on circumstantial evidence regarding who sent it); *see also U.S. v. Siddiqui*, 235 F.3d 1318, 1322-23 (11th Cir. 2000) (same). The Government has also cited circumstantial evidence that "princeasiel@aol.com" was Ben Israel's e-mail address. *See* Pl.'s MILs at 7 n.6 (describing August 20, 2010 e-mail from the same account that reads: "Here is my contact information: Prince Asiel Ben Israel, E-mail: princeasiel@aol.com."). These facts support a strong inference that Ben Israel either sent the Consulting Agreement to Bank Employee A or authorized someone to send it on his behalf.

In sum, the Government has presented evidence that (1) Ben Israel and Turner acted in accordance with the Consulting Agreement's distinctive payment structure and (2) Ben Israel, or someone acting on his behalf, sent the Consulting Agreement to Bank Employee A to explain the purpose of the incoming wire from Ms. Mutsvangwa. This combination of evidence is sufficient to support a finding under Rule 901(b)(4) that Ben Israel was the declarant of the statements contained in the Consulting Agreement. I underscore, however, that this finding presumes

that the Government will, in fact, present evidence at trial consistent with its prima facie showing of genuineness. *See* Fed. R. Evid. 104(b). "[T]he task of deciding the [Consulting Agreement's] true authenticity and probative value is left to the jury." *Fluker*, 698 F.3d at 999.

B.

I now turn to whether the Consulting Agreement, properly authenticated as Ben Israel's statement to Bank Employee A, meets the admissibility criteria of Rule 801(d)(2)(E).

"A statement made by a member of a conspiracy is admissible pursuant to Rule 801(d)(2)(E) if the government proves by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy." *U.S. v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010). Turner once again misses the mark--and ignores basic principles of conspiracy law--by focusing on the fact that his name does not appear on the purported Consulting Agreement. *See* Dkt. No 152 at ¶¶ 33-34.

The evidence presented in the Government's *Santiago* proffer establishes that Ben Israel and Turner were, more likely than not, members of a conspiracy to act as agents for the Republic of Zimbabwe and provide public relations, political consulting, and lobbying services to Zimbabwean SDNs. Turner's only

objection to this proffer was the Government's reliance on the Consulting Agreement as evidence of the conspiracy upon which its admissibility depends. *See* Dkt. No. 152 at 9 n.2. This argument has no merit. *See Bourjaily v. U.S.*, 483 U.S. 171, 180 (1987) ("[T]here is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy.").[4]

With regard to the third factor for admitting a co-conspirator statement, the Government's proffer is prima facie proof that Ben Israel made the statements contained in the Consulting Agreement to Bank Employee A in furtherance of the charged conspiracies. "In order to satisfy the 'in furtherance' requirement, the coconspirator's statement need not have been exclusively, or even primarily, made to further the conspiracy." *U.S. v. Cruz-Bea*, 626 F.3d 929, 937 (7th Cir. 2010) (internal quotation omitted). "The government has satisfied its burden even if the statement is susceptible to alternative interpretations, so long as some reasonable basis exists for concluding that the statement furthered the conspiracy." *Id.*

---

[4] *See also U.S. v. Martinez de Ortiz*, 907 F.2d 629, 634 (7th Cir. 1990) (en banc) (noting that "the anti-bootstrapping rule--the principle that the hearsay [statements] sought to be introduced may not also be used to establish the existence of the conspiracy on which their admissibility depends...did not survive [*Bourjaily*]").

(internal quotation omitted).  One objective of the charged conspiracies was to collect money for services rendered to Zimbabwean SDNs.  It follows that the statements Ben Israel made to Bank Employee A for the purpose of receiving a $90,000 wire from Ms. Mutsvangwa furthered the charged conspiracies.  *See U.S. v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991) (statements made in furtherance of a conspiracy include statements made "to conduct and further the business").

C.

Turner's next argument is that the Consulting Agreement is more prejudicial than probative and should be excluded on that basis.  *See* Fed. R. Evid. 403.  "To warrant exclusion under Rule 403, [the Consulting Agreement's] 'probative value must be insignificant compared to its inflammatory nature so that the evidence unfairly prejudices the defendant.'"  *U.S. v. Gougis*, 432 F.3d 735, 743 (7th Cir. 2005) (quoting *U.S. v. Rutledge*, 40 F.3d 879, 885 (7th Cir. 1994)).

Turner has not cited any cases in support of his Rule 403 argument.  The Consulting Agreement has probative value because it reflects statements that one of Turner's co-conspirators made to explain the purpose of a $90,000 wire coming from a member of the same political party as the SDNs to whom Turner allegedly provided services.  So long as the Government adheres to its theory of admissibility at trial and refrains from assuming

17

facts not in evidence--e.g., that Ms. Mutsvangwa or someone acting her behalf signed the Consulting Agreement--admitting the document under established principles of conspiracy law will not unfairly prejudice Turner.

Turner remains free, of course, to argue before the jury that Ben Israel's statements to Bank Employee A should be assigned little weight in deciding whether he personally joined an illegal conspiracy.

### D.

Turner's final argument is that if the Consulting Agreement is admitted over his objection, he should be granted leave to travel to Zimbabwe using Criminal Justice Act funds, *see* 18 U.S.C. § 3006A(e)(1), for the purpose of taking Ms. Mutsvangwa's deposition. I will address that argument in a separate order.

### III.

For the reasons stated above, I deny Turner's motions to bar the Government from introducing the Consulting Agreement (Dkt. No. 141 at § IV, Dkt. No. 152, Dkt. No. 162) and provisionally grant the Government's cross motion (Dkt. No. 155 at § I) on the assumption that it will introduce evidence at trial to support the factual assertions made in its motion.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: September 22, 2014