1

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   UNITED STATES OF AMERICA,              )    No. 2013 CR 572
                          Plaintiff,        )    October 2, 2014
 4              v.                          )    9:30 a.m.
     C. GREGORY TURNER,                     )
 5                        Defendant.        )

 6                TRANSCRIPT OF PROCEEDINGS - TRIAL
                 BEFORE THE HON. ELAINE E. BUCKLO
 7                          VOLUME IV
     APPEARANCES:
 8
     On behalf of Plaintiff:  MR. BARRY JONAS
 9                            MS. GEORGIA N. ALEXAKIS
                              ASSISTANT UNITED STATES ATTORNEY
10                            219 South Dearborn Street, 5th floor
                              Chicago, Illinois 60604
11                            (312) 353-5300

12                            MR. DAVID RECKER
                              US DEPARTMENT OF JUSTICE
13                            COUNTERESPIONAGE SECTION
                              600 E Street N.W., 10th floor
14                            Washington, D.C. 20004
                              (202) 233-2261
15
     On behalf of Defendant:  MR. JAMES D. TUNICK
16                            LAW OFFICES OF JAMES D. TUNICK
                              30 North LaSalle Street, Suite 2140
17                            Chicago, Illinois 60602
                              (312) 580-1839
18
                              MR. MICHAEL I. LEONARD
19                            LEONARD LAW OFFICES, INC.
                              230 North LaSalle Street, suite 1620
20                            Chicago, Illinois 60601
                              (312) 380-6559
21

22

23                      MICHAEL P. SNYDER, FCRR
                          Official Court Reporter
24                    United States District Court
                 219 South Dearborn Street, Room 2244A
25                        Chicago, Illinois 60604
                            (312) 435-5563
```

MICHAEL P. SNYDER, Official Court reporter

1    (Proceedings in open court.  Jury out.)

2        MR. JONAS:  A few matters, just housekeeping.

3        THE COURT:  Yes.

4        MR. JONAS:  One, one of the case agents yesterday

09:41:00   5    inadvertently took the wrong set of elevators, wasn't on an

6    elevator with a juror, but he almost bumped into a juror and

7    just said "Excuse me" and kept going.  Just reporting it to the

8    Court.

9        MR. LEONARD:  No problem.  I had the same thing happen

09:41:12  10    to me yesterday.

11        THE COURT:  Okay.  So I'll tell them again if I

12    remember.  You might have to remind me.

13        MR. LEONARD:  You made the switch, and I didn't know

14    the switch was on yet, and I used the wrong one the first time.

09:41:22  15        THE COURT:  You didn't talk to the juror, right?

16        MR. LEONARD:  No, no, no.  The door opened with the

17    marshal and two jurors, and they said, "You're in the wrong

18    elevator."  I never got on, just ran.

19        THE COURT:  All right.  Well, try to remember.  Okay.

09:41:35  20    Just makes things easier.

21        MR. JONAS:  Our intern Sarah Gallo is going to

22    question another custodian of records, Southwest Airlines.  We

23    expect that will be this morning, if that's okay with Your

24    Honor?

09:41:47  25        THE COURT:  Sure.  If you want to approach somebody,

MICHAEL P. SNYDER, Official Court reporter

3

1   don't keep asking permission to approach.  It drives me crazy.

2   You can say "May I approach the witness" or I'll tell you what,

3   you don't even have to ask.

4          MR. JONAS:  Thank you, Judge.

09:42:05    5          If you remember yesterday, we brought Miss McKoy back

6   in.  The defense spoke to her, so there's absolutely no basis

7   for Mr. Leonard to say to her the government told you, you

8   can't speak to us.

9          THE COURT:  Well, right.

09:42:20   10          MR. LEONARD:  We don't have any problem with that.

11          MR. JONAS:  Okay.  I just wanted to make sure.

12          The defense said yesterday, and I don't know if this

13  was to Your Honor, but they said to me that Ms. McKoy asked the

14  government for a job, and that's absolutely not true.  The 302

09:42:36   15  says --

16          MR. LEONARD:  We are fine.  For some reason one of us

17  had thought we saw it in a 302.  We obviously made a mistake.

18  It's not coming up.

19          You didn't buy her a second Chipotle burrito, did you?

09:42:48   20          MR. JONAS:  No.

21          MR. LEONARD:  Because the first one was disclosed.

22          MR. JONAS:  Full disclosure.  The government, when she

23  got in Sunday night, she didn't have any money, she was

24  starving.  The government took her to Chipotle and paid $15 for

09:43:00   25  the meal.  I disclosed that to the defendant.

          MICHAEL P. SNYDER, Official Court reporter

1    MR. LEONARD:  I just wanted to know if there's

2  guacamole and salsa.

3         Judge, we are not going to get into that.

4         MR. JONAS:  Judge, we expect to call a woman named

09:43:13   5  Heather Hunt probably this morning who is from the Department

6  of Justice who is in charge of the unit that receives

7  notifications from people who represent foreign governments in

8  the United States, and she's going to say we never received

9  notification under the defendant's name or Ben Israel's name.

09:43:31   10         In order to play it safe that there's no question

11  whether or not she's getting into the law, we would request

12  that Your Honor just give a very short instruction to the jury,

13  just take judicial notice of the statute.  I have a copy right

14  here, and I presented a copy to defense counsel.

09:44:00   15         THE COURT:  Any objection?

16         MR. LEONARD:  I guess our position is, just like

17  before, you should instruct them at the end of the case, not

18  highlight certain instructions with certain witnesses.

19         MR. JONAS:  Judge, as with the earlier witness from

09:44:12   20  OFAC, we just want, because their job involves matters that

21  touch upon statutes essentially --

22         THE COURT:  All right.  I'm going to do that.  I mean,

23  if you'd ask, we could have decided to do all the instructions

24  before at the beginning of the case.  I'm told that the ABA

09:44:29   25  jury project actually does suggest that.

MICHAEL P. SNYDER, Official Court reporter

1    MR. JONAS:  Your Honor, I think Miss --

2    THE COURT:  This is just to avoid, one, avoid

3  confusion.  Of course, you could simply stipulate, and then we

4  wouldn't need the witness.

09:44:45    5    MR. JONAS:  Your Honor, the defense counsel said

6  before trial they will not stipulate to anything.

7    MR. LEONARD:  We didn't say that, but if they don't

8  want to withdraw that witness and you just read that

9  instruction, we are okay with that.

09:44:55   10    MR. JONAS:  Judge, that's the problem.  The

11  instruction doesn't say that the defendant never filed

12  notification with the attorney general.

13    THE COURT:  Right.  I mean, I guess they would have to

14  have that.  This isn't worth spending that much time on, I

09:45:08   15  don't think.

16    MR. LEONARD:  Judge, if they want to withdraw their

17  witness, we'll stip to the fact that he didn't do that.

18    MR. JONAS:  It's just a little late right now to start

19  drafting up a stipulation.  I think we prefer at this point, we

09:45:20   20  flew this woman out here from Washington, defense counsel

21  specifically said in the pretrial conference, Mr. Tunick said

22  that Mr. Leonard would not agree to any stipulations.  It is

23  our prerogative to put her on, so we'd like to put her on.

24    MR. LEONARD:  If they want to put her on, that's

09:45:35   25  great, but we would now, understanding where we are in the

MICHAEL P. SNYDER, Official Court reporter

1    case, we are okay with stipulating.

2            MR. JONAS:  We're going to put her on, Judge.

3            MS. ALEXAKIS:  One of the government witnesses this

4    morning, Your Honor, is going to be Robert Harris.  He's an

09:45:48    5    officer from US Customs and Border Protection.  And the purpose

6    of his testimony is to introduce into evidence a number of

7    travel records for individuals, for defendant and other

8    individuals whose names have come up in this trial.

9            I created a summary exhibit to help, because of the

09:46:05    10    voluminous nature of the travel records.  I tendered a copy to

11    defense counsel about a week ago to see if there were any

12    objections to the summary exhibit.  I didn't hear anything and

13    just wanted to raise it now before Officer Harris testifies to

14    make sure there won't be any issues with my presenting the

09:46:22    15    summary exhibit to the jury as part of the direct examination.

16            MR. TUNICK:  No problem, Judge.

17            THE COURT:  Okay.

18            MS. ALEXAKIS:  Thank you.

19            MR. JONAS:  Your Honor, in hindsight, maybe we will

09:46:33    20    stipulate, but I would just need a few moments to draft a

21    stipulation, maybe during the break this morning.

22            THE COURT:  Pardon me?

23            MR. JONAS:  Regarding, going back to the witness from

24    the Department of Justice.  If the defense is willing to

09:46:41    25    stipulate and to move things along, we will stipulate, but I

MICHAEL P. SNYDER, Official Court reporter

1   would need a few moments during the break to draft the
2   stipulation.

3            THE COURT:  You have two minutes.

4            MR. TUNICK:  Judge, I have one issue.  With respect to
5   Johnny Ford, during one of the interviews -- Johnny Ford is the
6   mayor of Tuskegee, Alabama.  He said that he agreed to travel
7   to Zimbabwe, but he didn't really mean it because he was caught
8   in a 1989 coup in Liberia where many people were killed
9   including people he knew, he stated one coup was enough for
10  him.  I'm very careful based on that experience.

11           That was his reason for telling why he didn't really
12  mean that he was going to Zimbabwe.  That is a very prejudicial
13  statement.

14           MR. JONAS:  I'm not going there.

15           MR. TUNICK:  Okay.  And he had also stated that he had
16  been aware of the Zimbabwean government and there was bloodshed
17  in Zimbabwe, obviously.

18           MR. JONAS:  We are not going there.

19           MR. TUNICK:  Okay, just making sure.

20           MR. LEONARD:  The juror has returned?

21           THE COURT:  The juror has returned.

22           So you're finished with your direct?

23           MR. JONAS:  Yes.

24           THE COURT:  And your cross?

25           MR. LEONARD:  Ready to go.

             MICHAEL P. SNYDER, Official Court reporter

McKoy - cross by Leonard

8

| | |
|---|---|
| 1 | THE COURT:  And we'll see where you go with that. |
| 2 | Obviously my rulings are subject to any issue coming up on |
| 3 | cross that could change it. |
| 4 | MR. TUNICK:  And there's, before Mr. Boykin testifies, |
09:48:08 | 5 | I just want to bring something up. |
| 6 | THE COURT:  Are all these people testifying today? |
| 7 | MR. TUNICK:  I guess, yes. |
| 8 | THE COURT:  Okay. |
| 9 | MR. TUNICK:  They are short witnesses most of them. |
09:48:16 | 10 | But I just want to bring something up to the Court. |
| 11 | THE COURT:  Okay.  Why don't we do it later? |
| 12 | All right.  Why don't we bring the jury in and get |
| 13 | started. |
| 14 | ALICE HOLMES McKOY, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN |
09:49:41 | 15 | (Jury in.) |
| 16 | THE COURT:  Please be seated.  Good morning. |
| 17 | All right.  Let's return to where we were. |
| 18 | Do you understand that you are still under oath in |
| 19 | this case? |
09:50:19 | 20 | THE WITNESS:  Yes, I do. |
| 21 | THE COURT:  Okay. |
| 22 | CROSS-EXAMINATION |
| 23 | BY MR. LEONARD: |
| 24 | Q.  Good morning, Miss McKoy. |
09:50:24 | 25 | A.  Good morning. |

MICHAEL P. SNYDER, Official Court reporter

|   |   |
|---|---|
| 1 | Q.  I want to talk to you first about that 2006 event in |
| 2 | Washington, D.C. in the United States Senate. |
| 3 | MR. RECKER:  Objection, Your Honor, beyond the scope. |
| 4 | THE COURT:  We'll have to take a sidebar. |
| 09:50:58  5 | (Discussion on the record at sidebar.) |
| 6 | THE COURT:  Okay.  I don't remember if she did. |
| 7 | MR. JONAS:  She didn't, and this was where those phone |
| 8 | calls came up. |
| 9 | THE COURT:  I know that's where those phone calls came |
| 09:51:32  10 | up, but I thought that she -- are you saying there was no |
| 11 | testimony about it? |
| 12 | MR. RECKER:  There was only two events. |
| 13 | THE COURT:  There was nothing whatsoever about 2006? |
| 14 | MR. RECKER:  No, Your Honor. |
| 09:51:44  15 | MR. LEONARD:  I honestly don't know the answer to |
| 16 | that, but, secondly, if we have to call her back and have her |
| 17 | come back from California to do this, it doesn't make a lot of |
| 18 | sense, Judge. |
| 19 | THE COURT:  What was the objection to putting in the |
| 09:51:54  20 | things that I excluded about 2006? |
| 21 | MR. LEONARD:  No.  Judge, the only reason I'm getting |
| 22 | into the 2006 issue is for two purposes.  One is that she |
| 23 | communicated to Mr. Turner; and, number two, to rebut what the |
| 24 | government said.  The government tried to establish through |
| 09:52:11  25 | other witnesses that it was expected that Biden was going to be |

MICHAEL P. SNYDER, Official Court reporter

McKoy - cross by Leonard

10

1    there, so it shouldn't be any surprise to the defendant.  She

2    will testify that nobody knew he was going to be there.

3           So we can call her back and have her come back, next

4    week or we can do it now.

09:52:26    5    MR. JONAS:  I guess I missed the point.  The only one

6    who testified about the event so far is Celestine Palmer, and

7    she said that Biden, my recollection is that Biden's office

8    planned the event, was involved in planning the event, which is

9    wrong, and this witness would say that.  But --

09:52:44    10    MR. LEONARD:  It's to rebut this idea that they --

11    they talked extensively, Judge, in sidebars that this idea is

12    that it shouldn't have been a surprise to him, it shouldn't

13    have been a big deal because he knew what was going to happen.

14    He didn't know, and she will establish that Biden's appearance

09:53:02    15    was not expected.

16           THE COURT:  I want to know what's in evidence, not

17    what was at the sidebars.

18           MR. LEONARD:  What's in evidence so far is on that

19    issue and the Biden issue --

09:53:10    20    THE COURT:  No, with her.

21           MR. LEONARD:  Oh.  I'm not sure about 2006.

22           MR. RECKER:  Nothing.  I didn't ask a question about

23    the 2006 reception.

24           THE COURT:  Because you were going to.

09:53:18    25    MR. JONAS:  You didn't let us go there.

MICHAEL P. SNYDER, Official Court reporter

McKoy - cross by Leonard

11

09:53:28

09:53:41

09:53:57

09:54:31

09:54:45

1    THE COURT:  And I think I excluded all that because
2    it's just --
3    MR. LEONARD:  But we are asking it for two reasons.
4    There is a relevant purpose because it goes to her
5    communicating it to Greg.
6    Secondarily, Judge, it's to rebut the idea that they
7    created that it's no big deal.  If we have to call her in our
8    case, we will.
9    THE COURT:  Okay.  I'm not going to do it now.  And
10   we'll have to look into that.  That means I'm going to have to
11   get a transcript to see what is in there as opposed to what was
12   at sidebar.
13   MR. LEONARD:  No problem.  We just wanted it clear
14   that she's not released from her subpoena and going to have to
15   come back next week.
16   THE COURT:  Well, I'll just say you can step down.
17   That's all I'll say.
18   MR. LEONARD:  Thank you, Judge.
19   (End of discussion at sidebar.)
20   BY MR. LEONARD:
21   Q.  Ma'am, I want to talk to you about those 2009 events that
22   you spoke about yesterday.
23   First of all, you indicated yesterday that in
24   connection with one of them, you received $5,000, correct?
25   A.  Correct.

MICHAEL P. SNYDER, Official Court reporter

McKoy - cross by Leonard

12

| | |
|---|---|
| 1 | Q.  And that was from Prince Ben Israel, right? |
| 2 | A.  Correct. |
| 3 | Q.  And you don't know where Prince Ben Israel actually got |
| 4 | those moneys, do you, ma'am? |
| 09:54:56  5 | A.  No, I do not. |
| 6 | Q.  Now, let's talk about the first of those two events that |
| 7 | you were involved in. |
| 8 | One was the USA Africa policy event, and that was held |
| 9 | at the Washington, D.C. convention center in December of 2009, |
| 09:55:13  10 | right? |
| 11 | A.  Yes. |
| 12 | Q.  And moneys were raised to pay for that event, correct? |
| 13 | There were sponsors, funds were raised to put it on, correct? |
| 14 | A.  Not for the panels. |
| 09:55:27  15 | Q.  I'm just talking about the event in general. |
| 16 | THE COURT:  It would probably be better if you sit |
| 17 | back. |
| 18 | THE WITNESS:  Okay.  All right. |
| 19 | BY THE WITNESS: |
| 09:55:36  20 | A.  Could you ask the question again, please? |
| 21 | BY MR. LEONARD: |
| 22 | Q.  Sure.  My understanding, correct me if I'm wrong, was that |
| 23 | for that particular event, both corporations and nonprofits |
| 24 | contributed money to it, is that fair? |
| 09:55:47  25 | A.  For the, for the forum or for the reception? |

MICHAEL P. SNYDER, Official Court reporter

McKoy - cross by Leonard

13

1   Q.  Either.  Any part of -- there's two events.  There's the US

2   policy event, and then there's the Lions of Africa event,

3   right?

4   A.  Yes.

09:56:02   5   Q.  And right now we are just focusing on the USA Africa policy

6   events, okay?

7   A.  Yes.

8   Q.  And was money raised from corporations and from nonprofits

9   to help fund any part of that event?

09:56:13   10   A.  It funds the overall Congressional Black Caucus events that

11   take place during that week, but not specifically for the

12   panel.

13   Q.  Understood.  So moneys come in from corporations and

14   nonprofits, not specifically for this, but part of the overall

09:56:29   15   funding, fair?

16   A.  Yes.

17   Q.  Okay.  And that event, the panel on the Africa policies

18   issues, that wasn't all about Zimbabwe, was it, ma'am?

19   A.  There was a part of it that was about Zimbabwe.

09:56:48   20   Q.  Understood, ma'am, but that's not my question.  There were

21   various speakers on subjects --

22   A.  Yes.

23   Q.  -- and all the subjects were not about Zimbabwe, correct?

24   A.  The answer would be yes, they were not all about Zimbabwe.

09:57:01   25   Q.  Exactly, thank you.

MICHAEL P. SNYDER, Official Court reporter

McKoy - cross by Leonard

14

1      And the section that was on Zimbabwe was actually what
2    was called a point/counterpoint about Zimbabwe, right?
3    A.  Yes.
4    Q.  Meaning that parties give both sides' differing viewpoints
09:57:17    5    about issues and concerns relating to Zimbabwe, correct?
6    A.  Yes.
7    Q.  Now, the second event that you spoke about yesterday was
8    the Leadership Africa USA, a salute to the Lions of Africa,
9    right?
09:57:34   10    A.  Yes.
11    Q.  And that was also held in September 2009 in D.C., correct?
12    A.  Yes.
13    Q.  And obviously both of these events which we are speaking
14    about, they are public events, right?  They are not secret?
09:57:46   15    A.  Yes, they are public.
16    Q.  And that event, this Lions of Africa event was held as part
17    of the annual Congressional Black Caucus meetings, right?
18    A.  Yes.
19    Q.  And that second event that we are talking about included
09:58:00   20    people such as Andrew Young who used to be in President
21    Carter's administration, right?
22    A.  Yes.
23    Q.  And that event was also sponsored by corporations and
24    nonprofits, that's where moneys came directly or indirectly to
09:58:17   25    fund that, correct?

MICHAEL P. SNYDER, Official Court reporter

McKoy - cross by Leonard

15

1    A.  Yes.

2    Q.  Including, for instance, Toyota Corporation, right, ma'am?

3    A.  Yes.

4    Q.  Now, counsel asked you a couple times yesterday something

09:58:29    5    along the lines of did you tell congressional member Watson

6    that you were sending out these invites and sending out these

7    documents.  Do you remember those questions?

8    A.  Yes.

9    Q.  And you said, no, I didn't tell Congressman Watson I was

09:58:46    10   doing that.  Do you remember that?

11   A.  Yes.

12   Q.  There was nothing secret about what you were doing, was

13   there, ma'am?

14   A.  No.

09:58:53    15   Q.  You actually believed that, based upon the fact that you

16   had done this a whole number of times in the past, that you had

17   the authority to do it, right?

18   A.  Yes.

19   Q.  Nobody told you "Don't tell Watson what you're doing,"

09:59:05    20   right?

21   A.  No.

22   Q.  And certainly Greg Turner and Prince Ben Israel didn't say

23   "Don't let Watson or someone know what you're doing"?  That

24   didn't happen, did it, ma'am?

09:59:16    25   A.  No.


MICHAEL P. SNYDER, Official Court reporter

McKoy - redirect by Recker

16

1  Q.  Ma'am, the fact of the matter is, you have no basis for

2  saying that Mr. Turner engaged in any wrongdoing, do you,

3  ma'am?

4          MR. RECKER:  Objection, Your Honor.

09:59:37  5          THE COURT:  Sustained.

6          MR. LEONARD:  Nothing further, Judge.

7                  REDIRECT EXAMINATION

8  BY MR. RECKER:

9  Q.  Ms. McKoy, with respect to the afri-gala event in

09:59:58  10  Washington in 2009, you indicated that there were a number of

11  different sponsors for that event, is that right?

12  A.  Yes.

13  Q.  How many of those corporations or sponsors asked you to

14  invite Gideon Gono to the event?

10:00:14  15  A.  None.

16  Q.  Okay.  Did you express concern to the defendant that Gono,

17  about Gono's attendance at the afri-gala event because he was a

18  sanctioned person at some point?

19  A.  Yes.

10:00:33  20          MR. LEONARD:  Objection to relevance and beyond the

21  scope, Judge.

22          THE COURT:  You should wait until I rule on the

23  objection.

24          But I'm going to allow the answer to stand.

10:00:51  25  BY MR. RECKER:

          MICHAEL P. SNYDER, Official Court reporter

McKoy - recross by Leonard

17

| | |
|---|---|
| 1 | Q.  Miss McKoy, did you tell the defendant you had a concern |
| 2 | over Gono's attendance at the forum or at the panel? |
| 3 | THE COURT:  She already answered. |
| 4 | MR. RECKER:  Sorry.  Nothing further. |
| 10:01:04  5 | RECROSS-EXAMINATION |
| 6 | BY MR. LEONARD: |
| 7 | Q.  Ma'am, the fact of the matter is in connection with |
| 8 | both 2009 -- |
| 9 | MR. RECKER:  Objection, Your Honor. |
| 10:01:09  10 | MR. LEONARD:  Counsel, let me ask the question, |
| 11 | please, before you object. |
| 12 | THE COURT:  I can't rule on the objection without |
| 13 | hearing the question. |
| 14 | BY MR. LEONARD: |
| 10:01:20  15 | Q.  The fact of the matter, ma'am, is in connection with both |
| 16 | of those 2009 events, Mr. Turner never discussed with you the |
| 17 | issue of lifting the sanctions, did he? |
| 18 | A.  No, he did not talk about that. |
| 19 | MR. LEONARD:  Thank you. |
| 10:01:37  20 | THE COURT:  Anything further? |
| 21 | MR. RECKER:  Nothing further, Your Honor. |
| 22 | THE COURT:  All right.  You may step down. |
| 23 | (Witness excused.) |
| 24 | THE COURT:  Call your next witness. |
| 10:01:45  25 | MS. ALEXAKIS:  The government calls Robert Harris. |

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

18

| | |
|---|---|
| 1 | THE COURT:  Would you raise your right hand. |
| 2 | ROBERT HARRIS, PLAINTIFF'S WITNESS, SWORN |
| 3 | THE COURT:  Please be seated. |
| 4 | DIRECT EXAMINATION |
| 10:02:24  5 | BY MS. ALEXAKIS: |
| 6 | Q.  Could you please state your name for the record. |
| 7 | A.  Robert W. Harris. |
| 8 | Q.  Could you please spell that. |
| 9 | A.  R-o-b-e-r-t, middle initial W., last name is H-a-r-r-i-s. |
| 10:02:53  10 | Q.  What do you do for a living? |
| 11 | A.  I'm a supervisory Customs and Border Protection officer for |
| 12 | Customs and Border Protection. |
| 13 | Q.  Officer Harris, what is the US Customs and Border |
| 14 | Protection? |
| 10:03:06  15 | A.  It's a border inspection agency.  It's responsible for |
| 16 | inspecting cargo, conveniences and persons entering and exiting |
| 17 | the United States of America. |
| 18 | Q.  And sometimes do people refer to the Customs and Border |
| 19 | Protection as CBP for short? |
| 10:03:21  20 | A.  Yes. |
| 21 | THE COURT:  Could you sit back a little bit or just |
| 22 | away from microphone.  The echo makes it harder to hear instead |
| 23 | of easier.  Thank you. |
| 24 | BY MS. ALEXAKIS: |
| 10:03:30  25 | Q.  How long have you been with the CBP? |

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

19

1   A.   25 years.

2   Q.   How long have you been a supervisor with CBP?

3   A.   13 years.

4   Q.   What are your responsibilities as a CBP supervisor?

10:03:40   5   A.   My responsibilities are supervise our tactical and

6   analytical unit.

7   Q.   What does that mean?

8   A.   It's a targeting unit that is responsible for targeting

9   cargo conveyances and persons entering and exiting the United

10:03:55   10   States.

11   Q.   What did you do before you joined the CBP?

12   A.   I was with the United States Coast Guard.

13   Q.   For how long?

14   A.   Ten years.

10:04:01   15   Q.   Does CBP maintain information reflecting an individual's

16   travel history?

17   A.   Yes.

18   Q.   And in particular, does CBP maintain information reflecting

19   an individual's international travel history?

10:04:14   20   A.   Yes.

21   Q.   Is that information recorded in various documents or

22   databases maintained by CBP?

23   A.   Yes.

24   Q.   Are you familiar with the type of CBP document referred to

10:04:25   25   as a border crossing document?

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

20

1  A.  Yes.

2  Q.  How are you familiar with border crossing documents?

3  A.  Based on my experience as a CBP officer and supervisor.

4  Q.  What is a border crossing document?

10:04:35  5  A.  Boarder crossing document is a record that shows whether a

6  cargo, conveyance or person entered or exited the United

7  States.

8  Q.  What kind of information does a border crossing document

9  typically contain?

10:04:47  10  A.  For a traveler, it typically contains a person's bio

11  information, name, passport number, date of birth and where

12  they entered and exited, as well as flight information.

13  Q.  Does the border crossing document also reflect the date and

14  time of travel?

10:05:09  15  A.  Yes.

16  Q.  How does Customs and Border Protection obtain information

17  that's reflected in a border crossing document?

18  A.  It is actually uploaded by the airlines.

19  Q.  When do airlines provide that information to CBP?

10:05:27  20  A.  No later than 72 hours prior to departure or arrival.

21  Q.  Does CBP add any information to border crossing documents

22  in addition to what they get from the airline?

23  A.  The only information that we would add is when a traveler

24  enters the United States, we'll actually confirm their arrival.

10:05:45  25  Q.  When does CBP do that?

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

21

1   A.  Upon, when the passenger presents themselves to a CBP

2   officer for inspection.

3   Q.  Does CBP maintain the information contained in the border

4   crossing document as part of its regular course of business?

10:05:58   5   A.  Yes.

6   Q.  Does CBP also maintain the information contained in the

7   border crossing document as required by law?

8   A.  Yes.

9   Q.  Where does CBP maintain the information that is contained

10:06:08   10   in border crossing documents?

11   A.  In the Treasury Enforcement Communication System, commonly

12   referred to as TECS.

13   Q.  What is TECS?

14   A.  TECS is the law enforcement database used by CBP.

10:06:16   15   Q.  Does CBP generate border crossing documents as part of its

16   regular course of business?

17   A.  Yes.

18   Q.  Before your testimony today, did CBP retrieve border

19   crossing documents for a number of individuals whose names are

10:06:29   20   associated with this trial?

21   A.  Yes.

22   Q.  Which individuals?

23   A.  Individuals by the name of Prince Asiel Ben Israel, Richard

24   Boykin, Danny Davis, Kenneth Dunkin, Donne Trotter, Oscar Webb

10:06:47   25   and Gregory Turner.

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

22

1   Q.  For what time period did CBP retrieve these border crossing

2   documents?

3   A.  Between 2008 and 2010.

4   Q.  Officer Harris, I have handed you a binder that includes a

10:07:08    5   number of, well, all of the travel records that the government

6   has marked for identification purposes for this trial.  Given

7   the volume of the records, it makes it a little bit easier for

8   you to have them all in one place.  So what you should have in

9   front of you are seven government exhibits.  If you could take

10:07:24   10   a look at them.  It's Government's Exhibit BI Travel,

11   Government's Exhibit DT Travel, Government's Exhibit KD Travel,

12   Government's Exhibit DD Travel, Government Exhibit RB Travel,

13   Government's Exhibit OW Travel, Government's Exhibit GT Travel.

14   Do you have those in front of you?

10:07:46   15   A.  Yes.

16   Q.  And we'll get to the last exhibit in a little bit, but

17   while you have the binder in front of you, do you also see an

18   exhibit in there marked as Government's Exhibit CBP Records?

19   A.  Yes.

10:07:58   20   Q.  Turning your attention to Government Exhibit BI Travel, can

21   you generally describe that document?

22   A.  Yes, this is a border crossing record.

23   Q.  For which individual?

24   A.  This border crossing record is for Mr. Ben Israel.

10:08:13   25   Q.  How do you know that?

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

23

1  A.  Based on the passport number and the date of birth of Mr.

2  Ben Israel.

3  Q.  How do you know Mr. Ben Israel's passport number?  How do

4  you know that is Mr. Ben Israel's passport number?

10:08:26    5  A.  I confirmed the passport number with the US Department of

6  State.

7        MS. ALEXAKIS:  Your Honor, at this time the government

8  moves Government's Exhibit BI Travel into evidence.

9        MR. TUNICK:  No objection.

10:08:33   10        THE COURT:  It's admitted.

11     (Government's Exhibit BI Travel received in evidence.)

12  BY MS. ALEXAKIS:

13  Q.  Could you turn your attention to Government Exhibit DT

14  Travel.

10:08:41   15        Same question, Officer Harris.  What do those

16  documents reflect?  What does that exhibit reflect?

17  A.  This is a border crossing record for Mr. Donne Trotter.

18  Q.  How do you know that those are border crossing documents

19  for Donne Trotter.

10:08:53   20  A.  It has the subject's name and his date of birth.

21        MS. ALEXAKIS:  Your Honor, at this time the government

22  moves Government Exhibit DT Travel into evidence.

23        MR. TUNICK:  No objection.

24        THE COURT:  Admitted.

10:09:01   25     (Government's Exhibit DT Travel received in evidence.)

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

24

1  BY MS. ALEXAKIS:

2  Q.  Officer Harris, if you could turn to the next exhibit and

3  if you could tell us generally what that exhibit appears to be.

4  A.  Yes, this is a border crossing record for Mr. Kenneth

10:09:14  5  Dunkin.

6  Q.  How do you know that?

7  A.  It's based on the passport number, date of birth and the

8  last name of the subject.

9  Q.  Is that also information that you confirmed with the state

10:09:21  10  department?

11  A.  Yes, I did.

12        MS. ALEXAKIS:  Your Honor, at this time the government

13  moves Government's Exhibit TD Travel into evidence.

14        MR. TUNICK:  No objection.

10:09:26  15        THE COURT:  Admitted.

16      (Government's Exhibit TD Travel received in evidence.)

17  BY MS. ALEXAKIS:

18  Q.  If you could turn to the next exhibit, Officer Harris,

19  Government Exhibit DD Travel.  And again, the same set of

10:09:36  20  questions.  If you could describe the exhibits generally.

21  A.  Yes.  This is a border crossing record for Mr. Danny Davis.

22  Q.  And how do you know that?

23  A.  It's based upon the last name, date of birth and the

24  passport number.

10:09:48  25  Q.  Is that information you confirmed with the state

MICHAEL P. SNYDER, Official Court reporter

1   department?

2   A.  Yes.

3           MS. ALEXAKIS:  Your Honor, at this time the government

4   moves Government Exhibit DD Travel into evidence.

10:09:54   5           MR. TUNICK:  No objection, Your Honor.

6           THE COURT:  Admitted.

7       (Government's Exhibit DD Travel received in evidence.)

8   BY MS. ALEXAKIS:

9   Q.  The next exhibit is Government Exhibit RB Travel.  Do you

10:10:02   10  have that, Officer Harris?

11  A.  Yes.

12  Q.  Can you describe that exhibit generally?

13  A.  It's a border crossing record for Mr. Richard Boykin.

14  Q.  How do you know that?

10:10:10   15  A.  Based on the passport number, last name and date of birth.

16  Q.  And did you confirm that information with the state

17  department?

18  A.  Yes.

19          MS. ALEXAKIS:  Your Honor, at this time the government

10:10:16   20  moves Government Exhibit RB travel into evidence.

21          MR. TUNICK:  No objection, Your Honor.

22          THE COURT:  Admitted.

23      (Government Exhibit RB Travel received in evidence.)

24  BY MS. ALEXAKIS,

10:10:23   25  Q.  If you could turn to the next exhibit, Officer Harris,

        MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

26

1  Government Exhibit OW Travel.  Do you have that in front of

2  you?

3  A.  Yes.

4  Q.  Can you describe that?

10:10:30  5  A.  This is a border crossing record for Mr. Oscar Webb.

6  Q.  How do you know that?

7  A.  Based on the passport number, last name and date of birth.

8  Q.  And is that information that you confirmed with the state

9  department?

10:10:40  10  A.  Yes.

11  MS. ALEXAKIS:  Your Honor, at this time the government

12  moves into evidence Government Exhibit OW Travel.

13  MR. TUNICK:  No objection, Your Honor.

14  THE COURT:  Admitted.

10:10:47  15  (Government Exhibit OW Travel received in evidence.)

16  BY MS. ALEXAKIS:

17  Q.  If you could turn to the next government exhibit, Officer

18  Harris, Government Exhibit GT Travel.  What does that exhibit

19  look like to you?

10:10:56  20  A.  This is a border crossing record for Mr. Turner.  It's

21  based on the passport number, last name and date of birth.

22  Q.  And did you confirm that, the date of birth and passport

23  number with the state department?

24  A.  Yes.

10:11:09  25  MS. ALEXAKIS:  Your Honor, at this time the government

MICHAEL P. SNYDER, Official Court reporter

1    would move Government Exhibit GT Travel into evidence.

2              MR. TUNICK:  No objection.

3              THE COURT:  It's admitted.

4         (Government Exhibit GT Travel received in evidence.)

10:11:17  5    BY MS. ALEXAKIS:

6    Q.  Officer Harris, who is eligible for a US passport?

7    A.  US citizens.

8    Q.  Can anyone other than a US citizen be issued a US passport?

9    A.  No.

10:11:25  10   Q.  How do you know that?

11   A.  Based on my 25 years as a CBP officer.

12   Q.  Does Mr. Turner have a US passport?

13   A.  Yes.

14   Q.  If you could turn to -- we have been talking about border

10:11:36  15   crossing documents, Officer Harris.  Does the CBP also maintain

16   records known as PNR documents?

17   A.  Yes.

18   Q.  What does PNR stand for?

19   A.  Passenger name record.

10:11:46  20   Q.  What are PNR documents?

21   A.  PNR documents are documents that contain flight

22   information, it has the passenger's flight itinerary and their

23   reservation for intended flight.

24   Q.  Where does the information contained in PNR documents come

10:12:01  25   from?

                   MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

28

1   A.  The airlines actually generate PNR documents and upload

2   them to a CBP database.

3   Q.  Why do the airlines provide that information to CBP?

4   A.  It's required by law.

10:12:09   5   Q.  What kind of information does a PNR document typically

6   contain?

7   A.  It would typically contain the passenger's last name, date

8   of travel, flight number and their, the port of arrival, port

9   of departure.

10:12:23   10   Q.  When is the information that is contained in a PNR document

11   reported by the airlines?

12   A.  No later than 72 hours prior to a departure or arrival.

13   Q.  And does CBP maintain the information that is contained in

14   the PNR documents as part of its regular course of business?

10:12:37   15   A.  Yes.

16   Q.  Does CBP also maintain the information contained in PNR

17   documents as required by law?

18   A.  Yes.

19   Q.  Where does CBP maintain the information contained in PNR

10:12:48   20   documents?

21   A.  In the CBP law enforcement data system.

22   Q.  Does CBP generate PNR documents as part of its regular

23   course of business?

24   A.  Yes.

10:12:55   25   Q.  Before your testimony today, did CBP generate PNR documents

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

29

1   for a number of individuals whose names have come up or are

2   associated with this trial?

3   A.  Yes.

4   Q.  So did you generate those records or did CBP generate those

5   records for the same seven individuals we mentioned earlier?

6   A.  Yes.

7   Q.  For what time period did CBP generate PNR records for those

8   individuals?

9   A.  Between 2008 and 2010.

10  Q.  If you could turn to the last exhibit in the binder,

11  Government Exhibit CBP Records.  Do you have that in front of

12  you?

13  A.  Yes.

14  Q.  And what, can you generally describe that exhibit.

15  A.  Yes.  This is a CBP PNR record for Mr. Ben Israel,

16  indicates a Delta Flight 597.

17  Q.  I'm sorry, officer.  If you could just generally describe

18  the entire -- it should be about a hundred pages or so there.

19  A.  Oh, yes, I'm sorry.  All of these exhibits actually

20  indicate passenger name records for the subjects previously

21  identified.

22  Q.  Those seven individuals?

23  A.  Yes.

24  Q.  That we identified earlier?

25          MS. ALEXAKIS:  Your Honor, at this time the government

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

30

1    moves into evidence Government Exhibit CBP records.

2             MR. TUNICK:  No objection.

3             THE COURT:  Admitted.

4        (Government Exhibit CBP Records received in evidence.)

10:14:04   5    BY MS. ALEXAKIS:

6    Q.  Officer Harris, if you could turn back to the first exhibit

7    that should be in that binder, Government Exhibit BI Travel.

8    I'd like to talk to you about travel records related to Mr. Ben

9    Israel.  And in particular if you could turn to the page in

10:14:18   10   that exhibit that ends in the number 1.

11            MS. ALEXAKIS:  Your Honor, since it's been admitted

12   into evidence, can I publish the records?

13            THE COURT:  Yes, you may.

14   BY MS. ALEXAKIS:

10:14:32   15   Q.  Officer Harris, I'm showing you BI Travel No. 1.  I'm going

16   to blow up the relevant portion of the page.

17            Can you generally describe what this record shows?

18   A.  Yes.  This is a border crossing record for passenger Ben

19   Israel.  It shows a departure flight departing from Atlanta

10:15:01   20   Hartsfield International Airport in Atlanta, arriving from

21   Dakar, Senegal, via Delta Flight 34 departing on November 5th,

22   2008.

23   Q.  And we won't do this for all of the records that I'm going

24   to have you discuss, but just at the outset, given that, to

10:15:20   25   make everyone more familiar with the documents, if you could

             MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

31

1    just walk us through this one a little more slowly.

2            You testified that this shows that Mr. Ben Israel was

3    traveling.  How do you know that this was Mr. Ben Israel's

4    border crossing document?

10:15:33    5    A.  It's based on his passport number and his date of birth.

6    Q.  And is the fact that -- is there also an indication that

7    it's Mr. Ben Israel's border crossing document?

8    A.  Yes, it's an abbreviation of his last name.

9    Q.  You testified that this record shows that he left from

10:15:48   10    Atlanta and landed in Dakar, is that right?

11    A.  Yes.

12    Q.  Where do you see Atlanta?  How do you know that he left

13    Atlanta?

14    A.  For the line that indicates departure location, the airport

10:15:58   15    code is ATL, which stands for Atlanta Hartsfield.

16    Q.  And Dakar, where do you see that?

17    A.  For the line that indicates arrival location, that shows

18    DKR, which is the airport code for Dakar.

19    Q.  Where did you say that Dakar is located?

10:16:13   20    A.  In Senegal.

21    Q.  And that's in Africa?

22    A.  Yes.

23    Q.  You said that it was Delta Airline Flight 34.  Where do you

24    see that on the document?

10:16:21   25    A.  The carrier code and the two-character code of DL indicates

MICHAEL P. SNYDER, Official Court reporter

1    Delta airlines.  And the next line below that where it says

2    flight or vessel number, the number 34 indicates the flight

3    number.

4    Q.  And finally you testified that this was travel that Mr. Ben

10:16:34    5    Israel took on November 5th, 2008?

6    A.  Correct.

7    Q.  Is that right here under date, is that where you got that

8    information?

9    A.  Yes.

10:16:44    10    Q.  If you could turn now to Government Exhibit CBP Record,

11    that last exhibit in your binder into the first page, the page

12    ending in the number 1.  If I could direct your attention to

13    the top of the page, the line starting with the number 2.

14            What does that line show?

10:17:03    15    A.  That shows a Delta Flight 34 from November 5th, departing

16    Atlanta Hartsfield International Airport and arriving in

17    Johannesburg, South Africa.

18    Q.  How do you know that he arrived in Johannesburg?

19    A.  JNB is the airport code for Johannesburg.

10:17:21    20    Q.  And when I say "he," I am referring to Mr. Ben Israel.

21            Do you understand the record to be a record of Mr. Ben

22    Israel's travel?

23    A.  Yes.

24    Q.  Why does the document that we just looked at, the border

10:17:32    25    crossing document show Mr. Ben Israel flying from Atlanta to

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

33

1    Dakar, but this PNR document shows him travelling from Atlanta

2    to Johannesburg?  Why is there a difference?

3    A.  The border crossing document indicates your port of

4    departure and your first international port of arrival.

10:17:48    5    Q.  Whereas the PNR shows what?

6    A.  It shows the final destination.

7    Q.  How do you know that difference between the border crossing

8    document and the PNR?

9    A.  It's based on the reservation system.

10:17:57    10    Q.  Once Mr. Ben Israel arrived in Johannesburg, could he have

11    traveled elsewhere?

12    A.  Yes.

13    Q.  Would Customs and Border Protection necessarily know that?

14    A.  No.

10:18:05    15    Q.  Why not?

16    A.  If the -- the passenger could have actually had a separate

17    flight reservation independent of this one, and that would not

18    have been reported to CBP.

19    Q.  Because it wouldn't have been entry or exit into or out of

10:18:18    20    the United States?

21    A.  Yes.

22    Q.  If you could turn back to Government Exhibit BI Travel and

23    turn to the page ending in the number 2.

24         Can you summarize for us what that document shows.

10:18:29    25    A.  Yes.  This is a border crossing record for Mr. Ben Israel.

MICHAEL P. SNYDER, Official Court reporter

1    It shows a travel date of November 6, 2008.  It's an inbound

2    flight into Atlanta Hartsfield International Airport with a

3    departure location of Dakar via Delta Airlines Flight 35.

4    Q.  You testified this was November 6.  Is this actually

10:18:52    5    November 16?

6    A.  Oh, I stand corrected, yes.  November 16.

7    Q.  And is it fair to assume that this then is, whereas what we

8    were discussing before was an outbound trip to Africa, this is

9    an inbound return to the United States?

10:19:03    10   A.  Yes.

11   Q.  Let talk about a second trip that Mr. Ben Israel took in

12   early December 2008.  If you could turn to Government Exhibit

13   BI Travel, the page ending in the number 5.  You can also

14   follow along, I believe you have a screen next to you, Officer

10:19:20    15   Harris, if that makes things easier for you.

16         Can you summarize for us what this document shows?

17   A.  Yes, it's a border crossing document for Mr. Ben Israel.

18   It shows, indicates an outbound flight departing from JFK

19   Airport in New York, arriving Tel Aviv, Israel, Delta Flight

10:19:38    20   86, with a departure date of December 5th, 2008.

21   Q.  And then if I turn to the next page, the next page in

22   Government Exhibit BI Travel, the page ending in the number 6.

23         What does that show?

24   A.  It shows an international flight departing from Accra,

10:20:01    25   Ghana, arriving into JFK Airport in New York, Delta Flight 167,

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

35

1    arriving on December 18th, 2008.

2    Q.  And you mentioned that Accra is in Ghana.  Is that also in

3    Africa?

4    A.  Yes.

10:20:14    5    Q.  So the previous record showed us outbound travel that Mr.

6    Ben Israel was making outside of the United States, and this

7    shows his return from Africa?

8    A.  Yes.

9    Q.  If you could turn to, direct your attention to Government

10:20:31    10    Exhibit BI Travel, the page ending in the number 7.

11            Can you summarize this border crossing document for

12    us.

13    A.  It is a border crossing document indicating an outbound

14    international flight departing from Dulles International

10:20:46    15    Airport, arriving in London Heathrow via British Airways Flight

16    264, departing on January 9th, 2009.

17    Q.  And Dulles International Airport is in Washington, D.C.?

18    A.  Yes.

19    Q.  And London Heathrow is in England?

10:21:02    20    A.  Yes.

21    Q.  I'm showing you Government Exhibit CBP records ending in

22    the number 22.

23            Directing your attention to the top of page, do you

24    see the name Ben Israel?

10:21:11    25    A.  Yes.

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

36

1    Q.  What does this show?

2    A.  This is a passenger name record indicating international

3    travel with a departure of January 9th via British Airways

4    Flight 264, departing Washington Dulles International, arriving

10:21:29   5    into London Heathrow with a return on January 10th via British

6    Airways Flight 55, departing London Heathrow, arriving into

7    Johannesburg.

8    Q.  Is that a return or is that just the next --

9    A.  That's the next leg of his international flight for this

10:21:45   10   particular reservation.

11   Q.  So this document shows that Mr. Ben Israel traveled on

12   January 9th and 10th from Dulles to Johannesburg?

13   A.  Yes.

14   Q.  Was he traveling with anyone?

10:21:53   15   A.  According to this passenger name record, Mr. Danny Davis on

16   line 2.

17   Q.  I'm sorry?

18   A.  I'm sorry.  According to this passenger name record, Mr.

19   Danny Davis is indicated on line item No. 2.

10:22:07   20   Q.  If I could turn your attention to Government Exhibit BI

21   Travel ending in the number 8.

22        If you could summarize this border crossing document.

23   A.  Yes.  It's a border crossing document it appears to Ben

24   Israel.  It's an inbound international flight departing from

10:22:26   25   Dakar, Senegal, arriving into Atlanta Hartsfield International

MICHAEL P. SNYDER, Official Court reporter

1    via Delta Flight 35 with an arrival date of February 15th,

2    2009.

3    Q.  And this next document?

4    A.  This is another border crossing document.

10:22:45    5    Q.  I'm sorry.  I'm referring to Government Exhibit BI Travel

6    ending in the number 11.

7    A.  This is another border crossing document for Mr. Ben

8    Israel.  It shows an international departure from Atlanta

9    Hartsfield International, arriving into Johannesburg via Delta

10:23:02    10    Airlines Flight 200 with a departure date of July 15, 2009.

11    Q.  And this next document, Government Exhibit BI Travel ending

12    in the number 12.

13    A.  This is another border crossing document for Mr. Ben Israel

14    indicating an international arrival, departing from

10:23:24    15    Johannesburg, South Africa, arriving into Atlanta Hartsfield

16    International Airport via Delta Flight 201 with an arrival date

17    of July 27, 2009.

18    Q.  So these two documents together show that Mr. Ben Israel in

19    the middle of July, mid to late July 2009 traveled from the

10:23:43    20    United States to and from Africa?

21    A.  Yes.

22    Q.  Let's talk about another trip that Mr. Ben Israel took in

23    August and September of 2009.  If you could turn your attention

24    to Government Exhibit BI Travel, page ending in the number 13.

10:23:57    25         What does this document show?

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

38

1   A.  It's a border crossing record for Mr. Ben Israel indicating

2   a departure flight, international departing from Atlanta

3   Hartsfield International Airport and arriving into Johannesburg

4   via Delta flight 200, departing the US on August 7, 2009.

10:24:16   5   Q.  And the next document, Government Exhibit BI Travel ending

6   in the number 14.

7           Does that show Mr. Ben Israel's return from that

8   outbound trip that we just discussed?

9   A.  Yes.  It's an inbound flight from Dakar, Senegal, arriving

10:24:32   10   JFK International in New York via South African Airways Flight

11   203 arriving on September 7th, 2009.

12   Q.  Let talk about one last trip that Mr. Ben Israel took to

13   Africa in October and November of 2009.  I direct your

14   attention to Government Exhibit BI Travel ending in page No.

10:24:53   15   15.

16           What does this show?

17   A.  It's a border crossing document for a departing flight

18   departing Atlanta Hartsfield Airport, arriving into

19   Johannesburg via delta Flight 200 with a departure date of

10:25:07   20   October 6, 2009.

21   Q.  And if we turn to Government Exhibit BI Travel ending in

22   page No. 16, does that show Mr. Ben Israel's return to the

23   United States?

24   A.  Yes.

10:25:18   25   Q.  Can you give us the details of that return.

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

39

1  A.  It's an inbound International flight departing from Dakar,

2  Senegal, arriving into Washington Dulles via South African

3  Airways Flight 207 arriving on November 9th, 2009.

4  Q.  Officer Harris, as part of, in the course of preparing for

10:25:36   5  your testimony today, did you also assist in the preparation of

6  an exhibit that summarizes the travel records that you just

7  reviewed?

8  A.  Yes.

9  Q.  I'm going to show you the beginnings of that summary

10:25:47  10  exhibit, in particular populated the line here for Mr. Ben

11  Israel.  Do these green boxes accurately reflect the dates that

12  Mr. Ben Israel traveled to or from Africa between November 2008

13  and December of 2009?

14  A.  Yes.

10:26:02  15  Q.  Do you agree that this is an accurate summary of the travel

16  record we just reviewed?

17  A.  Yes.

18  Q.  Setting aside Mr. Ben Israel, if you could turn to

19  Government Exhibit DT Travel and discuss travel taken by Mr.

10:26:16  20  Donne Trotter.  In particular, let's discuss a trip that Mr.

21  Trotter took in December of 2009.  I'll turn your attention to

22  Government Exhibit DT Travel, page ending in the number 11.

23      Can you summarize what this document shows.

24  A.  Yes.  This is a border crossing record for Mr. Donne

10:26:36  25  Trotter indicating an outbound international flight departing

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

40

1    Atlanta Hartsfield Airport, arriving into Dakar, Senegal, via

2    flight, Delta Flight 34 with a departure date of November 5th,

3    2008.

4    Q.  Now we are going to turn to those PNR documents, in

10:26:54    5    particular Government Exhibit CBP Records ending in page ending

6    in the number 53.

7            Is this a PNR document for Mr. Trotter?

8    A.  Yes.

9    Q.  Do you see that right here where you see Mr. Trotter's

10:27:07    10    name?

11    A.  Line item 1, yes.

12    Q.  Do you have an indication from this document as to what Mr.

13    Trotter's ultimate destination was in Africa other than Dakar?

14    A.  The ultimate destination is Johannesburg.

10:27:20    15    Q.  How do you know that?

16    A.  Actually, if you look at line item 2, it indicates a flight

17    from Atlanta to JNB, which is Johannesburg.

18    Q.  So the airport code here ATL means Atlanta and JNB means

19    Johannesburg?

10:27:35    20    A.  Yes.

21    Q.  If we can turn to the next document, Government Exhibit DT

22    Travel, the page ending in the number 12.

23            Does that show Mr. Trotter's return from his early

24    November 2008 trip to Africa?

10:27:49    25    A.  Yes.


            MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

41

1    Q.  And can you summarize what this document shows.

2    A.  It's a border crossing document for inbound international

3    flight with a departure location of Dakar, Senegal, arriving

4    into Atlanta via Delta Airlines Flight 35, arriving on November

10:28:05    5    11, 2008.

6    Q.  Let talk about a second trip that Mr. Trotter took in

7    December of 2008.  I'm going to direct your attention to

8    Government Exhibit DT Travel, page ending in the number 10.

9        Can you summarize this border crossing document?

10:28:18    10    A.  Yes, border crossing document for Mr. Donne Trotter

11    indicating a departing international flight departing from

12    Newark International Airport arriving into Tel Aviv via

13    Continental Airlines Flight 90, with a departure date of

14    December 1st, 2008.

10:28:37    15    Q.  And at the risk of being extra obvious, Newark Airport is

16    in the United States?

17    A.  Yes.

18    Q.  And if you turn to Government Exhibit DT Travel, page

19    ending in the number 9.

10:28:50    20        Does this show Mr. Trotter's return from his early

21    December 2008 trip oversees?

22    A.  Yes.

23    Q.  What does this show?

24    A.  It's an inbound international flight departing from

10:29:02    25    Amsterdam, Netherlands, arriving into Washington Dulles

MICHAEL P. SNYDER, Official Court reporter

1  International Airport via KLM Flight 651, with an arrival date

2  of December 12th, 2008.

3  Q.  We are going to go back to those PNR documents, in

4  particular Government Exhibit CBP Records, page ending in the

10:29:23  5  number 58.

6      Is this a PNR document for Mr. Trotter?

7  A.  Yes.

8  Q.  What does this show?

9  A.  It indicates --

10:29:28  10  Q.  And in particular, I'm sorry, I am directing your attention

11  to the lines at the top of the page that start with the numbers

12  1 and 2.

13  A.  Line item 1 actually shows a KLM Flight 592 on the 11th of

14  December, departing Johannesburg, South Africa, arriving into

10:29:45  15  Amsterdam.

16      Line No. 2 is KLM Flight 651 with a travel date of

17  December 12th, departing Amsterdam, Netherlands, arriving back

18  into the US into Washington Dulles International Airport.

19  Q.  So in sum, do these last three records that we reviewed

10:30:03  20  show that Mr. Trotter in early December 2008 flew from the

21  United States to Israel and then returned from Johannesburg to

22  Amsterdam and from Amsterdam back to the United States?

23  A.  Yes.

24  Q.  And then if we go back to our summary exhibit, Officer

10:30:20  25  Harris, I'm going to populate the next line in the exhibit with

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

43

1    travel for Mr. Trotter.

2         Do those two green boxes that I just added to the

3    summary exhibit accurately reflect the travel records we just

4    reviewed?

10:30:32   5    A.  Yes.

6    Q.  So they show that Mr. Trotter was traveling in Africa or to

7    or from Africa in early November 2008 and then early December

8    of 2008, is that right?

9    A.  Yes.

10:30:43   10   Q.  And do those travel dates overlap with the travel dates of

11   Mr. Ben Israel?

12   A.  Yes.

13   Q.  Let's turn to the next individual, Kenneth Dunkin.  In

14   particular, if you could turn to Government Exhibit KD Travel

10:30:57   15   and direct your attention to the page that ends with the number

16   17 and start discussing a trip that Mr. Dunkin took in early

17   December of 2008.

18   A.  This is a border crossing record for Mr. Kenneth Dunkin

19   indicating an outbound international flight departing from

10:31:13   20   Newark International Airport in New Jersey, arriving into Tel

21   Aviv, Israel via Continental Airlines Flight 90, with a

22   departure date of December 1st, 2008.

23   Q.  If we turn to Government Exhibit KD Travel, page ending in

24   the number 18, does this show Mr. Dunkin's return from his

10:31:33   25   overseas trip in early December 2008?

               MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

44

1    A.  Yes.

2    Q.  What exactly does this border crossing document show?

3    A.  It indicates an inbound international flight departing from

4    Madrid in Spain, arriving into Chicago O'Hare International via

10:31:48   5    Iberia Airlines Flight 6275, with an arrival date of December

6    12, 2008.

7    Q.  Now, I'm going to go back to the PNR document, Government

8    Exhibit CBP Records, ending in the page ending in number 43,

9    and direct your attention to the top of the page where we see

10:32:06   10   Mr. Dunkin's name and then line starting with the numbers 2 and

11   3.

12        What do those lines show, Officer Harris?

13   A.  It indicates that Iberia Flight 6050 with a travel date of

14   December 11th, departing Johannesburg, South Africa, arriving

10:32:24   15   into Madrid, Spain, line item 3 indicates Iberia Flight 6275 on

16   the 12th of December departing Madrid, arriving back into

17   Chicago O'Hare.

18   Q.  So if we look at these three records that we just put

19   together, do they show that Mr. Dunkin traveled from the United

10:32:43   20   States to Israel on December 1st, 2008, and returned to the

21   United States on December 12th, 2008 from Johannesburg via

22   Madrid to Chicago?

23   A.  Yes.

24   Q.  Let's talk about the second trip that Mr. Dunkin took in

10:32:57   25   late January 2009.  Looking at Government Exhibit KD Travel,

MICHAEL P. SNYDER, Official Court reporter

1    the page ending in the number 15.

2         What does this border crossing document show?

3    A.  This is a border crossing document for Mr. Kenneth Dunkin

4    indicating outbound international flight departing Washington

10:33:14    5    Dulles International, arriving into Johannesburg via South

6    African Airways Flight 208, with a departure date of January

7    24th, 2009.

8    Q.  And if we turn to Government Exhibit KD Travel, the page

9    ending in the number 16, what does this show?

10:33:31    10    A.  It's a border crossing document for Mr. Dunkin indicating

11    an inbound international trip departing from Dakar, Senegal,

12    arriving into Washington Dulles International via South African

13    Airways Flight 207, with an arrival date of January 31st, 2009.

14    Q.  So these two documents together would show us that Mr.

10:33:53    15    Dunkin left the United States for Johannesburg on January 24th,

16    2009, and then returned to the United States on January 31st

17    from Dakar?

18    A.  Yes.

19    Q.  Okay.  If I could direct your attention to Government

10:34:06    20    Exhibit CBP Records, page ending with the number 45.

21         Is this a PNR document related to Mr. Dunkin?

22    A.  Yes.

23    Q.  Do you see that up here on line 1 where it says his name?

24    A.  Yes.

10:34:16    25    Q.  Can you summarize what the itinerary reflected on lines 2

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

46

1    through 6 show?

2    A.  Yes.  It indicates South African Airways Flight 208, the

3    travel date of the 22nd of January, departing Dulles

4    International, arriving into Johannesburg.

10:34:32    5    Q.  And if I could stop you there, Officer Harris.

6            Was that trip actually taken?

7    A.  Yes.

8    Q.  I'm sorry.  Well, go ahead and look at the line that starts

9    with the number 3.  What does that show?

10:34:44    10    A.  Excuse me.  The number 3 indicates Flight 208 with the date

11    of the 24th of January, the itinerary of Washington Dulles

12    International to Johannesburg.

13    Q.  And just on the border crossing document that we just

14    looked at, is that the flight that Mr. Dunkin actually took

10:35:01    15    from the United States to Johannesburg?

16    A.  Yes, line item 3.

17    Q.  Now, if you look at line item 4, does that give us any

18    indication of where Mr. Dunkin left after he arrived in

19    Johannesburg?

10:35:13    20    A.  Yes.

21    Q.  Where did he go?

22    A.  South African Airways Flight 22 with a travel date of

23    January 26, departed Johannesburg to Harare Airport.

24    Q.  How do you know that he arrived in Harare, based on what

10:35:28    25    line 4 shows us?

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

47

1   A.  HRE is an airport code for Harare Airport in Zimbabwe.

2   Q.  Harare is in Zimbabwe?

3   A.  Yes.

4   Q.  If we look at lines 5 and 6, what does that show us?  What

10:35:40   5   does that tell us about Mr. Dunkin's travel?

6   A.  South African Airways Flight 23 on January 30th, departing

7   Harare arriving into Johannesburg, and line item 6 is South

8   African Air Flight 207 on the 31st of January, departing

9   Johannesburg, arriving back into Washington Dulles.

10:36:00   10   Q.  So based on these travel records, we know that Mr. Dunkin

11   traveled to Harare?

12   A.  Yes.

13   Q.  I'd like to go back to that summary exhibit, and if we can

14   populate the line reflecting Mr. Dunkin's travel.

10:36:12   15         Do those two green boxes accurately reflect, based on

16   the travel records we reviewed, the dates that Mr. Dunkin was

17   travelling to or from Africa in December of 2008 and January

18   2009?

19   A.  Yes.

10:36:23   20   Q.  And do those dates overlap, in particular the trip that he

21   took in early December of 2008, does that overlap with the

22   times that, the dates and times that Mr. Ben Israel and Mr.

23   Trotter were in Africa in December of -- Mr. Trotter and Mr.

24   Ben Israel were in Africa in early December of 2008?

10:36:41   25   A.  Yes.

        MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

48

1 Q.  Does Mr. Dunkin's travel in January, late January 2009

2 overlap with Mr. Ben Israel's time in Africa in late January of

3 2009?

4 A.  Yes.

10:36:53 5 Q.  Let's talk about another individual's travel history, in

6 particular Danny Davis.  If you could turn to Government

7 Exhibit DD Travel.  I'm going to pull up the page that ends in

8 the number 50.

9      What does this border crossing document show?

10:37:14 10 A.  It indicates international outbound flight departing

11 Washington Dulles International, arriving into London Heathrow

12 via British Airways Flight 264, with a departure date of

13 January 9th, 2009.

14 Q.  And if we go to Government Exhibit CBP Records, in

10:37:33 15 particular the page ending in the number 22, do we see where

16 Mr. Davis traveled after he arrived in London?

17 A.  Yes.

18 Q.  What does that show?

19 A.  Line item 4 of British Airways Flight 55 with a travel date

10:37:48 20 of January 10th indicating a departure from London Heathrow

21 with an arrival into Johannesburg, South Africa.

22 Q.  Was Mr. Davis travelling with anyone?

23 A.  Yes.

24 Q.  Who was he traveling with?

10:37:56 25 A.  According to line item 1, Mr. Ben Israel.

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

49

1    Q.  If you could direct your attention to Government Exhibit DD
2    Travel, the page number ending with 51.
3            Does this show Mr. Davis' return from Africa?
4    A.  Yes.
10:38:17   5    Q.  Can you give us the details of that return.
6    A.  Yes, it's an international flight departing from Dakar,
7    Senegal, arriving into Washington Dulles via South African
8    Airways Flight 207, with an arrival date of January 12th, 2009.
9    Q.  And if you go back to the PNR documents, specifically
10:38:37   10   Government Exhibit CBP Record, page number ending in 70, do we
11   see more details about Mr. Davis' return trip from Africa in
12   early 2009?
13   A.  Yes.
14   Q.  What does this show?
10:38:49   15   A.  It shows a South African Airways Flight 207 on January
16   11th, departing Johannesburg, arriving into Washington Dulles.
17   Q.  So we know that Mr. Davis actually left Johannesburg, that
18   was his original departure point from Africa, not Dakar?
19   A.  Yes.
10:39:05   20   Q.  If we go back to the summary exhibit and populate a line
21   for Mr. Davis, does that green box that I just added to the
22   summary exhibit accurately reflect the travel records we
23   reviewed for Congressman Davis?
24   A.  Yes.
10:39:18   25   Q.  And does the date of travel reflected in that green box

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

50

1    January 9 through January 12, 2009, overlap with Mr. Ben

2    Israel's time in Africa in January of 2009?

3    A.  Yes.

4    Q.  Let's talk about a trip taken by an individual by the name

10:39:35    5    of Richard Boykin in early January 2009.  I'm going to direct

6    your attention to Government Exhibit RB Travel, the page ending

7    in the number 52.

8            Can you summarize this border crossing document for

9    us.

10:39:49    10    A.  Yes.  This indicates international outbound flight

11    departing from Washington Dulles International, arriving into

12    London Heathrow Airport via British Airways Flight 264, with a

13    departure date of January 9th, 2009.

14    Q.  And is this the same flight that we just saw Mr. Davis

10:40:06    15    take?

16    A.  Yes.

17    Q.  Going to the PNR documents, Government Exhibit CBP, page

18    number ending in 22, do we see where Mr. Boykin traveled to

19    after he landed in London?

10:40:21    20    A.  Yes.  It indicates on January 10th he took British Airways

21    Flight 55 from London Heathrow to Johannesburg.

22    Q.  And are you pointing to the line that starts with the

23    number 0000/SSBA055?

24    A.  Yes.

10:40:42    25    Q.  Now let's look at documents that reflect Mr. Boykin's

MICHAEL P. SNYDER, Official Court reporter

1  return from his trip to Africa, in particular Government

2  Exhibit RB Travel, page number ending with the number, page

3  ending in the number 53.

4      What does this border crossing document show?

10:40:56  5  A.  This indicates an inbound international flight departing

6  from Dakar, Senegal, arriving into Washington Dulles

7  International via South African Airways Flight 207, with an

8  arrival date of January 12, 2009.

9  Q.  And let's do the same thing that we had done with

10:41:11  10  Congressman Davis to get a little bit more detail on where Mr.

11  Boykin's return trip actually originated.

12      Turning your attention to Government Exhibit CBP

13  Records, page number ending in 70, what does this reflect?

14  A.  This is a PNR record indicating a flight, South African

10:41:31  15  Airways Flight 207 on January 11th, departing Johannesburg,

16  arriving into Washington Dulles.

17  Q.  So if you go back to the summary exhibit and populate a

18  line for Mr. Boykin, does the line that I just added to the

19  summary exhibit for Mr. Boykin reflect, that green box

10:41:49  20  accurately reflect travel, a trip that he took to and from

21  Africa in January 2009?

22  A.  Yes.

23  Q.  Does Mr. Boykin's trip to Africa overlap with Congressman

24  Davis' trip to Africa, or match it actually?

10:42:04  25  A.  Yes.

        MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

1    Q.  Does it overlap with Mr. Ben Israel's time in Africa?

2    A.  Yes.

3    Q.  Let's talk about travel taken by an individual by the name

4    of Oscar Webb.  I'm looking at Government Exhibit OW Travel,

10:42:18    5    page ending in the number 40.

6              Can you summarize this border crossing document.

7    A.  Yes.  This indicates an outbound international flight

8    departing from Atlanta, arriving into Johannesburg via Delta

9    Airlines Flight 200, with a departure date of July 15th, 2009.

10:42:34    10   Q.  And if we look at Government Exhibit OW Travel, page ending

11   with the number 41, what does this border crossing document

12   show?

13   A.  This indicates an inbound international flight departing

14   from Johannesburg, arriving into Atlanta via Delta Airlines

10:42:51    15   Flight 201, with the arrival date of July 27th, 2009.

16   Q.  So if we go back to the summary exhibit and populate a line

17   for Mr. Webb, does the green box that I just added that shows

18   July 15 through July 27, traveling those days to and from

19   Africa, is that an accurate depiction of the travel records

10:43:11    20   that we just reviewed?

21   A.  Yes.

22   Q.  Does Mr. Webb's travel to Africa in July of 2009 overlap

23   the dates that Mr. Ben Israel was in Africa in July of 2009?

24   A.  Yes.

10:43:22    25   Q.  One more individual, Officer Harris.  Let's talk about

MICHAEL P. SNYDER, Official Court reporter

1 travel records related to the defendant Gregory Turner.  In
2 particular, if you could turn to Government Exhibit GT Travel,
3 the page ending in number 27.
4        Could you please summarize this border crossing
5 document.
6 A.  Yes.  This is a border crossing document for inbound
7 international flight departing from Dakar, Senegal, arriving
8 into Washington Dulles International via South African Airways
9 Flight 207, with an arrival date of May 21st, 2009.
10 Q.  And just to be clear, the travel records we've been looking
11 at thus far show travel from the United States to Africa and
12 then from Africa back to the United States, is that right?
13 A.  Yes.
14 Q.  But in Mr. Turner's case, these, the travel, this travel
15 record and perhaps other travel records we'll see will show
16 travel originating in Africa, coming to the United States, and
17 then going back the Africa, is that right?
18 A.  Yes.
19 Q.  So if we turn to Government Exhibit GT Travel, page ending
20 in the number 28, please summarize this border crossing
21 document.
22 A.  This is a border crossing document for an outbound
23 international flight departing from JFK Airport in New York,
24 arriving into Johannesburg via South African Airways Flight
25 204, with a departure date of May 23rd, 2009.

                MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

54

1   Q.  Let's talk about a second trip that Mr. Turner took to the

2   United States in June of 2009.  Looking at Government Exhibit

3   GT Travel, page ending in the number 29, could you summarize

4   this border crossing document, please.

10:45:01   5   A.  Yes.  It's an international flight departing from Dakar,

6   Senegal, arriving into Washington Dulles with an arrival date

7   of June 9th, 2009.

8   Q.  And if we look at Government Exhibit GT Travel, page ending

9   in the number 30, when did Mr. Turner return to Africa,

10:45:19   10   according to this record?

11   A.  It indicates an outbound international flight departing

12   from -- excuse me -- departing from Washington Dulles

13   International, arriving into Dakar, Senegal, via South African

14   Airways Flight 208, with a departure date of June 12th, 2009.

10:45:40   15   Q.  Officer Harris, we are almost done here, but do you need a

16   glass of water?

17   A.  Yes, actually.  Sorry.

18   Q.  Why don't we go ahead.

19        Government Exhibit GT Travel, page ending with number

10:46:41   20   30.

21        You were saying it shows a return trip to Africa?

22   A.  Yes, this indicates an outbound international flight

23   departing from Washington Dulles International, arriving into

24   Dakar, Senegal, via South African Airways Flight 208, with a

10:46:57   25   departure date of June 12, 2009.

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

55

1  Q.  Let talk about a trip that the defendant took to the United

2  States in August of 2009.  Looking at Government Exhibit GT

3  Travel, page ending in the number 31, can you please summarize

4  this document.

10:47:09  5  A.  Yes.  This is an inbound international flight with a

6  departure location of Dakar, Senegal, arriving into JFK Airport

7  in New York via South African Airways Flight 203, with an

8  arrival date of August 16, 2009.

9  Q.  And if we turn to Government Exhibit GT Travel, page ending

10:47:29  10  with the number 32, do we see Mr. Turner's, the return portion

11  of his trip in August of 2009?

12  A.  Yes, this is the border crossing record that indicates

13  departure location of Washington Dulles with an arrival

14  location of Dakar, Senegal, via South African Airways Flight

10:47:47  15  208, with a departure date of August 25th, 2009.

16  Q.  So these two records that we just looked at show that Mr.

17  Turner was in the United States from August 16th through August

18  25th, 2009?

19  A.  Yes.

10:47:57  20  Q.  Now, if we look, go back to Government Exhibit CBP Records,

21  page ending in the number 98.  If I direct your attention to

22  the top of the page, lines beginning with 1, 2 and 3, does that

23  show that Mr. Turner was also in Chicago during that trip that

24  he took to the United States in August of 2009?

10:48:15  25  A.  Yes.

MICHAEL P. SNYDER, Official Court reporter

1   Q.  And how do you know that?

2   A.  Line item 2 indicates Delta Airlines Flight 6617 on the

3   17th of August, it shows a departure location of JFK Airport in

4   New York, with an arrival location of Chicago O'Hare

10:48:30   5   International.

6   Q.  If would you look at the line beginning with the number 3,

7   what does that?

8   A.  That indicates United Airlines Flight 950 with a travel

9   date of August 20th, departure location of Chicago O'Hare, with

10:48:41   10   an arrival location of Washington Dulles International.

11   Q.  And you know it's Chicago O'Hare because of the airport

12   code ORD?

13   A.  Yes.

14   Q.  The next trip I'd like to talk about is a November 2009

10:48:53   15   trip taken by the defendant to the United States.  If you look

16   at Government Exhibit GT Travel, page ending the number 33.

17           What does this border crossing document tell you,

18   Officer Harris?

19   A.  It's a border crossing document indicating an inbound

10:49:11   20   international flight with a departure location of Dakar,

21   Senegal, arriving into Washington Dulles International via

22   South African Airways Flight 207, with an arrival date of

23   November 19th, 2009.

24   Q.  And if we turn to that Government Exhibit which should be

10:49:29   25   GT Travel, page ending in number 34, what does this tell us?

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

57

1    A.  This is an outbound international flight with a departure

2    location of JFK Airport in New York, arrival location

3    Johannesburg via South African Airways Flight 204, with a

4    departure date of November 24th, 2009.

10:49:49    5    Q.  One last record I'd like to show you, Officer Harris.  I'm

6    looking at Government Exhibit GT Travel, the page number ending

7    in the number 35.

8             What does this document show?

9    A.  This is a border crossing document for an inbound

10:50:08    10   international flight with a departure location of Dakar,

11   Senegal, arriving into JFK Airport in New York via South

12   African Airways Flight 203, with an arrival date of January 27,

13   2009.

14   Q.  Were you able to find a border crossing document that

10:50:25    15   showed Mr. Turner's return to Africa after arriving in the

16   United States on July 27, 2009?

17   A.  No.

18   Q.  Why not?

19   A.  Based on the information uploaded by the airlines, the

10:50:36    20   airlines did not populate his information.

21   Q.  So it was an airline error?

22   A.  It was an airline error, yes.

23   Q.  Now, if we go back to the summary exhibit and add in one

24   last line for Mr. Turner.  The blue boxes that I have added

10:50:51    25   indicate the times that, based on the CBP records, we know Mr.

MICHAEL P. SNYDER, Official Court reporter

Harris - direct by Alexakis

58

1    Turner was outside the United States.  Those gray boxes are

2    meant to indicate dates that we know that Mr. Turner, based on

3    these travel records we've just reviewed, was inside the United

4    States.

10:51:06    5    Would you agree that this is an accurate reflection of

6    the travel records that we just reviewed for Mr. Turner?

7    A.  Yes.

8    Q.  And based on this exhibit then, does it appear that Mr.

9    Turner's time outside the United States overlaps with time that

10:51:19    10    Mr. Ben Israel and Mr. Trotter and Mr. Dunkin and Mr. Davis,

11    Mr. Boykin and Mr. Webb were in Africa?

12    A.  Yes.

13    MS. ALEXAKIS:  Your Honor, at this time the government

14    would move into evidence Government Exhibit Travel Summary

10:51:33    15    pursuant to Federal Rule of Evidence 1006.

16    MR. TUNICK:  No objection.

17    THE COURT:  It's admitted.

18    (Government Exhibit Travel Summary received in evidence.)

19    MS. ALEXAKIS:  I have no further questions at this

10:51:42    20    time.

21    MR. TUNICK:  No questions, Your Honor.

22    THE COURT:  All right.  You may be excused.  Thank

23    you.

24    (Witness excused.)

10:51:49    25    MS. ALEXAKIS:  The government calls Annalisa Funk.

MICHAEL P. SNYDER, Official Court reporter

1    THE COURT:  Raise your right hand.

2         ANNALISA FUNK, PLAINTIFF'S WITNESS, SWORN

3    THE COURT:  Please be seated.

4                   DIRECT EXAMINATION

10:52:20    5    BY MS. GALLO:

6    Q.  Please state and spell your name.

7    A.  Annalisa Funk.  A-n-n-a-l-i-s-a, last name Funk, F-u-n-k

8    Q.  Miss Funk, what do you do for a living?

9    A.  I work for Southwest Airlines as a senior station

10:52:41    10    administrator.

11    Q.  What is a senior station administrator?

12    A.  Basically the support staff to all the operational

13    managerial team.

14    Q.  How long have you held that position, Miss Funk?

10:52:53    15    A.  As the senior station administrator, about a little over a

16    month.

17    Q.  What was your position at Southwest prior to that?

18    A.  Station administrator.

19    Q.  What is a station administrator?

10:53:02    20    A.  Basically the same thing without the leadership role.

21    Q.  How long have you been at Southwest overall?

22    A.  Six years.

23    Q.  As a result of your work experience at Southwest, have you

24    become familiar with data and records maintained by Southwest?

10:53:16    25    A.  I have.

MICHAEL P. SNYDER, Official Court reporter

Funk - direct by Gallo

60

1  Q.  Are you also familiar with databases that Southwest uses to
2  track data and generate records?
3  A.  I am.
4  Q.  Does Southwest use a database to track information related
10:53:29  5  to its customers, reservations and flight operations?
6  A.  Yes.
7  Q.  What is that database called?
8  A.  It's called Cirrus.
9  Q.  What kind of information does Cirrus collect related to
10:53:43  10  flight reservations?
11  A.  Everything pertaining to a passenger's particular
12  itinerary.
13  Q.  Does it contain information about customers' names?
14  A.  Yes.
10:53:53  15  Q.  Addresses?
16  A.  Yes.
17  Q.  Email addresses?
18  A.  Yes.
19  Q.  And phone numbers?
10:53:57  20  A.  Yes.
21  Q.  When is this data captured by Cirrus?
22  A.  In realtime.
23  Q.  So as soon as they book a flight?
24  A.  Correct.
10:54:06  25  Q.  Is a record made in Cirrus when a customer checks in to

MICHAEL P. SNYDER, Official Court reporter

Funk - direct by Gallo

61

1    their Southwest flight?

2    A.  Yes.

3    Q.  When is this captured?

4    A.  In realtime when it happens.

10:54:17    5    Q.  Is a record made in Cirrus when a customer hands over their

6    boarding pass at the gate just before they board the airplane?

7    A.  Yes.

8    Q.  When?

9    A.  In realtime.

10:54:28   10    Q.  Is a record made in Cirrus when a customer checks their

11    baggage into a flight?

12    A.  Yes.

13    Q.  When?

14    A.  In realtime.

10:54:35   15    Q.  Can Southwest employees print records from Cirrus?

16    A.  Yes.

17    Q.  Is accessing Cirrus and printing records from Cirrus part

18    of a Southwest employee's regular business activities?

19    A.  Yes.

10:54:48   20    Q.  Does Southwest retain records produced by Cirrus as a

21    result of its regular business activities?

22    A.  Yes.

23    Q.  Miss Funk, let me direct your attention to Government

24    Exhibit Southwest.  Do you recognize this document?

10:55:17   25    A.  I do.

                MICHAEL P. SNYDER, Official Court reporter

Funk - direct by Gallo

62

1   Q.  What is it generally?

2   A.  It's a printed record from Cirrus.

3   Q.  A record of what?

4   A.  Of this passenger's flight itinerary and then other

10:55:30   5   information related to it.

6   Q.  Is it for a particular flight?

7   A.  It's for a particular passenger showing that they booked

8   this flight.

9           MS. GALLO:  The government offers Government Exhibit

10:55:44   10   Southwest into evidence, Your Honor.

11          MR. TUNICK:  No objection, Judge.

12          THE COURT:  It's admitted.

13      (Government Exhibit Southwest received in evidence.)

14          MS. ALEXAKIS:  Permission to publish?

10:55:52   15          THE COURT:  Yes.

16  BY MS. ALEXAKIS:

17  Q.  Miss Funk, please turn to the first page which is marked

18  with the last number 21.

19          What is the name of the Southwest customer who

10:56:05   20  purchased this ticket?

21  A.  C. Gregory Turner.

22  Q.  What is the email address given for Mr. Turner from this

23  record?

24  A.  Theafricanenvoy@yahoo.com.

10:56:15   25  Q.  Miss Funk, let me direct your attention to the 8th page in

            MICHAEL P. SNYDER, Official Court reporter

1  the exhibit marked with the last numbers 28.  Please note the
2  boarding activity box.
3          Looking at the line starting with January 17, 2010,
4  5:47 p.m., Miss Funk, what does that line show?
10:56:48  5  A.  This shows that at 5:47 p.m., the passenger checked in at
6  the ticket counter for Flight 2990 from Midway to LaGuardia.
7  Q.  How do you know it was at Midway?
8  A.  The origin shows MDW, and then all the right under agent
9  info, you see MDW again.  That means the originator.  MDW
10:57:10  10  stands for Chicago Midway Airport.
11  Q.  How do you know the destination is New York?
12  A.  LGA is in the destination column, which means LaGuardia.
13  Q.  Let me direct your attention to the baggage activity box.
14          Looking at the lines starting January 17, 2010, 5:47
10:57:31  15  p.m., what does that line show?
16  A.  This shows that at 5:47 p.m., the passenger checked two
17  bags on flight 2990 from Midway to LaGuardia at the ticket
18  counter.
19  Q.  How many bags?
10:57:44  20  A.  Two.
21  Q.  Who is the passenger on this flight?
22  A.  C. Gregory Turner.
23  Q.  Going back to the boarding activity box.
24          Looking at the line January 17, 2010, 7:56 p.m., what
10:58:00  25  does that line show, Miss Funk?

          MICHAEL P. SNYDER, Official Court reporter

Funk - direct by Gallo

64

1    A.  This shows that at 7:56 p.m. the passenger's boarding pass

2    was scanned at the boarding gate for Flight 2990 Midway to

3    LaGuardia.

4    Q.  Where was that pass scanned?

10:58:14    5    A.  Right at the boarding door.

6    Q.  At what airport?

7    A.  Midway.

8    Q.  Who was the passenger?

9    A.  C. Gregory Turner.

10:58:19    10    Q.  What does gate on mean, Miss Funk?

11    A.  That verbiage is used when the boarding pass has been

12    actually scanned at the boarding door.

13              MS. ALEXAKIS:  No further questions, Your Honor.

14              MR. TUNICK:  No questions, Your Honor.

10:58:33    15              THE COURT:  All right.  You're excused.  Thank you.

16         (Witness excused.)

17              THE COURT:  I think we should take a break.  We'll

18    take ten minutes.

19         (Recess.  Jury out.)

11:15:02    20              MR. TUNICK:  Judge, yesterday the government emailed

21    us a witness list.  Mr. Boykin's name, Richard Boykin's name

22    was not on the witness list.

23              So we have him under subpoena, and I went to contact

24    through his lawyer, Pat Cotter.  He'd sent me a letter on

11:15:22    25    December 9, 2014, with some documents that we also requested.

MICHAEL P. SNYDER, Official Court reporter

1  And I went to contact Mr. Cotter at Barnes & Thornburg.  So I

2  called his line and got me to the overall Barnes & Thornburg

3  line.  And then I contacted his email, and it shot me back an

4  email that Mr. Cotter no longer works at Barnes & Thornburg.

11:15:47  5       So I left a message for Mr. Boykin himself.  I called

6  Barnes & Thornburg and said that since he's under our subpoena,

7  he might have to testify, but if Mr. Cotter still represented

8  him, to have him call me.  Well, I got a call from Mr. Cotter

9  about 9:30 last night saying that I contacted a represented

11:16:04  10  party, that he's threatening me to go to the ARDC, just left a

11  message.

12       THE COURT:  All right.  Well, let's not worry about

13  that right now, but we'll take that up later.  Yes.

14       MR. TUNICK:  Okay.

11:16:14  15       MR. JONAS:  Your Honor, just for clarity, Richard

16  Boykin has been on the witness list we filed.  Mr. Tunick even

17  talked about Mr. Boykin testifying for the government in his

18  opening.

19       What I had sent last night was the next several

11:16:25  20  witnesses we were going to call.  Richards Boykin's name wasn't

21  on it.  We didn't do any wrong.

22       MR. TUNICK:  No, no.  We were, just out of concern.

23       MR. JONAS:  He's on the witness list.

24       MR. TUNICK:  I'm not accusing you guys of anything.

11:16:36  25       THE COURT:  Why don't -- I understand.  I wouldn't

MICHAEL P. SNYDER, Official Court reporter

1　want somebody threatening me either.  I understand that.

2　　　　　MR. TUNICK:  Right.

3　　　　　THE COURT:  We probably don't need to do that this

4　second.

11:16:45　5　　　　　MR. TUNICK:  I just wanted to bring it to the

6　attention of Your Honor.

7　　　　　THE COURT:  I understand.

8　　　　　MR. LEONARD:  We do have a second Boykin issue, so we

9　can either raise it now, before or later.

11:16:53　10　　　　　THE COURT:  Tell me what that is.  If it's an issue, I

11　take it he's the next witness?

12　　　　　MR. JONAS:  No, he's the witness after this one.

13　　　　　THE COURT:  Okay, but presumably before noontime?

14　Then what is it?

11:17:03　15　　　　　MR. LEONARD:  We would like to move to exclude him

16　based on attorney-client privilege.

17　　　　　MR. JONAS:  Your Honor --

18　　　　　MR. LEONARD:  Our position is, just so you understand

19　it, is that although Mr. --

11:17:12　20　　　　　THE COURT:  He represents Mr. Turner?

21　　　　　MR. LEONARD:  No.  He, in our mind, represented his

22　co-conspirator Ben Israel.  Although we believe that Mr. Boykin

23　may deny such a relationship, he has indicated that he had many

24　visits, meetings with him at Barnes & Thornburg's offices, that

11:17:31　25　he sent letters on Ben Israel's behalf, Barnes & Thornburg

MICHAEL P. SNYDER, Official Court reporter

1  letterhead to various people, entities on behalf of Mr. Ben
2  Israel.  Therefore, we believe there is an attorney-client
3  relationship.  Whether or not those services were paid for or
4  not, there is an ongoing relationship, and our position is,
5  therefore, the only one who could waive that privilege is Ben
6  Israel.
7          I've reached out to his counsel, Mr. Pijon, and left a
8  message about what their position is.  I don't have an answer
9  yet, but our position is he can't testify about any
10 communications or any interactions that would be detrimental to
11 Ben Israel because of the attorney-client relationship.
12         THE COURT:  I'm not sure you have standing to raise
13 that.
14         MR. JONAS:  They don't.  They cannot raise this issue,
15 Your Honor.
16         MR. LEONARD:  The only one who can raise the privilege
17 is Ben Israel, not his attorney.
18         THE COURT:  I understand he's the only one who can
19 waive it if there is one, but I don't think you, I don't think
20 you can assert it.
21         MR. LEONARD:  We can assert it because the statements
22 will be offered against both of us.  They will be offered
23 against Ben Israel and against Mr. Turner as co-conspirators,
24 Judge, so any evidence that is there spills over.
25         THE COURT:  I assume --

MICHAEL P. SNYDER, Official Court reporter

1      MR. LEONARD:  At a minimum we want a hearing where Ben

2  Israel can say whether he's waiving the privilege or not.

3      MR. JONAS:  No, Judge.  That's wrong.

4      THE COURT:  Ben Israel could come in here and assert

5  the privilege; and, otherwise, I mean, assuming that there is

6  some basis.

7      MR. LEONARD:  I don't know why we don't have status

8  when our standing is derived from the fact that statements

9  he'll elicit in violation of the privilege are detrimental to

10  us as well.  And, in fact --

11      THE COURT:  And why on earth is this being raised now?

12  You said he was on your list?

13      MR. LEONARD:  Some legal issues, Judge, arise because

14  you are more --

15      THE COURT:  You just found this last night.

16      MR. LEONARD:  -- more cognizant of the ability of it

17  making sense, and we figured that out.  So that's why we are

18  raising it.

19      THE COURT:  Thank you.  About immediately before.

20      MR. LEONARD:  We are not always the quickest, but we

21  are the doggedest.

22      MR. JONAS:  Your Honor, first of all, there is an

23  incredible assumption here that there's an attorney-client

24  relationship.

25      THE COURT:  I realize that.

        MICHAEL P. SNYDER, Official Court reporter

1      MR. JONAS:  I think that needs to be established.

2      Second of all, they can't assert it.  It's simple as

3 that.

4      MR. LEONARD:  Well, we want to at least brief it,

5 Judge, because we think we are correct.  We think we have

6 standing because the spillover effect is to allow statements

7 against our client's interest, who is a co-conspirator.  We

8 want to at least be able to brief the issue and also understand

9 Ben Israel's counsel's position on the issue.

10      THE COURT:  It certainly isn't anything new.  In fact,

11 I think, I think there was some mention made at some point that

12 you thought --

13      MR. LEONARD:  Not by us.

14      THE COURT:  Him or somebody.  I thought you people

15 said it.  You know --

16      MR. LEONARD:  And the other thing, Judge, is when,

17 when Mr. Turner is charged, he calls Boykin and asks him

18 about -- so there's also that potentiality.

19      MR. JONAS:  Which we were not going to go into at all.

20      MR. LEONARD:  Well, we want this issue resolved,

21 Judge.  We would like to brief it because we think we do have

22 standing in this circumstance.

23      THE COURT:  Well, the first thing we'd have to do is

24 ask him if he ever represented him.

25      MR. LEONARD:  Well, we think he's going to say that

MICHAEL P. SNYDER, Official Court reporter

1  from his viewpoint he didn't think he did because he didn't

2  charge him.

3          THE COURT:  Well, Mr. Ben Israel, if he thinks that

4  there's --

5          MR. LEONARD:  Well, Mr. Ben Israel was going to take

6  the Fifth, so I don't know if he'll take the Fifth on this

7  issue or not.  But I guess we'll find out.  But we want to hear

8  from Mr. Pijon about what Mr. Ben Israel's position is before

9  Mr. Boykin goes on the stand.

10         THE COURT:  Ben Israel pled guilty.

11         MR. JONAS:  He has pled guilty and you have sentenced

12  him.

13         THE COURT:  He wouldn't have a Fifth Amendment right.

14         MR. LEONARD:  Then he doesn't, then perhaps we can get

15  him in here.  But we would like to -- we don't want to waive

16  this.  We think it's very important.  We think it's a bell that

17  cannot be unrung.

18         Whether Boykin believes they have an attorney-client

19  privilege based on all the contacts, of course Boykin is going

20  to say, we don't, he's not my client, I didn't do those things.

21         THE COURT:  Well, then the only other person that

22  could say it, that you're not saying your client was present,

23  the only other person that could conceivably say that there had

24  been a privilege would be Mr. Ben Israel.

25         MR. LEONARD:  We still think, we think we can make a

MICHAEL P. SNYDER, Official Court reporter

1   good faith showing based upon --

2           THE COURT:  And then he can waive it if there was.

3           MR. LEONARD:  We think we can make a good faith

4   showing based on the fact that there was an attorney/client

11:21:48   5   privilege or an issue if you resolve it.  It's not the bald

6   statement by Boykin that, "No, I didn't."  We should be allowed

7   to explore the nature of those services provided the fact that

8   he sent documents on Barnes & Thornburg, a prominent national

9   law firm's letterhead, on his behalf and that he visited his

11:22:07   10   office frequently, that he brought business opportunities to

11   the firm.  He's a client.

12           MR. JONAS:  Your Honor, no, he's not a client, first

13   of all.

14           Second of all, whatever letters were sent on behalf of

11:22:20   15   Prince Ben Israel by Richard Boykin, other than maybe -- well,

16   even one, we are not getting into.  So if there's other contact

17   between Ben Israel and Richard Boykin, there has been, that had

18   nothing to do with what his testimony is.

19           So I think, A, there's no privilege, there's no

11:22:42   20   attorney-client relationship; but, B, I don't think we are

21   getting into anything that would be considered privileged

22   because there's no seeking of legal advice that Mr. Boykin is

23   going to testify about; and, C, it's not this defendant's right

24   to assert this privilege.

11:22:55   25           What Mr. Leonard is doing is going to end up delaying

MICHAEL P. SNYDER, Official Court reporter

Ford - direct by Recker

72

1      this trial, Judge.

2              THE COURT:  I'm not going to delay the trial.  This

3      isn't anything new.

4              All right.  Let's go ahead.

11:23:08   5      MR. LEONARD:  Okay, Judge.  Absent a hearing on it

6      with Mr. Ben Israel and Mr. Boykin prior to testifying, we do

7      move for a mistrial.

8              MR. JONAS:  Obviously we object.

9              THE COURT:  That's denied.

11:24:09  10          (Jury in.)

11              THE COURT:  Please be seated.

12              Please call your next witness.

13              MR. RECKER:  The government calls Johnny Ford.

14              THE COURT:  Please come up here.  Please raise your

11:25:09  15      right hand.

16                  JOHNNY FORD, PLAINTIFF'S WITNESS, SWORN

17              THE COURT:  Please be seated.

18                          DIRECT EXAMINATION

19      BY MR. RECKER:

11:25:31  20      Q.  Would you state and spell your name for the record, please.

21      A.  Johnny Lawrence Ford, J-o-h-n-n-y L-a-w-r-e-n-c-e F-o-r-d.

22      Q.  What do you do for a living, Mr. Ford?

23      A.  I serve as mayor of Tuskegee, Alabama.

24      Q.  How long have you been mayor of Tuskegee, Alabama?

11:25:55  25      A.  Approximately 30 years.

               MICHAEL P. SNYDER, Official Court reporter

Ford - direct by Recker

73

1    Q.  Were you ever in the Alabama state legislature?

2    A.  Yes, sir.

3    Q.  And what time period was that?

4    A.  January 1998 through September 2004.

11:26:10    5    Q.  And where is Tuskegee, Alabama?

6    A.  We are located on Interstate 85 about 40 miles east of

7    Montgomery, Alabama, the state capital, so we are central

8    Alabama.

9    Q.  Do you have a relationship with an entity named The World

11:26:29    10   Conference of Mayors?

11   A.  Yes, sir.

12   Q.  And what is your relationship with The World Conference of

13   Mayors?

14   A.  I serve as the founder of The World Conference of Mayors.

11:26:38    15   Q.  And so what are your current duties with The World

16   Conference of Mayors as founder?

17   A.  As founder for life, my responsibility is to advise the

18   Conference and the mayors, to work with them to make sure that

19   the Conference continues to carry out its seven goals of

11:26:59    20   developing trust, trade, tourism, technology transfer, twin

21   cities, treasury and training of mayors in this country and

22   around the globe.  As the founder, my responsibility is to

23   generally oversee the conference and make sure that it carries

24   out its goals and functions even though we have elected

11:27:27    25   officers each year.

MICHAEL P. SNYDER, Official Court reporter

Ford - direct by Recker

74

1   Q.  Have you held previous positions, previously held different
2   positions with The World Conference of Mayors?
3   A.  Yes.  I was the founding president elected in 1984, served
4   approximately six years as the founding president, then
11:27:44   5   appointed as CEO and Secretary General of the Conference.  So
6   I've served as founding president, secretary general, and about
7   ten years ago I was appointed and asked by the board to serve
8   as the founder for life.
9   Q.  And for the time period of 2008 to 2010, were you the
11:28:08   10   founder during that time period?
11   A.  Yes, sir.
12   Q.  What is the overall purpose of The World Conference of
13   Mayors?
14   A.  It is an alliance.  It is a conference, not an association,
11:28:19   15   of mayors in this country, in Africa, the Caribbean and
16   elsewhere who work together on common goals through the
17   technique of conferencing.  We strive to strengthen the ability
18   of mayors to be more effective at mayors.  We convene
19   workshops, conferences, seminars, transfer technology in an
11:28:47   20   effort to use best practices to help these mayors be more
21   effective as mayors of their respective cities, not only mayors
22   but any elected or appointed official, because in some city's
23   they may be a mayor and they may have a different title, but
24   still have that same responsibility.
11:29:07   25   Q.  All right.  And how often does The World Conference of

MICHAEL P. SNYDER, Official Court reporter

Ford - direct by Recker

75

1    Mayors meet?

2    A.  We meet annually and sometimes quarterly, and we meet in

3    person and via telephone conferences.  We also conduct

4    workshops during the year from time to time.

11:29:28    5    Q.  Have you ever met an individual named Prince Asiel Ben

6    Israel?

7    A.  Yes, sir.

8    Q.  When and where was the first time you met him?

9    A.  I first met him in December of 1984.  He was a speaker at

11:29:42    10    our first annual meeting of The World Conference of Mayors in

11    Monrovia, Liberia.

12    Q.  Have you ever met the defendant Greg Turner?

13    A.  I don't know this individual.  I don't remember meeting

14    him.

11:29:58    15    Q.  Do you know an individual named Oscar Webb or OJ Webb?

16    A.  Yes, sir.

17    Q.  And who, how do you know OJ Webb?

18    A.  I've known OJ Webb for a number of years.  He had -- he has

19    worked with our conference.  He volunteered to serve as an

11:30:19    20    honorary ambassador of goodwill for The World Conference of

21    Mayors.  So I've known him probably 20, 30 years.

22    Q.  And as ambassador for The World Conference of Mayors, what

23    kinds of responsibilities or duties has OJ Webb taken on?

24    A.  I want to note, this is a voluntary position.  He is not a

11:30:42    25    paid employee of The World Conference.  He volunteered to help

MICHAEL P. SNYDER, Official Court reporter

Ford - direct by Recker

76

1   us promote The World Conference worldwide.  He indicated that

2   he was traveling around the world to Israel and a number of

3   other places, and he wanted to assist us by promoting and

4   spreading the goodwill on behalf of The World Conference of

11:31:07   5   Mayors.

6   Q.  I'd like to refer you to what's referred to as Government

7   Exhibit GT Email 32, which should be in front of you.  Do you

8   see that?

9   A.  Yes, sir.

11:31:20   10   Q.  Could you turn to page 3 of this exhibit.

11          MR. RECKER:  If I may, Your Honor, could I have

12   permission to publish this?

13          THE COURT:  Yes, sir.

14          MR. TUNICK:  Judge, there's an objection.

11:31:33   15          THE COURT:  It's not in evidence?

16          MR. RECKER:  It is in evidence.

17          THE COURT:  You may publish.

18   BY MR. RECKER:

19   Q.  Mr. Mayor, do you recognize this document?

11:32:03   20   A.  Yes, sir.

21   Q.  What is it?

22   A.  It's a letter to Dr. R. Gidon Gono sent on World Conference

23   of Mayors stationery, signed by me, and dated July 11, 2009.

24   Q.  Okay.  And what is the title listed there for who the

11:32:30   25   letter is addressed to, Gono?

MICHAEL P. SNYDER, Official Court reporter

1    A.  Dr. R.  Gidon Gono, Governor of the Reserve Bank, Republic

2    of Zimbabwe.

3    Q.  Okay.  And the date of this letter?

4    A.  July 11, 2009.

11:32:46    5    Q.  If we could go back to the full letter.

6              Did you draft this letter?

7    A.  No.  What happened is Mr. OJ Webb, our honorary ambassador,

8    is the one who called this matter to our attention.  He was

9    responsible for drafting the letter.  I simply asked our office

11:33:10    10    to have it put on stationary and returned to him.  We did not

11    originate, draft this letter.  It was sent to us.  We just

12    simply put it on the stationery out of courtesy.

13    Q.  Okay.  If we could highlight the signature block for a

14    minute.

11:33:30    15              Is that your signature, Mr. Mayor?

16    A.  That may or may not be my signature.  If you can't read it,

17    it's probably mine, but that, that is probably my signature.

18    Q.  Okay.  If we can go back to the full letter.

19              What did you do with this letter after you put it on

11:33:51    20    the stationery, had it put on the stationery?

21    A.  It was sent back to Mr. Webb, whoever he caused to have it

22    sent to our office.  Out of courtesy we returned it to them.

23              MR. RECKER:  If we could blow up the first paragraph.

24    BY MR. RECKER:

11:34:14    25    Q.  Mr. Mayor, you write in this letter, "We forward this

              MICHAEL P. SNYDER, Official Court reporter

Ford - direct by Recker

78

1    communication in support of removal of sanctions against the

2    sovereign Republic of Zimbabwe."

3            Was that your position at the time that this letter

4    was drafted?

11:34:27    5    A.  I didn't have a personal opinion on this.  This was called

6    to our attention by our honorary ambassador, and out of

7    courtesy we went along with it, I went along with it and agreed

8    to send the letter.  But I had no interest in Zimbabwe, never

9    been there, and we have no mayors in our conference from that

11:34:48    10   particular country.

11   Q.  Okay.  You also indicate in the letter that "We are

12   determined to join forces with the National Association of

13   Black Officials and all other positive African-American

14   organizations to strongly protest and demand the removal of the

11:35:05    15   sanctions."

16           Were you planning to take those actions?

17   A.  What happened is Mr. Webb and Prince Asiel, I believe he

18   was on the phone as well, they indicated that black leaders

19   from across the country, they were going to marshal them in

11:35:24    20   support of trying to get the sanctions removed.  And when that

21   was called to my attention, I assumed that it was something

22   that we would join with the others in doing, so we went along

23   with it.  But I really had no specific plans to marshal any

24   plans to mobilize other elected officials.  It's something they

11:35:53    25   said they were going to do, and they wanted us to be a part of

MICHAEL P. SNYDER, Official Court reporter

Ford - direct by Recker

79

1    it.

2            MR. RECKER:  If we could blow up the third paragraph.

3    BY MR. RECKER:

4    Q.  Just referring down to the third paragraph, Mr. Mayor,

5    there you state, "Secondly, we are prepared to visit Harare on

6    the week of 14th July and confer with yourself and any

7    representative of government you designate."

8            Were you actually planning to travel to Zimbabwe to

9    meet with government officials?

10   A.  Absolutely not.

11   Q.  Finally, you wrote, "International Ambassador Honorable

12   Oscar J. Webb will be dispatched with full authority to meet

13   with you on behalf of The World Conference of Mayors."

14           And you indicate that you await response from Prince

15   and Gregory if this schedule meets your approval.

16           Did you on behalf of The World Conference of Mayors

17   dispatch OJ Webb to go to Zimbabwe to have these discussions?

18   A.  No, I did not dispatch him.  They indicated that they were

19   going, and I said good luck, fine.  But we did not dispatch

20   them, nor did I intend to go.  I got caught in one coup --

21           MR. TUNICK:  Objection, Judge.

22   BY THE WITNESS:

23   A.  Okay.  No, we did not dispatch, no.

24   BY MR. RECKER:

25   Q.  I'd like to now refer you to Government Exhibit GT Email

                 MICHAEL P. SNYDER, Official Court reporter

Ford - direct by Recker

80

1  100.

2  A.  I see it, yes.

3  Q.  I'm sorry, Mr. Ford.  Could we go back to just the previous

4  letter we were just talking about, GT Email 32.

11:37:35  5  A.  Okay.

6  Q.  Do you see it?

7  A.  Yes, I'm back to the exhibit.

8  Q.  Okay.

9  A.  The previous one.

11:37:48  10  Q.  What did you do with this letter after you put it on World

11  Conference of Mayors stationery?

12  A.  It was sent back to whoever sent it to us to have it put on

13  the stationery.  We did that out of courtesy, and I'm not sure

14  that I did this directly.  I just asked the office to comply as

11:38:09  15  we normally do in courtesy situations like this.

16  Q.  And you testified earlier that the language was provided to

17  you from who?

18  A.  From Mr. OJ Webb.  OJ Webb was our point person on this.

19  He's the one that introduced this to us.

11:38:27  20  Q.  So did you send it, have it sent back to him?

21  A.  Yes.

22  Q.  I want to refer you to Government Exhibit GT Email 100.

23  And if you could turn to the second page of that exhibit.

24  A.  Yes.

11:38:47  25  Q.  If we can blow up the address.  Well, first, do you

MICHAEL P. SNYDER, Official Court reporter

Ford - direct by Recker

1  recognize this document?

2  A.  I do.

3  Q.  What is it?

4  A.  It's a letter to Dr. Gideon Gono, Governor of the Reserve

11:39:03  5  Bank of Zimbabwe.

6  Q.  What's the date of this letter?

7  A.  August 5th, 2009.

8  Q.  Did you draft this letter?

9  A.  Here again, the language was submitted by Mr. Webb.  We out

11:39:22  10  of courtesy just simply put it on stationery and sent it back.

11  Q.  And how did you get the language for this particular

12  letter?

13  A.  It was supplied to us by Mr. Webb.

14  Q.  If we can blow up the signature block.

11:39:40  15       Is that your signature, Mayor Ford, at the bottom?

16  A.  That's probably a stamp, I'm thinking.  We have, sometimes

17  I sign things, and we also have a stamp in the office, and if

18  you can read it, it's a stamp.

19  Q.  Okay.  If we can blow up the first paragraph.

11:40:03  20       In the first paragraph you write, "I am writing this

21  letter to you on behalf of The World Conference of Mayors," and

22  then you state that "OJ Webb and Prince Asiel Ben Israel have

23  briefed me on the historic meetings held in Zimbabwe with you

24  and President Mugabe."

11:40:21  25       Did Ben Israel or OJ Webb brief you on meetings that

MICHAEL P. SNYDER, Official Court reporter

Ford - direct by Recker

82

1  they had held in Zimbabwe with President Mugabe and Gideon
2  Gono?

3  A.  They may have.  I don't recall, because he talked to us,
4  talked to me on the phone, and also he attended a meeting that
11:40:44  5  we held in Jackson, Mississippi.  So he may very well have
6  briefed us, but he talked about the Zimbabwe situation, which
7  was not a priority of mine.

8  Q.  In terms of meetings that would have been held later that
9  summer in 2009 in Zimbabwe, were you ever briefed by Ben Israel
11:41:03  10  or OJ Webb about that?

11  A.  I don't remember being specifically briefed.

12  Q.  You also state that "Ben Israel and OJ have also informed
13  me about the invitation extended to you from Congresswoman
14  Diane Watson to attend the 2009 Congressional Black Caucus
11:41:23  15  leadership forum in September."

16       Are you aware of any such invitation?

17  A.  No.

18  Q.  What did you do with this letter once you had it placed on
19  The World Conference of Mayors stationery?

11:41:35  20  A.  The office sent it back to the sender, the persons who sent
21  us the wording for it.

22  Q.  And who is that?

23  A.  OJ Webb.  OJ Webb was the point person on this.

24  Q.  Do you know if Ben Israel or OJ Webb were being paid by
11:41:55  25  Zimbabwe officials to lift the sanctions?

MICHAEL P. SNYDER, Official Court reporter

1  A.  No, sir.

2  Q.  Did Ben Israel or OJ Webb tell you whether they were being

3  paid by anyone else to lift the sanctions?

4  A.  No, sir, not a word.

11:42:07  5  Q.  Did you get paid to issue these letters?

6  A.  No, sir, not a penny.

7  Q.  Okay.  If we could go back to page 1 of this exhibit and

8  highlight the top of that document.

9      Mr. Mayor, this is an email from, at the top, the

11:42:45  10  defendant to another individual.  But if you scroll down to the

11  bottom of the letter, the very last email or the last two,

12  you'll see it appears OJ Webb forwards it from himself to

13  himself, and then above that it appears he forwards it to

14  Prince Asiel at an email address of chicagomo1@aol.com.

11:43:20  15      And then if we could --

16      MR. TUNICK:  I'm not sure what the question is of the

17  witness.

18      THE COURT:  I'm waiting for it.  Is there a question?

19      MR. RECKER:  I am just trying to put it in context for

11:43:30  20  the question.

21      THE COURT:  Go ahead.

22  BY MR. RECKER:

23  Q.  If we could just highlight the last email down.

24      And then there's an email from Prince Asiel at

11:43:43  25  theafricanenvoy@yahoo.

      MICHAEL P. SNYDER, Official Court reporter

|           |    |                                                                      |
|-----------|----|----------------------------------------------------------------------|
|           | 1  | Do you understand what happened to the letter that you               |
|           | 2  | had placed on, based on this email traffic, what happened to         |
|           | 3  | the letters that you put on The World Conference of Mayors           |
|           | 4  | stationery?                                                          |
| 11:43:53  | 5  | MR. TUNICK:  Objection to his personal knowledge.                    |
|           | 6  | THE COURT:  Sustained.                                               |
|           | 7  | BY MR. RECKER:                                                        |
|           | 8  | Q.  Did you send this letter to the defendant?                       |
|           | 9  | A.  Yes, yes.  The office returned it to the sender.                 |
| 11:44:02  | 10 | Q.  I'm sorry.  Did you send it to, did you or your office send      |
|           | 11 | the letter directly to --                                            |
|           | 12 | A.  OJ Webb.                                                          |
|           | 13 | Q.  The defendant Greg Turner?                                       |
|           | 14 | A.  We sent it back to whoever sent us the draft wording.            |
| 11:44:19  | 15 | Q.  Okay.                                                            |
|           | 16 | A.  But, yes, our office did return it.                              |
|           | 17 | MR. RECKER:  No further questions, Your Honor.                       |
|           | 18 | THE COURT:  Okay.                                                    |
|           | 19 | CROSS-EXAMINATION                                                    |
| 11:44:30  | 20 | BY MR. TUNICK:                                                        |
|           | 21 | Q.  Good morning, Mr. Mayor.                                         |
|           | 22 | Welcome to the great City of Chicago.                                |
|           | 23 | A.  Good morning.  Yes.                                              |
|           | 24 | Q.  Now, we never talked, have we?                                  |
| 11:44:44  | 25 | A.  No.                                                              |

MICHAEL P. SNYDER, Official Court reporter

Ford - cross by Tunick

85

1    Q.  And, of course, you talked to the government a couple

2    times, correct?

3    A.  Yes.

4    Q.  Now, you talked about there are seven, the seven goals of

11:44:51    5    The World Conference of Mayors?

6    A.  Sure.

7    Q.  Correct?

8    A.  Yes.

9    Q.  And one of those goals is twin cities, correct?

11:44:57    10    A.  Yes.

11    Q.  I'm sorry?

12    A.  Yes.

13    Q.  Okay.

14    A.  Yes.

11:45:00    15    Q.  And twin cities is twin cities in the United States with

16    Africa, correct?

17    A.  It means exactly what it states.  Twin cities means not

18    with Africa, with city to city.  It's the same as sister

19    cities.

11:45:15    20    Q.  Some of the sister cities are African cities, correct?

21    A.  Yes.

22    Q.  Are all the twin cities African cities?

23    A.  No, no.  We have cities from, we have Trinidad, we have

24    Bahamas, we have People's Republic of China, Taiwan, cities,

11:45:37    25    Japan.


MICHAEL P. SNYDER, Official Court reporter

Ford - cross by Tunick

86

1  Q.  How many sister cities are African cities?

2  A.  Well, at one point my city, we had three, but --

3  Q.  Which were Tuskegee's city?

4  A.  Tuskegee.

11:45:51  5  Q.  I'm sorry.

6  A.  Home of the Tuskegee Airmen.

7  Q.  What were Tuskegee's sister cities in Africa?

8  A.  Bangui, Central African Republic, Banjul from Gambia.  And,

9  who else did I have?  Soweto, South Africa, Davey Town, South

11:46:14  10  Africa, and one in Senegal, Rafeek in Senegal.  But none in

11  Zimbabwe.

12  Q.  Okay.  Now, you supported the lifting of the sanctions in

13  2009, isn't that correct?

14  A.  I had absolutely no position on that.

11:46:41  15  Q.  Okay.

16  A.  Mr. OJ Webb brought this matter to the attention, to my

17  attention.

18  Q.  Okay.  Well, back in 2009, OJ Webb?

19  A.  Yes.

11:46:53  20  Q.  You trust OJ Webb, correct?

21  A.  I did at that point.

22  Q.  You knew him a long time, right?

23  A.  Known him for years.

24  Q.  You guys were friends, correct?

11:47:03  25  A.  Yes.

MICHAEL P. SNYDER, Official Court reporter

Ford - cross by Tunick

87

1  Q.  And OJ told you that the sanctions were crippling the

2  country?

3          MR. RECKER:  Objection, hearsay.

4          MR. TUNICK:  Well, it goes to his support of the

11:47:14  5  sanctions.

6          MR. RECKER:  He didn't take a position.

7          THE COURT:  Sustained.

8  BY MR. TUNICK:

9  Q.  Well, do you recall talking to Mr. Recker fairly recently

11:47:30  10  on September 18th, 2014?  Do you recall talking with Mr. Recker

11  on the telephone?

12  A.  Yes.

13  Q.  And do you recall telling him that you supported the

14  sanctions back in 2009?

11:47:42  15  A.  No, no.  My position has always been very, very clear.

16  This was not an issue.  We have no mayors in Zimbabwe, we have

17  no interest in Zimbabwe.  All of this was done because of our

18  courtesy, respect and out of courtesy to OJ Webb.  We trusted

19  him.  He had volunteered to be our goodwill ambassador.

11:48:13  20  Q.  I got that, Mr. Mayor, but I just want to talk to you about

21  September 18th.

22  A.  Okay.

23  Q.  Do you recall having a conversation with Agent Noldin and

24  Mr. Recker on the telephone?  Do you recall that?

11:48:26  25  A.  Yes.

         MICHAEL P. SNYDER, Official Court reporter

1  Q.  Okay?

2  A.  We have had several conversations.

3  Q.  I understand that.  And do you recall telling both Agent

4  Noldin and Mr. Recker that you supported --

11:48:41    5          MR. RECKER:  Objection, Your Honor.  Asked and

6  answered.

7          MR. TUNICK:  I'm setting up impeachment.

8          THE COURT:  He may answer.

9  BY MR. TUNICK:

11:48:56   10  Q.  Do you recall telling both Agent Noldin and Mr. Recker

11  recently on September 18, 2014, that you supported the lifting

12  of the sanctions back in 2009?

13  A.  No, I never told anyone that I supported the lifting of the

14  sanctions.  I told them that OJ Webb called this to our

11:49:19   15  attention, and out of respect and courtesy for him, we trusted

16  him.  Goodwill ambassador.  He volunteered.

17  Q.  Got you.

18  A.  That's why we did this.  I have no interest in Zimbabwe,

19  never intended to go there, did it out of courtesy.

11:49:34   20          MR. TUNICK:  No further questions, Judge.

21          THE COURT:  All right.  You're excused.  Thank you.

22      (Witness excused.)

23          THE COURT:  Call your next witness.

24          MR. JONAS:  Your Honor, the government calls Richard

11:49:54   25  Boykin.

          MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

89

| | | |
|---|---|---|
| | 1 | What time will we break for lunch? |
| | 2 | THE COURT: About 12:30 unless you finish your witness |
| | 3 | early. |
| | 4 | Please raise your right hand. |
| 11:50:47 | 5 | RICHARD BOYKIN, PLAINTIFF'S WITNESS, SWORN |
| | 6 | DIRECT EXAMINATION |
| | 7 | BY MR. JONAS: |
| | 8 | Q. Sir, would you please state and spell your name. |
| | 9 | A. Richard Boykin, B-o-y-k-i-n. |
| 11:51:02 | 10 | Q. Mr. Boykin, what do you do for a living? |
| | 11 | A. I am an attorney. |
| | 12 | Q. And where do you practice? |
| | 13 | A. Barnes & Thornburg. |
| | 14 | Q. Is that a big law firm? |
| 11:51:11 | 15 | A. We have 600 lawyers firmwide. |
| | 16 | Q. What city do you practice in? |
| | 17 | A. I practice in two cities, Chicago and Washington, D.C.. |
| | 18 | Q. What type of law do you practice? |
| | 19 | A. Government services. |
| 11:51:25 | 20 | Q. How long have you been with Barnes & Thornburg? |
| | 21 | A. Since November of 2006. |
| | 22 | Q. And prior to November of 2006, where did you work? |
| | 23 | A. I worked on Capital Hill for Congressman Danny Davis. |
| | 24 | Q. Capital Hill is Washington, D.C.? |
| 11:51:41 | 25 | A. Yes. |

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

90

| | |
|---|---|
| 1 | Q.  Where is Congressman Danny Davis' district? |
| 2 | A.  We are sitting in his district right now.  He covers all of |
| 3 | downtown Chicago, parts of the west side and parts of the south |
| 4 | side. |
| 11:51:54  5 | Q.  What did you do for Congressman Davis? |
| 6 | A.  I was his chief of staff for almost ten years. |
| 7 | Q.  Just briefly, can you explain to us what a chief of staff |
| 8 | does? |
| 9 | A.  So as chief of staff, I'm actually responsible for 22 staff |
| 11:52:09  10 | members, responsible for a budget of about $1.5 million and |
| 11 | responsible for making sure that everything in the |
| 12 | Congressman's office gets done legislatively, meetings, things |
| 13 | of that nature. |
| 14 | Q.  How long were you his chief of staff for? |
| 11:52:29  15 | A.  Almost ten years. |
| 16 | Q.  Do you know the defendant Greg Turner? |
| 17 | A.  I do. |
| 18 | Q.  And how long have you known him? |
| 19 | A.  I have known Mr. Turner for I'd say ten years. |
| 11:52:41  20 | Q.  You met him in person before? |
| 21 | A.  I met Mr. Turner through Mr. Asiel. |
| 22 | Q.  In person? |
| 23 | A.  Yes. |
| 24 | Q.  Do you recognize the defendant in court today? |
| 11:52:52  25 | A.  I do. |

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

91

```
          1    Q.  Can you describe what he's wearing?
          2         MR. LEONARD:  Judge, we'll stipulate that this is Mr.
          3    Turner and that he knows him.
          4         THE WITNESS:  Thank you.
11:53:01  5    BY MR. JONAS:
          6    Q.  How did you meet the defendant?
          7    A.  I met Mr. Turner through Mr. Asiel.
          8    Q.  Would that be Prince Asiel Ben Israel?
          9    A.  Yes.
11:53:10  10   Q.  Do you know if Prince Asiel Ben Israel is a real prince?
          11   A.  No.
          12   Q.  No, he's not, or you don't know?
          13   A.  No, I don't know.
          14   Q.  And how did you meet Ben Israel?
11:53:20  15   A.  I met Mr. Asiel through Congressman Danny Davis while I was
          16   working on Capital Hill.
          17   Q.  Was Ben Israel a friend of Congressman Davis'?
          18   A.  Yes.
          19   Q.  How did Ben Israel portray himself to you?
11:53:36  20   A.  Mr. Asiel portrayed himself as a businessman and as someone
          21   who was a community activist concerned about issues in Africa.
          22   Q.  Did he ever describe himself to you as an international
          23   ambassador for Africa?
          24   A.  Yes.
11:53:56  25   Q.  Just so we are clear, was he, as far as you know, was he
```

                    MICHAEL P. SNYDER, Official Court reporter

1  ever a US-appointed ambassador?

2  A.  No, he was not.

3  Q.  Did you develop any sort of relationship with him?

4  A.  Just a business acquaintance through Congressman Davis.

11:54:14  5  Q.  Did you ever have email with him?

6  A.  Yes.

7  Q.  What's the email address?

8  A.  I think his email address is princeasiel@aol.com, and that

9  is because I looked at my phone, and it was in my phone.

11:54:31  10  Q.  Where did you get that email address from?

11  A.  From him.

12  Q.  Now, you said you met the defendant through Ben Israel.

13  How did that come about?

14  A.  The -- Mr. Turner actually come to my office a couple times

11:54:48  15  with Mr. Asiel, and I viewed their relationship as one of he

16  was an assistant to Mr. Asiel.

17  Q.  Who was an assistant to Mr. Asiel?

18  A.  Mr. Turner.

19  Q.  What do you base that on?

11:55:03  20  A.  Based on the fact that Mr. Asiel would often comment on Mr.

21  Turner as his person on the ground in Africa facilitating and

22  getting things done on his behalf.

23  Q.  Just so we are clear, because you're using the pronoun "he"

24  a few times, you're talking about the defendant Greg Turner

11:55:26  25  facilitating things for Ben Israel in Africa?

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

1    A.  That is correct.

2    Q.  Did there come a time when Ben Israel approached you about

3    traveling to South Africa?

4    A.  Yes.

11:55:34    5    Q.  When was that?

6    A.  I think it would have been in November of -- December of

7    2008.

8    Q.  And what did Ben Israel tell you about the purpose of this

9    trip?

11:55:48    10    A.  Mr. Israel basically said that there was a historic

11    opportunity, that President Mugabe was ready to leave his being

12    president.  He had basically talked about the sanctions that

13    were having a terrible effect and impact on the people of

14    Zimbabwe, and he indicated that if President Obama, the first

11:56:17    15    African-American elected president, would actually ask Mr.

16    Mugabe to leave, that in fact he would.

17    Q.  Did this -- did you agree to go on the trip?

18    A.  I did.

19    Q.  Why?

11:56:33    20    A.  I agreed to go because I saw it as a historic opportunity,

21    one, to hear from a high level official that Mr. Mugabe

22    actually was prepared to leave if in fact President Obama asked

23    him to leave, and I also knew that Congressman Davis was going

24    on the trip as well.

11:57:01    25    Q.  Just so we are clear, in December of '09 when Ben Israel

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

94

1   asked you to go on this trip --

2              MR. JONAS:  I'm sorry?

3              THE COURT:  Did you say '09?

4   BY MR. JONAS:

11:57:12   5   Q.  This is in December of '09, correct?  Or 2008, I'm sorry.

6   December 2008?

7   A.  Correct.

8   Q.  When Ben Israel asked you to go on this trip in December of

9   2008, were you the chief of staff of Congressman Davis at that

11:57:26   10  time?

11  A.  I was not.

12  Q.  But you understood that the congressman was going to go on

13  the trip as well?

14  A.  Yes.

11:57:32   15  Q.  Do you have any reason, do you know why Ben Israel asked

16  you to go on this trip if you were an attorney and not working

17  for the congressman?

18             MR. LEONARD:  Objection to foundation.

19             THE COURT:  The question is foundation.

11:57:46   20             MR. JONAS:  I'm going to the foundation.

21             THE COURT:  Right.  So you may answer yes or no.

22  BY THE WITNESS:

23  A.  Yes.

24  BY MR. JONAS:

11:57:52   25  Q.  And without telling us why you think he asked you, why do

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

95

1    you think you know why Ben Israel asked you to go on this trip?

2    A.  Well, because he had come by my office several times to

3    actually suggest that I was a key adviser to Hillary Clinton.

4    Q.  So based upon the defendant's -- sorry.  Based upon Ben

11:58:17    5    Israel's belief that you were a key adviser to Hillary Clinton

6    is your understanding as to why he asked you to go?

7    A.  That is correct.

8    Q.  Were you a key adviser to Hillary Clinton?

9    A.  No.

11:58:28    10    Q.  Did you know Hillary Clinton?

11    A.  Yes, I know her.  I've hosted an event for her at my office

12    during the presidential election.  But I wouldn't consider

13    myself a key adviser.

14    Q.  Prior to the trip, did Ben Israel tell you anything about

11:58:46    15    his relationship with Robert Mugabe?

16    A.  Mr. Israel indicated that he knew him, that he spoke to

17    him, that, he showed me a picture of them together.

18    Q.  Again, you are using pronouns.

19    A.  Mr. Israel showed me a picture of himself and the president

11:59:07    20    together, President Mugabe.

21    Q.  Prior to the trip, did Ben Israel tell you who you would be

22    meeting in South Africa?

23    A.  He did not.  He said that we would meet with a key high

24    level official who would confirm for us that President Mugabe

11:59:26    25    is willing to step down if President Obama made the ask.

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

96

 1   Q.  And, again, prior to going on the trip, did Ben Israel or

 2   the defendant ever tell you that they were working on behalf of

 3   the government of Zimbabwe?

 4   A.  No.

11:59:40   5   Q.  Is that something you would want to know in determining

 6   whether to go on this trip?

 7   A.  Yes.

 8   Q.  Why?

 9   A.  Well, because it was illegal to do business with the

11:59:51  10   Zimbabwe government.

11              MR. TUNICK:  Objection.

12              THE COURT:  I'll let the answer stand.

13   BY MR. JONAS:

14   Q.  Is it something -- would you want to know when someone is

12:00:06  15   asking you to go on a trip involving these type of issues

16   whether or not they are working actually for the government

17   that you would be meeting with?

18   A.  Yes.

19              MR. TUNICK:  Objection, asked and answered, Judge.

12:00:17  20              MR. JONAS:  I tried to rephrase, Judge.

21              THE COURT:  Yes.

22   BY MR. JONAS:

23   Q.  How did you get there?

24   A.  By plane.

12:00:25  25   Q.  You didn't walk, obviously?


              MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

97

```
            1    A.  Right.

            2    Q.  Who paid for the plane ticket?

            3    A.  Prince Asiel.

            4    Q.  Who made the travel arrangements?

12:00:33    5    A.  Mr. Asiel.

            6    Q.  Did he tell you your flights and when to go to the airport?

            7    A.  Yes.

            8    Q.  Who did you travel with?

            9    A.  I believe that Congressman Davis was on the plane and Mr.

12:00:46   10    Asiel.

           11    Q.  Where did you go?  Where in South Africa did you go?

           12    A.  Johannesburg.

           13    Q.  What happened when you landed?

           14    A.  When we landed --

12:00:59   15    Q.  In Johannesburg.

           16    A.  There was a car at the airport to meet us and take us to a

           17    hotel.

           18    Q.  And when you say "us," you mean yourself, Ben Israel and

           19    Congressman Davis?

12:01:10   20    A.  That is correct.

           21    Q.  Do you remember the hotel that it took you to?

           22    A.  I do not.

           23    Q.  You have before you the first exhibit is marked

           24    Government's Exhibit Westcliff.

12:01:30   25            MR. JONAS:  Judge, this is already in evidence.  If we
```

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

98

1    can publish it?

2              THE COURT:  Yes.

3              MR. JONAS:  If we can put up the first page, please.

4    BY MR. JONAS:

12:01:37     5    Q.  Mr. Boykin, does this refresh your recollection as to what

6    hotel you went to in South Africa for this meeting?

7    A.  This does.

8    Q.  And is this the hotel?

9    A.  Yes.

12:01:57    10    Q.  If you can turn to, there's a page that's tabbed, Mr.

11   Boykin.  Mr. Boykin, do you see a list of names on the left?

12   A.  Yes.

13   Q.  The defendant and Danny Davis?  That would be Congressman

14   Davis?

12:02:25    15   A.  Yes.

16   Q.  Prince Asiel, would that be Prince Asiel Ben Israel?

17   A.  Yes.

18   Q.  And is that your name underneath?

19   A.  That is.

12:02:31    20   Q.  Your signature is on the right.  Is that your signature on

21   the far right next to your name?

22   A.  That is.

23   Q.  Do you recognize the names below yours, the three names

24   there?

12:02:41    25   A.  I do not recognize the names.

                 MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

99

1  Q.  After you arrived at the hotel, what happened?

2  A.  After we arrived at the hotel, we were given rooms so that

3  we could go freshen up from the trip.

4  Q.  Did you each have your own room?

5  A.  Yes.

6  Q.  So there are room numbers next to each name, so that would

7  it be fair to say those are the room numbers that everyone went

8  to?

9  A.  Yes.

10 Q.  This document also is titled Gideon Gono group.  Did you

11 consider yourself part of the Gideon Gono group?

12 A.  No.

13 Q.  Did you even know when you checked in who you would be

14 meeting with?

15 A.  No.

16 Q.  After you freshened up, what happened?

17 A.  We were taken then to a conference room where there were a

18 good number of people.  Food was available in terms of

19 refreshments, light refreshments.  We were then told by Prince

20 Asiel who we were going to be meeting with, and then the

21 individual from the Zimbabwean government, Mr. Gono, comes into

22 the room with a few people with him, and we are introduced to

23 him, and then everybody sits down for the meeting.

24 Q.  Okay.  Let me, before we get to what was discussed at the

25 meeting, was the defendant at this meeting?

MICHAEL P. SNYDER, Official Court reporter

12:03:00

12:03:09

12:03:20

12:03:41

12:04:05

Boykin - direct by Jonas

1    A.  Mr. Turner was at the meeting.

2    Q.  You didn't say he traveled with you, so was he there

3    already?

4    A.  Yes, he was there already when we arrived at the hotel.

12:04:17    5    Q.  When Mr. -- when Gideon Gono walked into the room, were

6    there introductions made?

7    A.  Yes.

8    Q.  Were there business cards exchanged?

9    A.  Yes.

12:04:28    10    Q.  Did you get copies of business cards of some of the people

11    that were representing the Zimbabwe government?

12    A.  I did.

13    Q.  Before you, you should have before you what has been marked

14    as Government's Exhibits GG Business Card and JM Business Card?

12:04:41    15    A.  Yes.

16    Q.  Do you recognize those cards?

17    A.  Yes.

18    Q.  How do you recognize them?

19    A.  These are cards that were given to me while I was in South

12:04:57    20    Africa.

21         MR. JONAS:  Your Honor, at this time we would offer

22    into evidence Government's Exhibits GG Business Card and JM

23    Business Card.

24         MR. LEONARD:  No objection.

12:05:03    25         THE COURT:  Admitted.

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

|  |  |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 12:05:13 | 5 |

1        (Government Exhibits GG Business Card and JM Business

2    Card received in evidence.)

3        MR. JONAS:  If we can put Government Exhibit GG

4    Business Card on the screen, please.  Enlarge the bottom

5    part.

6    BY MR. JONAS:

7    Q.  Mr. Boykin, whose card is this?

8    A.  Dr. G. Gono, Governor of the Reserve Bank of Zimbabwe.

9    Q.  Do you see the email addresses under his name?

10   A.  Yes.

11   Q.  Do you recognize any of those email addresses?

12   A.  I do not.

13       MR. JONAS:  If you could put Government's Exhibit JM

14   Business Card on the screen, please.  Enlarge that.

15   BY MR. JONAS:

16   Q.  You said this is one of the cards that you got at the

17   meeting.  Whose card is this?

18   A.  This is Jean Maguranyanga.  I'm sorry I mispronounced her

19   last name.  But the bank secretary of the bank, Reserve Bank of

20   Zimbabwe.

21   Q.  Do you see there's some handwriting on this card from Jean

22   and what appears to be a phone number?

23   A.  Yes.

24   Q.  Is that your handwriting?

25   A.  That is not my handwriting.

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

102

1    Q.  Do you know who put that information on the card?

2    A.  I do not.

3    Q.  Did you get this card from Jean?

4    A.  Yes.

12:06:14    5    Q.  Is there a reason why she would have given you or someone

6    would have given you what appears to be a phone number, if you

7    know?

8    A.  I don't know.

9    Q.  After Gideon Gono and Jean --

12:06:26    10            And there were other people as well from Zimbabwe?

11    A.  Yes.

12    Q.  -- came into the room, what happened next?

13    A.  Mr. Asiel facilitated the meeting and turned things over to

14    Mr. Gono, and he began to talk about the sanctions and the

12:06:46    15    impact that the sanctions are having on the people.

16    Q.  Before we go there, I want to back up one second.

17    A.  Okay.

18    Q.  You say Ben Israel facilitated the meeting?

19    A.  Yes.

12:06:55    20    Q.  What did he do to start it off?

21    A.  Well, he made introductions of everybody who was there.

22    Q.  Let me stop you there.  Did he introduce you?

23    A.  Yes.

24    Q.  How did he describe you to the room?

12:07:06    25    A.  He described me as a attorney and a key adviser to

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

1    Secretary of State Hillary Clinton.

2    Q.  And at the time of this meeting now, I'm sorry, this

3    meeting was when?

4    A.  This meeting would have been I believe in January of 2009.

12:07:24    5    Q.  Okay.  So Ben Israel approached you in December, and the

6    trip is January.

7            At the time of the meeting, were you a close or a key

8    adviser to Hillary Clinton?

9    A.  No.

12:07:35    10   Q.  So you said that after Ben Israel facilitated the meeting

11   and did introductions, Gideon Gono starts to speak about the

12   sanctions.

13           Did he say anything regarding Robert Mugabe stepping

14   down in exchange for the lifting of the sanctions?

12:07:52    15   A.  He did not.

16   Q.  Was there any discussion about removal of the sanctions?

17   A.  There was no discussion from my vantage point from myself.

18   There was a plea made by Dr. Gono to involve members of the

19   Congressional Black Caucus to lobby President Obama to lift the

12:08:16    20   sanctions.

21   Q.  How long did this meeting last?

22   A.  Thirty minutes to an hour.

23   Q.  And just so we are clear, did you facilitate the meeting?

24   A.  I did not.

12:08:24    25   Q.  Did you arrange the meeting?

                    MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

```
 1   A.  I did not.
 2   Q.  Did you ask anyone to arrange the meeting on your behalf?
 3   A.  No.
 4   Q.  After the meeting, what happened?
 5   A.  After the meeting, we were taken by car to the airport,
 6   that would be Congressman Davis, myself and Mr. Asiel, to the
 7   airport, and got on the plane and came back to Chicago.
 8   Q.  This is a long trip, right?
 9   A.  Yes.
10   Q.  And you had a hotel room?
11   A.  Yes.
12   Q.  Did you pay for the hotel room, by the way?
13   A.  I did not.
14   Q.  Do you know who did?
15   A.  Prince Asiel.
16   Q.  How do you know that?
17   A.  He made all the travel arrangements.
18           And we didn't spend the night there.  Let me be clear.
19   I mean, we went there, arrived, went to the meeting, and turned
20   around and came right back.
21   Q.  After the meeting, how did you feel?
22   A.  I felt like I'd been used.  I felt kind of disappointed
23   that, you know, what we thought we would hear from Dr. Gono in
24   terms of President Mugabe stepping down if asked by President
25   Obama, we didn't hear that.
```

12:08:33
12:08:57
12:09:03
12:09:18
12:09:44

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

1   Q.  Did you express your feelings to Ben Israel?

2   A.  I did not.

3   Q.  Why not?

4   A.  Well, I was an acquaintance of his.  Congressman Davis was

12:09:55   5   there, and, you know, I expected Congressman Davis would do

6   that.  He was his friend for more than 20 years.

7   Q.  After the trip when you came back to the United States, did

8   you have any more conversations with Ben Israel about going

9   back to Africa?

12:10:11   10   A.  Not going back to Zimbabwe.  He attempted to get me to go

11   other places in Africa, but I declined.

12   Q.  Why?

13   A.  Because of the experience --

14          MR. LEONARD:  Objection to relevance.

12:10:25   15          MR. JONAS:  Judge, it goes straight back to the

16   meeting.

17          THE COURT:  He may answer.

18   BY THE WITNESS:

19   A.  Well, because of the experience in South Africa in the

12:10:35   20   meeting.  Things didn't really turn out the way that he had

21   portrayed them, the way that Mr. Israel had portrayed them to

22   me, and so I decided that I wasn't going to waste any time

23   pursuing additional things.

24   BY MR. JONAS:

12:10:51   25   Q.  Mr. Boykin, you have before you what's in evidence as

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

106

```
          1    Government Exhibit GT Email 17.  Do you see that?
          2    A.  I do.
          3              MR. JONAS:  Judge may we publish that?
          4              THE COURT:  Yes.
12:11:07  5              MR. JONAS:  If we can post GT 17 on the screen,
          6    please.  If we can go to the top.
          7    BY MR. JONAS:
          8    Q.  Do you see this is from the defendant to somebody named
          9    Jean?
12:11:20  10             MR. LEONARD:  Objection, Judge.  This is beyond the
          11   scope of this witness' personal knowledge, and it's cumulative.
          12             THE COURT:  He may answer.
          13   BY THE WITNESS:
          14   A.  I didn't hear the question.
12:11:33  15   BY MR. JONAS:
          16   Q.  Do you see it's an email from the defendant to somebody
          17   named Jean dated January 23rd, 2009?
          18   A.  Yes.
          19   Q.  Was this before or after the meeting in South Africa?
12:11:43  20   A.  That was after.
          21             MR. JONAS:  If we can go to the second page.  Enlarge
          22   the first paragraph with the bold point next to it.  Not the
          23   top.
          24   BY MR. JONAS:
12:11:53  25   Q.  Well, do you see who it is addressed to?
```

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

107

A.  Yes.  Governor Gono.

Q.  If we can, do you see who signed it on the bottom, whose name is on the bottom?

A.  Yes.

Q.  Who is that?

A.  Mr. Turner.

MR. LEONARD:  Objection, Judge.  This witness has no personal knowledge of the document.  This has no relationship to his testimony.  It's after the trip and after he's employed by Congressman Davis.

THE COURT:  Well, this I don't know at this point in time.

MR. JONAS:  Your Honor, I think the next question.

THE COURT:  Okay.

MR. JONAS:  If we can enlarge that, not the top photograph, the second paragraph, the bullet point.

BY MR. JONAS:

Q.  Mr. Boykin, this letter written by the defendant to Gideon Gono says "Representative Ken Dunkin will be finishing up" -- he meant his instead of is -- "intelligence gathering and networking with attorney Richard Boykin at the newly-formed Clinton state department."

Mr. Boykin, were you working with Ken Dunkin to finish up the intelligence gathering at the newly-formed Clinton state Department?

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

1   A.  I was not.

2   Q.  Were you doing anything with regard to Zimbabwe with the

3   state department?

4   A.  No.

12:12:55   5   Q.  Did you authorize the defendant to say this in his letter

6   to Gideon Gono?

7   A.  I did not.

8   Q.  Did you ever talk to the defendant, did the defendant ask

9   you if he could put this information in the letter about you?

12:13:06   10   A.  He did not.

11   Q.  After the trip, did Ben Israel ever talk to you again about

12   Gono?

13   A.  Yes.

14   Q.  And what did he talk to you about?

12:13:21   15   A.  He wanted to get a visa for Mr. Gono to come address the

16   Congressional Black Caucus annual legislative conference.

17   Q.  So why did he come to you?

18   A.  Well, I worked on the hill for ten years for Congressman

19   Davis, and he knew that I knew a number of the members of the

12:13:45   20   Congressional Black Caucus, and he considered me to be a key

21   adviser to Secretary of State Hillary Clinton, and that's the

22   Secretary -- the state department is where you get the visa.

23   Q.  Why would -- did the defendant -- I'm sorry.

24          Did Ben Israel tell you why he needed you to help

12:14:08   25   Gideon Gono get a visa?  Did he say why Gideon Gono did not

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

1    just do it on his own?

2    A.  He didn't indicate why other than he wanted to get him here

3    for the Congressional Black Caucus annual legislative

4    conference.

12:14:28    5    Q.  At the time -- do you remember when this was?

6    A.  I do not.

7    Q.  Is this after the South African trip?

8    A.  Yes.

9    Q.  And at that point what was your relationship like with Ben

12:14:38    10    Israel?

11    A.  Just an acquaintance.  He would oftentimes show up at my

12    office unannounced and, you know, bounce ideas in terms of, you

13    know, business ideas and stuff like that, politics, strategy.

14    Q.  If we can pull up Government Exhibit GT Email 35, which I

12:15:03    15    believe you have in front of you, Mr. Boykin.

16    A.  Yes.

17            MR. JONAS:  Your Honor, this is already in evidence,

18    if we can publish it?

19            THE COURT:  Yes.

12:15:10    20    BY MR. JONAS:

21    Q.  Go to the top of the email.  Just so we put it in context,

22    you see this is from the defendant to Alice Holmes McKoy.  Do

23    you know Alice Holmes McKoy?

24    A.  I do.

12:15:25    25    Q.  How do you know her?

MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

110

1   A.  She works on the hill.  She works on Capital Hill.  I think

2   she works for a member of Congress.

3   Q.  If we can scroll down.  Top paragraph, please.

4           Do you see the line, the second line?  Well, it says,

5   "For now we are concentrating on the issues forum and getting

6   the delegation of ten people visas, et cetera.  There is no

7   problem with any of the delegation except Gono.  We have

8   Richard Boykin's firm on it."

9           Did your firm or yourself personally work on getting

10  Gideon Gono a visa to come to the United States?

11  A.  No.

12  Q.  Did you tell Ben Israel you would?

13  A.  I probably told him we would, and the reason being is

14  because he was, he's a good friend of the Congressman's, and

15  oftentimes, you know, because of what happened in South Africa,

16  I decided that I wasn't going to do anything else to help

17  facilitate anything on these guys' behalf.

18          MR. LEONARD:  Objection, Judge, to the narrative

19  speech that Mr. Boykin is now giving.  I ask you to instruct

20  him to answer the question.

21          MR. JONAS:  Judge, this is a relevant issue, and the

22  witness is explaining his actions, why he did or did not do

23  something.

24          MR. LEONARD:  Judge, we would just like Mr. Boykin to

25  answer the question rather than giving speeches.


            MICHAEL P. SNYDER, Official Court reporter

Boykin - direct by Jonas

111

1    MR. JONAS:  He's answering the question, Judge.  The

2    defense wants him to answer it in one word.

3    THE COURT:  He may answer.

4    BY THE WITNESS:

12:17:00    5    A.  I did not do anything to facilitate getting Mr. Gono a

6    visa.

7    BY MR. JONAS:

8    Q.  Why not?

9    A.  Because I was disappointed about not hearing that President

12:17:13    10    Mugabe would actually step down when we visited South Africa.

11    That's what we were assured that we would hear.  We did not

12    hear that.  And so I didn't take any further steps since that

13    trip to help in Zimbabwe.

14    Q.  Did you ever tell to Ben Israel that you weren't going to

12:17:35    15    get a visa then?

16    A.  I did not.

17    Q.  Let me rephrase that.  Did you ever tell Ben Israel that

18    you wouldn't help Gideon Gono get a visa?

19    A.  I did not.

12:17:44    20    THE COURT:  Would or would not?

21    BY THE WITNESS:

22    A.  I did not.

23    BY MR. JONAS:

24    Q.  You did tell him you would?

12:17:48    25    A.  Right.

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

112

1  Q.  Why did you tell him you would?

2  A.  Well, I did it so I could get him off my back pretty much.

3  Q.  At any point in time, did either Ben Israel or the

4  defendant ever tell you that they were getting paid or

12:18:03  5  receiving money from the government of Zimbabwe?

6  A.  They did not.

7         MR. JONAS:  One moment, Your Honor.

8     (Pause.)

9  BY MR. JONAS:

12:18:18  10  Q.  Would that have made a difference to you in regard to your

11  trip to South Africa if you knew that?

12  A.  Yes.

13  Q.  Did you provide any services to Gideon Gono?

14  A.  I did not.

12:18:26  15  Q.  Did you provide any services to Robert Mugabe?

16  A.  I did not.

17         MR. JONAS:  Your Honor, I have no further questions.

18         THE COURT:  Thank you.

19                    CROSS-EXAMINATION

12:18:35  20  BY MR. LEONARD:

21  Q.  Mr. Boykin, it sounds like sometimes when you say something

22  to somebody, it's true, and sometimes when you say something to

23  somebody, it's false, right?

24  A.  Right.

12:18:47  25  Q.  So how do we know if what you're saying to the jury is true

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

113

1    or false since you do both?  How do we figure that out?

2              MR. JONAS:  Objection.

3              THE COURT:  Sustained.

4    BY MR. LEONARD:

12:19:06    5  Q.  Are you still planning on running for public office, sir?

6              MR. JONAS:  Objection, beyond the scope.

7              MR. LEONARD:  Goes to his motive and bias, the reason

8    to testify falsely.

9              MR. JONAS:  Objection.  There it is no good faith

12:19:18   10  basis for that, Judge.

11             MR. LEONARD:  There is, Judge.

12             THE COURT:  I'll hear you at sidebar.

13         (Discussion on the record at sidebar.)

14             THE COURT:  What's the good faith basis?

12:19:43   15            MR. LEONARD:  He told the prosecutors he's planning on

16   running for public office in a 302.  I believe it's relevant to

17   how he's shaping and portraying himself to the public and

18   especially with the media attention.  It's absolutely relevant

19   to his bias and motive to testify falsely.

12:19:59   20            MR. JONAS:  That's ridiculous.  He's running for

21   office.  He's running unopposed for a Cook County

22   commissioner's seat.

23             MR. LEONARD:  Why did he say the basis then?

24             MR. JONAS:  Why does that favor the government?  He

12:20:09   25  wants to get my vote?

              MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

114

```
           1        THE COURT:  There's no harm.  Let him answer it.  It
           2   just -- wait a minute.  I mean, they are allowed some leeway in
           3   terms of showing possible bias.
           4        MR. JONAS:  I'd like to know how --
12:20:27   5        THE COURT:  He's not just a private attorney.  If he's
           6   running for office, what?
           7        MR. JONAS:  The first question is you're running for
           8   office?
           9        Yes, I am.
12:20:37  10        What are you running for?
          11        But then if he's going to turn it around and say he
          12   has a bias in favor of the government simply because you're
          13   running for office is improper, and I think Mr. Leonard should
          14   make a proffer to Your Honor as to how this witness's running
12:20:50  15   for office shows he has a bias in favor of the government.
          16        MR. LEONARD:  Judge, it goes -- it doesn't have to be
          17   a clear bias to them.  It's how he shapes and presents himself
          18   in light of the fact he's trying to be a public official in
          19   this city, and he's told them he wants to be that.  Absolutely
12:21:05  20   relevant.  Why can't we explore it, Judge?  It's a couple
          21   questions.
          22        MR. JONAS:  Your Honor, Mr. Leonard is getting
          23   indignant about him telling us there, he ran in a primary.
          24   It's not like he just told us and no one else, Mr. Leonard,
12:21:19  25   don't make it seem like --
```

MICHAEL P. SNYDER, Official Court reporter

1  MR. LEONARD:  You can argue that in your close.

2  MR. JONAS:  He's ran in a primary for a Cook County

3  commissioner seat.  He's running unopposed in November.

4  It's not a secret.  There is no bias there.  It's not

12:21:33  5  like he's trying to win my vote.

6  MR. LEONARD:  Of course he is.  This is a media trial.

7  THE COURT:  I'm going to let him answer.

8  MR. LEONARD:  Good.

9  (End of discussion at sidebar.)

12:21:58  10  BY MR. LEONARD:

11  Q.  Mr. Boykin, the question was are you planning on running

12  for public office?

13  A.  I am currently running for public office.

14  Q.  And have you given that fact some thought about how you're

12:22:12  15  going to present yourself here in public today in terms of how

16  you're going to shape your testimony for this jury?

17  A.  That has no bearing on how I shape myself for this jury.

18  Let me tell you --

19  Q.  No, you've answered my question, sir.  You don't need to

12:22:25  20  tell me anything.

21  A.  I'm going to tell the truth.

22  Q.  Thank you.

23  A.  Thank you.

24  Q.  Let's talk about your honesty.  When Ben Israel says to you

12:22:34  25  before this trip to South Africa, hey, Rich, I want you to go

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

1    because you're a close advisor to Hillary Clinton, do you

2    remember testifying about that a few minutes ago?

3    A.  He introduced me as a close adviser.

4    Q.  I thought you said before you went on the trip one of the

12:22:51    5    reasons you thought he asked you to go is because he said to

6    you you're a close adviser to Clinton.  Didn't you tell us

7    something like that?

8    A.  My observation is that he considered me to be a close

9    adviser to Secretary of State Hillary Clinton.

12:23:09   10    Q.  Okay.  And when you went to this meeting in South Africa,

11    sir --

12    A.  Yes.

13    Q.  -- he actually introduced you at the meeting to Gono as a

14    close adviser to Hillary Clinton, didn't he, sir?

12:23:22   15    A.  That is correct.

16    Q.  And being as honest as you are, you didn't say "No, I'm

17    not, that's not true."  You didn't do that at all, did you,

18    sir?  Yes or no, sir?

19    A.  I thought about it, you know, but I said to myself I cannot

12:23:36   20    believe that --

21    Q.  Sir, I want you to answer my question.  When they said this

22    guy is a close adviser to Clinton, did you say to them that's

23    not true?

24    A.  It wasn't the forum, so I didn't.

12:23:50   25    Q.  So the answer is no, right?

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

1    A.  No.  Right.

2    Q.  Thank you.

3         Now, you also told us today about what you claimed

4    happened during the meeting, right?

12:24:05  5    A.  That is correct.

6    Q.  And you made some statement that at this important meeting

7    that there was some talk about lifting the sanctions and Obama.

8    Did I hear you right, sir?

9    A.  No.

12:24:21  10   Q.  The fact of the matter, sir, is at that meeting in South

11   Africa, the only reference to sanctions during the entire

12   meeting was when Gono said to the group, he asked his brothers

13   and sisters to help with the removal of those sanctions.  That

14   was the only time it came up during that meeting, right?

12:24:43  15   A.  That is not my understanding of the meeting.

16   Q.  You talked to these folks, these attorneys, these

17   prosecutors and agents, didn't you, sir?

18   A.  Pardon?

19   Q.  You talked to these folks?  You gave interviews to them,

12:24:57  20   right?

21   A.  That is correct.

22   Q.  You did that back in August of 2013, right, sir?

23   A.  That is -- I don't recall if it was in August.

24   Q.  Can we agree it was in 2013, sir?

12:25:10  25   A.  I don't remember.

             MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

1    Q.  Okay.  But at some point in time you sat down with agents

2    and the prosecutors for several hours with your attorney, and

3    they asked you detailed questions, right?

4    A.  That is correct.

12:25:25    5    Q.  Now, that time were you telling the truth or were you

6    lying?

7    A.  I've been telling the truth the whole time.

8    Q.  Okay.  And when you met with them, these prosecutors and

9    FBI agents, you said to them, didn't you, sir, the only mention

12:25:44    10    made to the removal of sanctions was when the Zimbabwean

11    official asked if he could ask his brothers and sisters to help

12    with the removal of the sanctions?  Did you say that to these

13    people or not?

14    A.  I said that today as well that at the meeting --

12:26:00    15    Q.  Sir, I'm not asking you about today.  We are trying to

16    figure out what you were saying before the trial started, not

17    what you're trying to do here today.

18    A.  I said the same things --

19    Q.  Sir, did you say that to them then or not?

12:26:10    20    A.  I said the same thing then and now.

21    Q.  So you did tell them that?

22    A.  Yes.

23    Q.  Okay.  And, sir, even though these folks, you were very

24    willing to cooperate with them and answer their questions and

12:26:32    25    make those statements, you wouldn't meet with us, right?

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

119

1    A.  I was never asked to meet with you.

2    Q.  Did your attorney fail to tell you that we repeatedly asked

3    to meet with you?  He never mentioned it to you?

4    A.  I was never asked to meet with you.

12:26:46    5    Q.  Okay.  Now, let's talk a little bit about the relationship

6    between Davis, Congressman Davis and Ben Israel before all this

7    happens.

8         You started working for Davis in '97, didn't you, sir?

9    A.  That is correct.

12:27:03    10    Q.  And you worked there till 2007, right?

11    A.  Till 2006, November of 2006.

12    Q.  And during those nine years or so, Ben Israel visited

13    Congressman Davis at his congressional office in D.C. on a

14    regular basis, didn't he, sir?

12:27:24    15    A.  I don't know what you consider regular.

16    Q.  Well, wouldn't you agree with me, sir, that over those nine

17    years, he was in Congressman Davis' offices in Washington on

18    dozens of occasions?

19    A.  I can't agree to that.  I don't know how many times he

12:27:41    20    visited the office.

21    Q.  Okay.  Let's see what we can agree upon.  You were there,

22    so what is your testimony about how often Ben Israel would come

23    visit Congressman Davis from '97 to '07?

24         MR. JONAS:  Your Honor, objection.  This is now going

12:27:58    25    beyond the scope.

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

120

1    MR. LEONARD:  It's background to the relationship that

2 leads to the trip, Judge.

3 BY THE WITNESS:

4 A.  I cannot say to you --

12:28:08    5    THE COURT:  I'll let him answer.

6 BY THE WITNESS:

7 A.  I cannot say to you how many times Mr. Israel visited the

8 Congressman's office in Washington, D.C. because there could

9 have been times when he visited that I wasn't there.  I worked

12:28:23   10 in both places, Chicago and Washington, D.C..

11 Q.  We understand that, Mr. Boykin.  All we are trying to get

12 you to do is give us your best estimate of how many times you

13 saw Ben Israel at Congressman Davis' office during those nine

14 years.  Can you do that for us?

12:28:42   15 A.  Look, you want me to be truthful, and so I'm being

16 truthful.  I cannot tell you how many times he visited

17 Congressman Davis' office.

18 Q.  Was it more than a dozen, sir?

19 A.  Over the nine years?  Sure.

12:28:58   20 Q.  Yes, sir.

21 A.  Let's say that, yes.

22 Q.  Was it two dozen?

23 A.  No, I can't agree to that.

24 Q.  Okay.  So you came to realize over that almost a decade

12:29:07   25 that Congressman Davis was close friends with Ben Israel,

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

121

1   right?

2   A.  That is correct.

3   Q.  And, in fact, there were times where if Congressman Davis

4   wasn't there, Ben Israel could still come to his chambers and

12:29:21    5   he'd be accommodated by you and Congressman Davis' staff,

6   right?

7   A.  That is correct.

8   Q.  And, sir, let's talk a little bit about this trip, okay?

9   A.  Okay.

12:29:34    10   Q.  When Mr. Israel first asked you to go, you weren't sure if

11   you wanted to go, right?

12   A.  That is correct.

13   Q.  And, in fact, one of the things that you did to figure out

14   for yourself if you wanted to go is you talked to Congressman

12:29:55    15   Davis to get his opinion about whether you should go, right?

16   A.  That is correct.

17   Q.  And the reason you did that is because you believe

18   Congressman Davis is a very honorable and honest man, right?

19   A.  Yes.

12:30:08    20   Q.  He's like a father figure to you, isn't he, sir?

21   A.  That is correct.

22   Q.  You have great respect for him, correct?

23   A.  I do.

24   Q.  And you believed that if Davis thought the trip was

12:30:18    25   legitimate, you should go, right?

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

122

1   A.  Yes.

2   Q.  And, in fact, the Congressman told you that he thought this

3   was a good idea because this could be an historic moment in

4   U.S./Zimbabwe relations, didn't he?

12:30:34    5           MR. JONAS:  Objection, calls for hearsay.

6           THE COURT:  Sustained.

7   BY MR. LEONARD:

8   Q.  You believed it, sir.  You believed yourself before you

9   went there this could be a unique, historic moment between the

12:30:46    10  countries of the United States and Zimbabwe, right?

11  A.  That is how it was portrayed to me.

12  Q.  I'm not asking how it was portrayed.  I'm talking about

13  your own thought process.  Before you went there, sir, you

14  thought it was going to be potential for a very significant

12:31:02    15  event in national, international politics, didn't you?

16  A.  That is correct.

17  Q.  But one of the things you didn't talk about here today,

18  sir, is you had another motive, didn't you?

19  A.  No.

12:31:15    20  Q.  In fact, you work at this big Barnes & Thornburg law firm,

21  don't you?

22  A.  I do.

23  Q.  And one of the reasons you went is because you thought if

24  the sanctions were to fall away and Mugabe were to leave the

12:31:29    25  government, you might make a lot of money for Barnes &

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

123

1  Thornburg, right?

2  A.  That is not correct.

3  Q.  Do you remember meeting with these folks on some unknown

4  date that we talked about earlier?  Do you remember us talking

12:31:42   5  about the meeting you had with these people?

6  A.  With the prosecution?

7  Q.  Yes, with the prosecution team.

8  A.  Yes.

9  Q.  Going back to that meeting, isn't it a fact that you told

12:31:52   10  these people here that one of the reasons you went on the trip

11  is because you thought if the sanctions fell, it might be a

12  good business opportunity for you and Barnes & Thornburg?

13  Didn't you tell these people that, sir?

14  A.  That was not my driving motive.  My driving motive --

12:32:09   15  Q.  Sir, I didn't ask for your driving motive.  I just asked

16  you --

17  A.  -- was humanitarian.

18  Q.  -- did you tell the prosecutors?  That's a simple question.

19  A.  Yes.

12:32:16   20  Q.  You did?

21  A.  Yes.

22  Q.  Okay.  And when you went to this meeting, Mr. Turner didn't

23  speak, did he, sir?

24  A.  I don't recall.

12:32:32   25  Q.  And at the meeting, there was no discussion whatsoever of

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

124

1  Turner or Ben Israel working for or receiving money from the

2  country of Zimbabwe, was there, sir?

3  A.  No.

4  Q.  And, in fact, Congressman Davis was not asked at that

12:32:50   5  meeting to perform services on behalf of the country of

6  Zimbabwe, was he, sir?

7  A.  No.

8  Q.  And you weren't either?  No one asked you to lift a finger

9  to do anything about these big sanction issues, did they, sir?

12:33:04  10  A.  Well, Congressman Davis --

11  Q.  I want you to answer the question.

12  A.  Well --

13  Q.  Did Gono at the meeting, sir, ask you to do anything to

14  lift the sanctions, yes or no?

12:33:14  15  A.  Mr. Gono asked Congressman Davis if he would go back and

16  talk to his fellow colleagues in the Congressional Black Caucus

17  and ask them to lobby President Obama to lift the sanctions.

18  He did ask him if he would do that.

19  Q.  And that's what you claim today, right?

12:33:37  20  A.  Yes.

21  Q.  And the funny thing about it is, this whole speech you just

22  gave us, not one word of it did you say when you met with these

23  folks to prepare for trial or to tell them the truth on that

24  day, did you, sir?

12:33:51  25  A.  I don't recall.

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

1   Q.  Ultimately after the meeting was done, you thought it was a

2   waste of time?

3   A.  I did.

4   Q.  You came back to the States, and I think I heard you say

12:34:06   5   today that Ben Israel is just an acquaintance, isn't that what

6   you told the jury?

7   A.  That is correct.

8   Q.  The fact of the matter, sir, you continued to interact with

9   him at your Barnes & Thornburg office, didn't you?

12:34:20   10  A.  He would pop up from time to time.

11  Q.  On one occasion he brought to you a deputy minister from

12  the country of Nigeria, right?

13  A.  That is correct.

14  Q.  At your office at Barnes & Thornburg, this acquaintance,

12:34:32   15  right?

16  A.  Yes.

17  Q.  You actually also sent out letters on letterhead of your

18  big law firm, Barnes & Thornburg, for Mr. Ben Israel too, this

19  acquaintance, didn't you, sir?

12:34:42   20  A.  I don't recall.

21  Q.  Well, going back to this meeting you had with the

22  prosecutors, didn't you tell them in the presence of your

23  attorney Mr. Cotter that from time to time, even after the

24  South African meeting, you would send letters on Barnes &

12:35:00   25  Thornburg letterhead for Mr. Ben Israel, and in fact your

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

126

1 attorney said that at some point your firm stopped that

2 practice?  Do you remember that?

3 A.  I don't recall.

4 Q.  Okay.  Did you think, sir, that before you went to South

12:35:37  5 Africa, were you under the understanding that to go to Zimbabwe

6 was illegal?

7          MR. JONAS:  Objection.

8          THE COURT:  Sustained.

9 BY MR. LEONARD:

12:35:51  10 Q.  Did you know when you went there to meet with Gono that he

11 was a specially designated national?

12          MR. JONAS:  Objection.  This violates Your Honor's

13 order.

14          THE COURT:  Sustained.

12:36:02  15 BY MR. LEONARD:

16 Q.  Sir, isn't it a fact that over the last couple of years at

17 your big law firm, you've actually transacted business for

18 clients with the country of Zimbabwe?

19          MR. JONAS:  Objection.

12:36:14  20          THE COURT:  Sustained.

21          MR. LEONARD:  Judge, can I be heard on sidebar on that

22 issue?

23          THE COURT:  No.

24          MR. LEONARD:  Judge, if I could make an offer of

12:36:24  25 proof?

                 MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

1     THE COURT:  You can later.

2     MR. LEONARD:  It's uncharged conduct.

3     THE COURT:  Counsel.

4     (Discussion on the record at sidebar.)

12:36:48    5     MR. LEONARD:  Judge, I have a good faith basis to

6  believe that him and his law firm are transacting business with

7  the country of Zimbabwe.  That's uncharged conduct.  That would

8  put --

9     THE COURT:  Okay.  One, apart from the fact that I

12:37:03   10  think you should have brought it up earlier, you certainly

11  shouldn't be saying that in front of the jury.  But what is

12  your basis for doing that?  What is your --

13     MR. LEONARD:  Uncharged conduct?  My understanding is

14  that he and his firm have represented individuals and entities

12:37:19   15  including L.C. Higginbottom, possibly Mel Reynolds and others

16  in business transactions with the country of Zimbabwe.

17     THE COURT:  And where is the documents?

18     MR. LEONARD:  I don't have documents.

19     THE COURT:  What's your good faith basis.

12:37:29   20     MR. LEONARD:  I've been told that.

21     THE COURT:  That's not a good faith basis.

22     MR. LEONARD:  Why not, Judge?

23     THE COURT:  Who have you been told it by?

24     MR. LEONARD:  Can we ask it outside the presence of

12:37:39   25  the jury?

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

128

1       THE COURT:  Who have you been told it by?

2       MR. LEONARD:  I can't disclose that.

3       THE COURT:  Or, for --

4       MR. JONAS:  One point.  There's nothing that indicates

12:37:47   5   any of that representation, assuming it's true, is illegal.

6    These sanctions are designated against individuals, and that's

7    another reason why it's not uncharged conduct.  So we have two

8    grounds for denying that.

9       I would ask Your Honor to instruct the jury to strike

12:38:00   10   his last comments.

11      MR. LEONARD:  Judge, can I make an offer of proof?

12      THE COURT:  I thought you just did.

13      MR. LEONARD:  It's the issue --

14      THE COURT:  Because that's just improper.

12:38:07   15      MR. LEONARD:  You asked me a question.  I said I

16   couldn't disclose it without waiving the attorney/client

17   privilege.  I have information provided to my client that

18   provides me the good faith basis that he's been conducting

19   business.  I'd like to question him outside the presence of the

12:38:20   20   jury whether they are dealing with specially designated

21   nationals.  If they are, that's uncharged conduct that's

22   relevant to my case.

23      THE COURT:  One, and who is it that would waive the

24   privilege if there was one?

12:38:32   25      MR. LEONARD:  What do you mean?  What privilege?

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

129

1          THE COURT:  If he's representing people, then that
2   would be privilege.
3          MR. LEONARD:  Well, let him assert it then.
4          MR. JONAS:  No, Judge.
12:38:41  5          THE COURT:  You'll have to give me more of a good
6   faith basis than saying you won't tell me who it is.
7          MR. LEONARD:  I can tell you.  I told you without
8   waiving the attorney-client privilege it's information provided
9   by my client.
12:38:52  10          THE COURT:  How about your client?
11          MR. LEONARD:  Judge, he can't get into the whole
12  attorney-client --
13          THE COURT:  No.
14      (End of discussion at sidebar.)
12:39:42  15          THE COURT:  That last comment by counsel you must
16  completely disregard.
17  BY MR. LEONARD:
18  Q.  Sir, presently as you sit here today, is one of the roles
19  that you play as an attorney and counselor is you advise
12:39:57  20  committees in Washington, D.C.?
21          MR. JONAS:  Objection.
22          THE COURT:  Sustained.
23  BY MR. LEONARD:
24  Q.  During the time period that these events were taking place
12:40:10  25  in 2008 and 2009, was one of your roles that of providing

          MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

1    services to congressional committees including on these types

2    of international issues?

3              MR. JONAS:  Objection.  Judge, this is going down the

4    road that will violate your order.

12:40:47   5              THE COURT:  Frankly, I'm thinking about it because I

6    don't understand the question.

7              MR. LEONARD:  Sure.

8              THE COURT:  It's very general.

9              MR. LEONARD:  The question was in 2008 and 2009 --

12:40:55  10              THE COURT:  I got that part.

11              MR. LEONARD:  -- was the gentleman -- did his duties

12    as a lawyer and counselor include advising congressional

13    committees?

14              THE COURT:  If you understand that, you may answer.

12:41:06  15    BY THE WITNESS:

16    A.  No.  I advise clients.

17    BY MR. LEONARD:

18    Q.  Your clients do not include congressional committees or

19    people interacting with congressional committees?

12:41:18  20    A.  My clients include people who may interact with

21    congressional committees.

22    Q.  Sir, one more point to address.  Counsel showed you that

23    letter or email that made reference to you and your firm being

24    on some work that Ben Israel asked you about, i.e., getting the

12:41:39  25    visa for Gono.  Do you remember that?

              MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

131

1    A.  I do.

2    Q.  You weren't surprised to learn that Ben Israel was

3    representing, or Mr. Turner was representing to others that you

4    were on it, in light of the fact that you told Ben Israel you

12:41:53    5    were on it, right?

6    A.  No, I was surprised to learn that he was representing that

7    to others.

8    Q.  So you thought that he should have known that you were

9    lying to him when you said you would assist the visa and he

12:42:04    10   should have assumed that you were telling him an untruth and,

11   therefore, shouldn't have repeated it to others?  Is that what

12   you're telling us?

13   A.  I don't understand the question.

14   Q.  Sure.  You tell Ben Israel you're going to do something for

12:42:16    15   him, right?  You're going to help get a visa for Gono, right?

16   A.  Right.

17   Q.  And you never told him that's false, do you?

18   A.  I told him that to get him off my back.

19   Q.  Just answer my question.  You never thereafter tell him,

12:42:31    20   "You know what?  That was false what I told you" or "I'm not

21   going to do it," correct?

22   A.  I didn't.

23   Q.  So it wouldn't be a big surprise that he would go tell

24   somebody else that you were going to do that for him, right?

12:42:42    25   A.  I didn't know he was working for the Zimbabwe government.

MICHAEL P. SNYDER, Official Court reporter

Boykin - cross by Leonard

132

1   Q.  Well, that's a nice speech, sir, but you still don't have

2   any fact at all that he was working for the Zimbabwe government

3   other than what these guys have told you, right?  True?

4   A.  Other than what I've read.

12:43:03   5   Q.  In the newspapers?

6        MR. JONAS:  Objection.

7   BY MR. LEONARD:

8   Q.  Did the prosecutors give you some newspapers to read?

9   A.  No.  The prosecutors didn't give me anything.

12:43:13   10   Q.  Okay.  So let's just stick with facts, sir.

11        You don't have any personal knowledge that Greg Turner

12   or Ben Israel were in fact agents of a foreign government,

13   correct, sir?

14   A.  I do not.

12:43:24   15        MR. JONAS:  Objection.

16   BY MR. LEONARD:

17   Q.  I didn't think so.

18        MR. LEONARD:  Nothing further.

19        MR. JONAS:  Do you want to break for lunch?

12:43:33   20        THE COURT:  I suppose we'd better.  Okay.  We will

21   break for lunch.  Come back at 1:35, please.

22      (Jury out.)

23        THE COURT:  In case there's any another issue, I ask

24   that you people be back here by 1:25.  Thank you.

12:44:18   25      (Recess from 12:35 p.m. to 1:25 p.m..)

       MICHAEL P. SNYDER, Official Court reporter

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   UNITED STATES OF AMERICA,          )     No. 2013 CR 572
                        Plaintiff,      )     October 2, 2014
 4              v.                      )     1:25 p.m.
     C. GREGORY TURNER,                 )
 5                      Defendant.      )

 6              TRANSCRIPT OF PROCEEDINGS - TRIAL
              BEFORE THE HON. ELAINE E. BUCKLO
 7                       VOLUME IV
     APPEARANCES:
 8
     On behalf of Plaintiff:  MR. BARRY JONAS
 9                            MS. GEORGIA N. ALEXAKIS
                              ASSISTANT UNITED STATES ATTORNEY
10                            219 South Dearborn Street, 5th floor
                              Chicago, Illinois 60604
11                            (312) 353-5300

12                            MR. DAVID RECKER
                              US DEPARTMENT OF JUSTICE
13                            COUNTERESPIONAGE SECTION
                              600 E Street N.W., 10th floor
14                            Washington, D.C. 20004
                              (202) 233-2261
15
     On behalf of Defendant:  MR. JAMES D. TUNICK
16                            LAW OFFICES OF JAMES D. TUNICK
                              30 North LaSalle Street, Suite 2140
17                            Chicago, Illinois 60602
                              (312) 580-1839
18
                              MR. MICHAEL I. LEONARD
19                            LEONARD LAW OFFICES, INC.
                              230 North LaSalle Street, suite 1620
20                            Chicago, Illinois 60601
                              (312) 380-6559
21

22

23                    MICHAEL P. SNYDER, FCRR
                      Official Court Reporter
24                 United States District Court
              219 South Dearborn Street, Room 2244A
25                    Chicago, Illinois 60604
                        (312) 435-5563

            MICHAEL P. SNYDER, Official Court reporter
```

1    (Proceedings in open court.  Jury out.)

2          MR. JONAS:  Should the witness go back on the stand?

3          THE COURT:  Okay.  Where were we?

4          I don't know if all the jurors are here.  I guess I

01:37:37    5    really came back I think a couple minutes early because I --

6          MR. JONAS:  You asked us --

7          THE COURT:  It's frustrating to be ready to start and

8    say we have a few issues when we could resolve them ahead of

9    time.

01:37:53    10         MR. JONAS:  We may have --

11         THE COURT:  I don't want to invite issues.

12         MR. JONAS:  No, no, no.  This morning we talked about

13   a stipulation regarding the witness from the Department of

14   Justice.

01:38:00    15         THE COURT:  Right.

16         MR. JONAS:  This afternoon we presented a stipulation

17   to the defense.  In the stipulation, it's a testimonial

18   stipulation.

19         MR. LEONARD:  We are going to stipulate.

01:38:08    20         MR. JONAS:  We are done.

21         MR. LEONARD:  One more issue?

22         Mr. Boykin appeared to try on his own volition to try

23   to get --

24         MR. TUNICK:  Excuse me.  Mr. Boykin is in the

01:38:20    25   courtroom.

MICHAEL P. SNYDER, Official Court reporter

1      MR. LEONARD:  Would you guys step out.

2      (Witness leaves the courtroom.)

3      MR. LEONARD:  He appeared to be attempting to on his

4  own make reference to the fact that he's looked at certain

01:38:32      5  documents about this case the government is giving him.

6      Number one, I'm not sure how that plays in terms of

7  the protective order, but I just want to make sure they are not

8  going to try to say you've reviewed discovery materials, and,

9  therefore, you now believe that they violated the law, any

01:38:49     10  nonsense along those lines, which is what he tried to do.

11      MR. JONAS:  No, that's --

12      THE COURT:  I am not going to try to put words in it.

13  It seemed to me there was a number of times when you wanted a

14  yes or no answer, and he wanted to give an answer that might be

01:39:14     15  longer, and you cut him off, and it will be up to the

16  government whether they decide to get a complete or a further

17  answer on some of that.  I don't think anything had to do with

18  the protective order.

19      MR. LEONARD:  I'm just talking about --

01:39:29     20      THE COURT:  You did ask a very broad question at the

21  end.

22      MR. LEONARD:  I'm just talking about very specific.

23  He's already admitted he has no factual knowledge to say these

24  guys did anything untoward, but he tried to say "Well, I

01:39:41     25  reviewed some government discovery materials" and maybe

MICHAEL P. SNYDER, Official Court reporter

1    suggested he did.  If they try to get into that, Judge, I think

2    it's completely improper to give the witness materials about

3    the case and have him testify that, based upon his opinion

4    after reviewing the discovery materials, there was a basis for

01:39:55    5    any wrongdoing.  It's absurd.

6            MR. JONAS:  Your Honor, can I explain?  Because once

7    again Mr. Leonard is twisting the facts.  He seems to be doing

8    that all the time.

9            Here's what happened.  We interviewed the witness.  We

01:40:05    10   showed the witness documents.  He looked at the documents,

11   answered our questions.  We took the documents back.  End of

12   story.

13           MR. LEONARD:  That's great as long as they are not

14   going to go into it.  That's my fear.

01:40:15    15           MR. JONAS:  I don't plan to go into it.

16           MR. LEONARD:  Okay, that's great.  Then there's

17   nothing to argue about.

18           THE COURT:  Okay.

19           MR. LEONARD:  We do, Judge, so we don't have to have

01:40:27    20   sidebars, anticipate that they want to go back to the same

21   documents that they've already covered on their direct or are

22   already in the case, we have to object to it being duplicative

23   and cumulative.  I just don't want to see that happen and have

24   to request to go to sidebar.

01:40:43    25           THE COURT:  We won't be having sidebars on something

                MICHAEL P. SNYDER, Official Court reporter

Boykin - redirect by Jonas

1   like that.  They are always entitled to try, as you do in your

2   own cases or with your own witnesses, you're always entitled to

3   a little bit of leeway in terms of if you feel like you need to

4   make clear something or sometimes to rehabilitate a witness or

01:41:10    5   whatever.  That's not going back improperly.

6            But it depends what it is.  I mean, there could be.  I

7   don't want, I don't want to say that because I have no idea

8   what he's intending to do.  But I know you did make that

9   argument at least one other time when I disagreed with you.

01:41:24    10          MR. LEONARD:  I understand.  We don't always agree.

11          THE COURT:  Well, I get to make the rulings.

12          MR. LEONARD:  I know.  We respect that.

13          THE COURT:  Yes, they are ready.  They can come in.

14      RICHARD BOYKIN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

01:42:31    15          THE COURT:  Oh, you're under oath.

16          THE WITNESS:  Thank you.

17       (Jury in.)

18          THE COURT:  Please be seated.

19          Good afternoon.

01:43:14    20          All right.  Go ahead.

21                      REDIRECT EXAMINATION

22   BY MR. JONAS:

23   Q.  Mr. Boykin, do you recall Mr. Leonard asking you about

24   whether defense counsel asked you many times to speak to you

01:43:25    25   prior to trial?

                MICHAEL P. SNYDER, Official Court reporter

Boykin - redirect by Jonas

1  A.  I do.

2  Q.  And do you, having had time to reflect, do you recall if

3  defense counsel asked your attorney if they could speak with

4  you?

01:43:36  5  A.  Yes, they asked if they could speak with me or meet with me

6  one time back in August.

7  Q.  Back in August?

8  A.  Yes.

9  Q.  Did you agree to meet with them?

01:43:45  10  A.  Under advice of my counsel, I turned the meeting down.

11  Q.  You were asked by Mr. Leonard about running for office?

12  A.  Yes.

13  Q.  Are you shaping your testimony in this courtroom for any

14  reason?

01:43:57  15  A.  No.

16  Q.  Have you been telling the truth?

17  A.  Yes.

18  Q.  Do you recall Mr. Leonard asking you about statements to

19  Ben Israel regarding Ben Israel's request to get Gideon Gono a

01:44:09  20  visa?

21  A.  I do.

22  Q.  Ben Israel's request to you?

23  A.  Yes.

24  Q.  Why didn't you just tell Ben Israel "No"?

01:44:15  25  A.  I was being respectful of the Congressman's friend of more

MICHAEL P. SNYDER, Official Court reporter

Boykin - redirect by Jonas

1    than 20 years and being polite and just really wanted to get

2    the guy off my back.

3    Q.  Did Ben Israel ask you to get a visa for any of the other

4    people in Gono's party?

01:44:32    5    A.  He did not.

6    Q.  Do you recall Mr. Leonard asking you about the historic

7    meeting in South Africa?

8    A.  Yes.

9    Q.  Who told you it was going to be historic?

01:44:40    10    A.  Mr. Ben Israel.

11    Q.  Was it?

12    A.  No.

13    Q.  During this meeting, you testified that Ben Israel

14    introduced you as an aid to Hillary Clinton?

01:44:50    15    A.  That is true.

16    Q.  Why didn't you correct Ben Israel when he introduced you

17    that way?

18    A.  It was not the appropriate forum.  I was actually there to

19    hear from this high level official from the Zimbabwean

01:45:02    20    government about President Mugabe actually being ready to step

21    down if asked by President Obama.

22    Q.  And what did, during this meeting, what did Gideon Gono ask

23    Congressman Davis to do?

24    A.  It is my recollection that he actually asked him if he

01:45:18    25    would talk to his colleagues in the Congressional Black Caucus

MICHAEL P. SNYDER, Official Court reporter

Boykin - recross by Leonard

1   and ask them if they will lobby President Obama to lift the

2   sanctions.

3   Q.  Who set up this meeting?

4   A.  Mr. Asiel.

01:45:33   5        MR. JONAS:  No further questions.

6                        RECROSS-EXAMINATION

7   BY MR. LEONARD:

8   Q.  Just one point of verification, sir.

9   A.  Yes.

01:45:42   10  Q.  Danny Davis actually told you before you went over there

11  that this could be a historic occasion, didn't he, sir?

12       MR. JONAS:  Objection, hearsay.

13       MR. LEONARD:  It's not offered for the truth.

14       THE COURT:  He may answer.

01:46:01   15  BY THE WITNESS:

16  A.  My recollection is that the Congressman indicated that this

17  could be a big moment in the relations between the United

18  States and Zimbabwe.

19       MR. LEONARD:  Thank you.

01:46:14   20       MR. JONAS:  No further question, Judge.

21       THE COURT:  All right.  You're excused.  Thank you.

22       THE WITNESS:  Thank you.

23     (Witness excused.)

24       MR. JONAS:  Your Honor, at this time I would offer

01:46:23   25  into evidence and I'd like to read a stipulation between the

                    MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1    parties.

2              THE COURT:  Yes.

3              MR. JONAS:  This is a stipulation between the

4    government and the attorneys for the defendant and the

01:46:31    5    defendant.

6              It is stipulated by and between the United States and

7    defendant C. Gregory Turner, by and through his attorneys

8    Michael Leonard and James Tunick, that if called to testify, a

9    qualified representative of the United States Department of

01:46:44    10    Justice would testify that a careful search of the appropriate

11    records of the Department of Justice reveals no record that

12    either Prince Asiel Ben Israel or C. Gregory Turner has ever

13    submitted any notification or registration to the Attorney

14    General that either person would act in the United States as an

01:47:02    15    agent of a foreign government or official.

16              MR. TUNICK:  So stipulated.

17              MR. JONAS:  Your Honor, the government calls Donne

18    Trotter.

19              THE COURT:  All right.

01:47:47    20              Come up here, please.  Raise your right hand.

21               DONNE TROTTER, PLAINTIFF'S WITNESS, SWORN

22              THE COURT:  Please be seated.

23                           DIRECT EXAMINATION

24    BY MR. JONAS:

01:48:10    25    Q.  Good afternoon, sir.

              MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

142

```
            1        Would you please state and spell your name.
            2   A.  Donne E. Trotter, D-o-n-n-e, middle initial E,
            3   T-r-o-t-t-e-r.
            4   Q.  Sir, what do you do for a living?
01:48:40    5   A.  I am a legislator.
            6   Q.  I'm sorry, I couldn't --
            7   A.  A legislator.
            8   Q.  For whom?
            9   A.  The State of Illinois.  I'm a state senator in the State of
01:48:49   10   Illinois.
           11   Q.  Where is your district?
           12   A.  17th Legislative District.
           13   Q.  How long have you been a state senator?
           14   A.  22 years now.
01:48:57   15   Q.  And where is your -- you said your district is the 17th
           16   District?
           17   A.  Correct.
           18   Q.  Where is that geographically?
           19   A.  In this rendition of the map, it's from 73rd Street to
01:49:13   20   Kankakee County.
           21   Q.  So part of Chicago?
           22   A.  73rd Street in the City of Chicago all the way through
           23   south to Kankakee County.
           24   Q.  Do you know an individual named Prince Asiel Ben Israel?
01:49:24   25   A.  I do.
```

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

143

1   Q.  How long have you known him?

2   A.  Thirty plus years, about 35 years.

3   Q.  How did you meet him?

4   A.  I knew of him and first met him as an activist in the

5   community as well as a member of the Alpha Phi Alpha

6   fraternity.

7   Q.  Are you a member of that fraternity as well?

8   A.  Well, he helped initiate me into that fraternity.

9   Q.  Is he a friend of yours?

10  A.  Yes.

11  Q.  Is he a friend of yours?

12  A.  Yes.

13  Q.  Do you know the defendant Greg Turner?

14  A.  I do.

15  Q.  How do you know the defendant?

16  A.  I've met him through Prince Asiel.

17  Q.  Where did you meet him?

18  A.  I believe our first encounter was in Zaire.

19  Q.  Over the years, did you see the defendant and Ben Israel

20  together often?

21  A.  I couldn't say often.  I certainly saw Prince Asiel on a

22  semiregular basis.  Through the years I've seen Mr. Turner at

23  least ten times throughout.

24  Q.  Okay.  And do you know the defendant by another name?

25  A.  Yes, I do.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

144

1    Q.  What's that other name?

2    A.  Ahkezear.

3    Q.  Based upon your observations, could you describe their

4    relationship, Ben Israel and the defendant.

01:50:50    5    A.  They are definitely friends, and they are confidants of

6    sorts.  It's a very close relationship.

7    Q.  Have you ever traveled to South Africa at the request of

8    Ben Israel?

9    A.  I've traveled to South Africa with --

01:51:10    10   Q.  With Ben Israel?

11   A.  Right.

12   Q.  When was that?

13   A.  The last time was in approximately '09, '08.  When was --

14   in November of '09, I believe.

01:51:29    15   Q.  Was this right after -- what was the purpose of the trip?

16   A.  It was post the election of Barack Obama.

17   Q.  So would this have been actually November of '08?

18   A.  '08, yes.

19   Q.  And are you familiar where South Africa is located?

01:51:46    20   A.  Yes, sir.

21   Q.  Where is that?

22   A.  The southern tip of the continent of Africa.

23          MR. JONAS:  Your Honor if I can just pull up a

24   demonstrative?

01:51:54    25         THE COURT:  You may.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

145

1        MR. JONAS:  Thank you.

2   BY MR. JONAS:

3   Q.  Senator Trotter, do you see where South Africa is located?

4   A.  Yes, I do.

01:52:09   5   Q.  Would you just describe for the record where it is.

6   A.  It is the southern tip of the continent of Africa.

7   Q.  What was the purpose -- you said the trip was after Barack

8   Obama won the election?

9   A.  Correct.

01:52:22  10  Q.  What was the purpose of you going to South Africa?

11  A.  The purpose, the initial purpose was wanting to go over

12  there and celebrate with some mutual friends.

13  Q.  Celebrate what?

14  A.  The election.

01:52:34  15  Q.  And did you go with Ben Israel?

16  A.  Yes, I did.

17  Q.  Was -- did you ever tell the defendant that you were going

18  there?

19  A.  I'm sorry, sir?

01:52:42  20  Q.  I'm sorry?

21  A.  I didn't hear the question.

22  Q.  Did you tell the defendant Greg Turner before the trip that

23  you were going to South Africa?

24  A.  I didn't have a conversation with him, no.

01:52:54  25      MR. JONAS:  Your Honor, if we can publish Government

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

146

1    Exhibit GT Email 107.

2         THE COURT:  All right.

3    BY MR. JONAS:

4    Q.  Senator Trotter, this is an email from the defendant Greg

01:53:06  5    Turner dated Sunday, November 2nd, 2008.  You also have, if

6    it's easier for you to look at, there is a binder in front of

7    you, whichever is easier.  This is GT Email 107, so this is

8    probably going to be further to the back.

9         If you want to read it on the screen, if that's

01:53:28  10   easier.

11        THE COURT:  This screen.

12        THE WITNESS:  I can make it out on the screen.

13        MR. JONAS:  If we can enlarge the first paragraph.

14   BY THE WITNESS:

01:53:36  15   A.  Read the first paragraph?

16   BY MR. JONAS:

17   Q.  No, no.  I'm asking if it can be enlarged.

18        Do you see where it says "We have been advised that

19   one of the senator's close admirers and members of the Illinois

01:53:47  20   senate, Donne Trotter" --

21        Would that be you?

22   A.  Yes.

23   Q.  Is there another state senator in Illinois that's named

24   Donne Trotter?

01:53:55  25   A.  No, sir, but technically I guess if we are allowed to be

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

147

1    technical, Donne isn't my name.

2    Q.  It's spelled wrong?

3    A.  That's correct.

4    Q.  You spell it without the I?

01:54:05    5    A.  That's correct.

6    Q.  -- "will be arriving in Johannesburg to meet with a few key

7    people on the issues related to African-American economic

8    development ideas.  The Senator is a longtime friend and

9    depends on me for intelligence in African matters."

01:54:20   10          Sir, did you depend upon the defendant for

11   intelligence in African matters?

12   A.  No.

13   Q.  "In addition, he's on the powerful finance committee for

14   the Illinois state senate, which controls pension funds, et

01:54:32   15   cetera."

16          Were you on the committee that controlled pension

17   funds for the State of Illinois?

18   A.  No, I was not.

19   Q.  When you got to South Africa, did you celebrate with

01:54:50   20   friends the election of Barack Obama?

21   A.  I did look up my friends.  Well, I had notified them when I

22   was coming.  Yes, we did.

23   Q.  I assume you flew?

24   A.  Yes.

01:55:00   25   Q.  Who paid for your plane ticket?

                MICHAEL P. SNYDER, Official Court reporter

Case: 1:13-cr-00572 Document #: 254 Filed: 04/16/15 Page 148 of 221 PageID #:2406
Trotter - direct by Jonas
148

1   A.  Prince Asiel.

2   Q.  Why did he pay for your plane ticket?

3   A.  I often travelled with Prince Asiel as a friend, so it

4   wasn't unusual.

01:55:12   5   Q.  When you were in South Africa during this trip, did Prince

6   Ben Israel arrange a meeting for you with anyone from the

7   Zimbabwe government?

8   A.  Yes.

9   Q.  Who was that from the Zimbabwe government?

01:55:35   10   A.  It was with the President Mugabe.

11   Q.  Robert Mugabe?

12   A.  Correct.

13   Q.  Was this the first time you met Robert Mugabe?

14   A.  No, it was not.

01:55:44   15   Q.  How many times prior to the South African meeting in

16   November of 2008 had you met him?

17   A.  Once.

18   Q.  When was that?

19   A.  Approximately 2002.

01:55:54   20   Q.  2002?  What was the circumstances of that meeting?

21   A.  It was a meeting of legislators and other elected officials

22   who went over to actually look at what was going on in Zimbabwe

23   at the time.

24   Q.  Going back to the meeting in November of 2008 with Robert

01:56:20   25   Mugabe, what were the circumstances surrounding that meeting?

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1    A.  Back to '08?

2    Q.  The '08 meeting, yes.

3    A.  Our conversation centered in part on the sanctions that

4    were happening and just the basic problems that were ongoing in

01:56:38    5    the country of Zimbabwe.

6    Q.  Was there another event going on that Robert Mugabe was

7    present?

8    A.  That's correct.

9    Q.  What was that event?

01:56:48    10    A.  There was a meeting with the presidents of the region and

11    from Gambia, South Africa, Zimbabwe and other people in the

12    Sub-Sahara district to talk about the land reallocation that

13    was going on.

14    Q.  Were you attending that meeting?

01:57:07    15    A.  I went to -- I wasn't an invitee, no, but I did go to the

16    hotel.

17    Q.  So it was during a break from that conference or that

18    meeting where you met Robert Mugabe?

19    A.  That's correct.

01:57:21    20    Q.  Where exactly did you meet with him?

21    A.  It was in the hotel in a private room.

22    Q.  Who was part of that meeting?

23    A.  Besides Prince Asiel, I believe Mr. Turner was there as

24    well.

01:57:34    25    Q.  Anyone else from the government of Zimbabwe?

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1  A.  There were -- he had various people with him.  I couldn't

2  tell you who was his bodyguard or other titles.

3  Q.  He had an entourage?

4  A.  Correct.

01:57:50  5  Q.  So at this meeting is Mugabe, you, Prince Asiel and the

6  defendant?

7  A.  That's correct.

8  Q.  And who arranged for that meeting to take place?

9  A.  Prince Asiel.

01:58:00  10  Q.  Did you ask him to set it up?

11  A.  No, I did not.

12  Q.  Did he approach you about it?

13  A.  He said there was a meeting we could go to, there was an

14  opportunity to meet with the President, yes.

01:58:10  15  Q.  What was discussed during this meeting?

16  A.  Essentially it was just a short meeting of reintroduction

17  in this case and with the promise that there might be another

18  opportunity for us to speak.  It wasn't a long, engaged

19  meeting.

01:58:30  20  Q.  I'll show you Government's Exhibit GT Email 3.

21        MR. JONAS:  Your Honor, can I publish?

22        THE COURT:  Yes, you may.

23  BY MR. JONAS:

24  Q.  Do you see that on the screen?

01:58:42  25  A.  Yes.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

151

1  Q.  This is an email from the defendant to an individual named
2  David dated November 15, 2008.

3           Sir, the election of Barack Obama would have been
4  early November 2008?

01:58:53    5  A.  That's correct, yes.

6  Q.  By this date, would you have been back in the United
7  States, do you recall?

8  A.  Yes.

9  Q.  Will you go to the second page.  This is a letter to the
01:59:07   10  defendant from an individual named SK Moyo.

11           Do you know who that is?

12  A.  Not by face.  I couldn't identify him.

13           MR. JONAS:  If we can enlarge the middle paragraph.
14  BY MR. JONAS:

01:59:20   15  Q.  He states "I am certain that his Excellency President RG
16  Mugabe was equally impressed with the concern expressed by the
17  Prince and Senator Trotter."

18           Did you express any concern at all to President Mugabe
19  about anything?

01:59:35   20  A.  More of an interest in what the conversation was about,
21  what was going on, but not a concern because I didn't know the
22  full scope of the concerns.

23  Q.  If you can scroll down to the bottom of this letter to the
24  P.S. on the bottom.  It states, "We pray for Senator Trotter's
01:59:57   25  elevation to Obama's senate seat."

           MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1    Were you in contention for Obama's senate seat at that
2  time?
3    MR. LEONARD:  Objection, calls for speculation, lack
4  of foundation.
02:00:06    5    THE COURT:  He may answer.
6  BY THE WITNESS:
7  A.  No.
8  BY MR. JONAS:
9  Q.  After the meeting with Robert Mugabe in South Africa, did
02:00:11   10  you have any other meetings during that trip?
11  A.  No.
12  Q.  With regard to anyone from the government of Zimbabwe?
13  A.  No.
14  Q.  Did there come a time, a point in time when you were asked
02:00:24   15  to travel to Zimbabwe?  I'm not referring to that first trip in
16  2002.  After the South African trip.
17  A.  Yes.
18  Q.  Who asked you to go to Zimbabwe?
19  A.  Prince Asiel.
02:00:35   20  Q.  Do you remember when he asked you?
21  A.  It was not long after I returned back.
22  Q.  Sometime in maybe late November of 2008?
23  A.  Going --
24  Q.  Roughly?
02:00:47   25  A.  Yes.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

153

1    Q.  What did he tell you was the purpose of the trip?

2    A.  To look at what again the status of the people, possibly

3    what the impact of the sanctions were, how they were impacting

4    on the individuals in the country.

02:01:04    5    Q.  Did you go?

6    A.  Yes.

7    Q.  Where did you travel from?

8    A.  The next time that I was able to travel was I was coming, I

9    had a trip in the Middle East up in Israel, and I came from

02:01:21    10   Israel.

11   Q.  Did you travel from Israel by yourself?

12   A.  No, I did not.

13   Q.  Who were you with?

14   A.  State representative Kenneth Dunkin.

02:01:32    15   Q.  Ken Dunkin?

16   A.  Correct.

17   Q.  Were you in Israel for state business?

18   A.  It wasn't state business.  It was the, under the auspices

19   of their education committee.  The Jewish, JDL I believe is the

02:01:48    20   Jewish Defense League who has these education committees

21   through the country.

22   Q.  When you traveled from Israel on this trip, where did you

23   go to?

24   A.  We went to South Africa.

02:01:59    25        MR. JONAS:  If we can pull up Government's Exhibit GT

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

154

1   Email 8 if that's okay.

2   BY MR. JONAS:

3   Q.  This is an email from the defendant to Venture capital

4   December 7, 2008.  Do you see, Senator Trotter, on the bottom

02:02:18   5   there is a flight itinerary, is that correct?

6   A.  That's correct.

7   Q.  And it says "Ben Israel, Prince," and it says traveling to

8   Johannesburg" -- do you see that -- "from Tel Aviv"?

9   A.  Yes.

02:02:34   10   Q.  In the middle of this email, we'll scroll up, it says,

11   "Shagreer, Senator Donne Trotter and Representative Ken Dunkin

12   all have the same itinerary into South Africa."

13          So does this confirm that this is what you traveled,

14   from Israel to South Africa with Ken Dunkin?

02:02:54   15   A.  Yes.

16   Q.  Did you also travel from Israel to South Africa with Ben

17   Israel?

18   A.  I believe Prince Asiel was on the flight as well.

19   Q.  What happened when you got to South Africa?

02:03:08   20   A.  We were there for the day, and then we went to Zimbabwe.

21   Q.  Did you stay overnight in South Africa?

22   A.  Zimbabwe.

23   Q.  No, I understand, but when you first got to South Africa,

24   did you first stay there overnight before going to Zimbabwe?

02:03:22   25   A.  Yes.

                    MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1   Q.  So when you were in South Africa, before you traveled the

2   next day to Zimbabwe, did you have a meeting about what was

3   going to take place in Zimbabwe?

4   A.  Not a formal meeting, no.

02:03:33   5   Q.  Just --

6   A.  I mean, we spoke about it, but there was no, that we will

7   be leaving basically what the itinerary would be, but there was

8   no handouts or formality to what the day would have to have.

9   Q.  So who led that informal meeting discussing what was going

02:03:55   10   to happen the next day?

11   A.  Prince Asiel.

12   Q.  What did he tell you would happen when you got to Zimbabwe?

13   A.  What happened?  Well, one of the things that I was looking

14   forward to do was to not just be told what was going on, but I

02:04:09   15   wanted opportunities to visit the countryside so I could see

16   personally for myself, and he confirmed that that was on our

17   agenda to do.

18   Q.  Did he tell you who you would be meeting with from the

19   government of Zimbabwe if anybody?

02:04:23   20   A.  I'm certain he did.

21   Q.  Do you remember who he told you?

22   A.  I knew I was supposed to meet with the Governor who I spoke

23   to, Governor Gono, the President if he was available would be

24   in attendance, and various other leaders from the country.

02:04:41   25   Q.  So did you go to Zimbabwe the next day?

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1    A.  Correct.

2    Q.  How did you get there?

3    A.  Flew.

4    Q.  What City in Zimbabwe did you fly into?

02:04:51    5    A.  Harare.

6    Q.  Is that the capital?

7    A.  That's the capital.

8    Q.  When you landed in Harare, were you met by anybody at the

9    airport?

02:05:00    10    A.  Yes, and -- yes.

11    Q.  By whom?

12    A.  I'm assuming Mr. Turner was there along with members from

13    the Zimbabwean government.

14    Q.  And I'm assuming you went from South Africa to Zimbabwe,

02:05:15    15    you travelled with Ben Israel and Ken Dunkin?

16    A.  Correct.

17    Q.  So when you got to the airport and you were met by the

18    defendant and the other people from the Zimbabwean government,

19    where did you go?

02:05:26    20    A.  We went to, the building, I believe it was the national

21    bank building.

22    Q.  For what purpose?

23    A.  For a meeting.  It was basically a large meeting room which

24    other people were in attendance as well.

02:05:40    25    Q.  When you went up to the meeting room, who was there?

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

157

1   A.  Along with other directors of business of the country were

2   there, and we were met then by the President.

3   Q.  President Mugabe?

4   A.  Correct.

02:05:58   5   Q.  Okay.  And it was you and Ken Dunkin, is that correct?

6   A.  Well, our delegation, right.  That was who I traveled with,

7   yes.

8   Q.  So let me back up for a second.

9        From the American side, who was there?

02:06:11   10   A.  That I recognized, I believe we had Carol Adams at the

11   time, Mr. Turner, and I can't think of any other.

12   Q.  Ken Dunkin?

13   A.  Oh, yes.

14   Q.  Ben Israel?

02:06:28   15   A.  My group, yes.

16   Q.  Okay.  And from the Zimbabwe side, who was there?

17   A.  Again, there were a couple of, and I'm giving them titles,

18   I don't know exactly, ministers from whatever department they

19   were, like the minister of health, minister of bank or finance

02:06:46   20   that they had and other people, minister of agriculture or at

21   least a representative if it wasn't the minister.

22   Q.  You said that President Mugabe showed up?

23   A.  I believe, just as a greeting.  It was not, he did not stay

24   for the meeting.

02:07:04   25   Q.  What did he say when he was there?

MICHAEL P. SNYDER, Official Court reporter

Case: 1:13-cr-00572 Document #: 254 Filed: 04/16/15 Page 158 of 221 PageID #:2416
Trotter - direct by Jonas
158

A.  Just welcoming everybody to the country, hopefully that,

you know, we'll get to see what some of the problems are and

hopefully work to make some kind of recommendations to make

things better.

Q.  Did Mugabe thank anybody for setting up the meeting?

A.  I'm certain he did, and I couldn't give you who he directed

his comments to.

Q.  Did Gideon Gono show up?

A.  Yes.

Q.  How were you introduced in this meeting?

A.  As a state senator who serves on not the Finance Committee

but I served on the Appropriations Committee, someone that was

familiar with how government operates and had a keen interest

in what goes on in Africa on the continent in general, not a

stranger to the continent of Africa.

Q.  Were you also described in any way as having a relationship

with Barack Obama?

A.  That I served with him, that is correct.

Q.  Who made this introduction?

        MR. JONAS:  Withdrawn.

BY MR. JONAS:

Q.  Who said what, who introduced you this way?

A.  This is normally I would have to say Prince Asiel.  That's

who basically that I spoke with, or who -- I mean, that's who I

came with, so I'm assuming it was him that did it.  I can't put

                MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1    it.  Prince Asiel.

2    Q.  At the meeting, Prince Asiel is the one who introduced you

3    to the Zimbabwe officials?

4    A.  As part of the delegation that came in with him, correct.

02:08:53    5    Q.  All right.  What was discussed by Gideon Gono during this

6    meeting?

7    A.  I'm sorry, sir?

8    Q.  What was discussed by Gideon Gono during this meeting?

9    A.  It was essentially just talking about again the status of

02:09:05    10   what was going on, the high inflation that was going on, the

11   hardships on the people because of the sanctions, they were not

12   able to do business.  Certainly it was talking about, touting

13   how great the country was, certainly how great the country can

14   be if there was an opportunity to exercise self-determination

02:09:31    15   versus being crippled by the things that were going on at the

16   time.

17   Q.  Did you stay in Zimbabwe?

18   A.  We stayed over that night, correct.

19   Q.  And then where did you go?

02:09:44    20   A.  We made those tours.  Part of this was we made the tours of

21   the country to look at some of the farmland, to walk through a

22   farm that was working, one that was not working, and had an

23   opportunity to meet with some of the indigenous people that

24   were there.

02:10:02    25   Q.  After you left Zimbabwe -- how long did you stay in

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1   Zimbabwe?

2   A.  Just the one, over one night, and we went back the next

3   day.

4   Q.  Who paid for your hotel room?

02:10:12   5   A.  In Zimbabwe?  I can only make the assumption it was paid

6   for by Prince Asiel.  I did not.

7   Q.  You didn't pay for it?

8   A.  No.

9   Q.  Who made the hotel reservations, if you know?

02:10:25   10   A.  I do not know who made the reservations.

11   Q.  Who made your flight arrangement?

12   A.  I do not know.

13   Q.  Were you just told to go to this flight, this airline this

14   day?

02:10:34   15   A.  Well, I had an itinerary, yes.

16   Q.  Who gave you that itinerary?

17   A.  It was Prince Asiel.

18   Q.  I'm sorry?

19   A.  Prince Asiel.

02:10:43   20   Q.  After the trip, did you follow up with any US official or

21   federal government official regarding lifting the sanctions

22   against Zimbabwe?

23   A.  No federal officials, no.

24   Q.  I show you what's been marked as Government's Exhibit GT

02:10:58   25   Email 5.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

161

| | |
|---|---|
| 1 | MR. JONAS:  If we can publish it, Your Honor? |
| 2 | THE COURT:  Yes. |
| 3 | BY MR. JONAS: |
| 4 | Q.  This is an email from the defendant to Prince Ben Israel |
| 02:11:06  5 | dated November 20th, 2008, a letter to Dr. Gono urgent.  If we |
| 6 | can go to the body. |
| 7 | Do you see that this letter is addressed to Hon. Dr. |
| 8 | Gideon Gono, Governor of the Reserve Bank? |
| 9 | A.  Yes. |
| 02:11:21  10 | Q.  Is that the same Gideon Gono you met with? |
| 11 | A.  Yes. |
| 12 | Q.  And this is I believe prior to the meeting in Zimbabwe? |
| 13 | A.  Correct. |
| 14 | Q.  Because this is November? |
| 02:11:30  15 | A.  November 12. |
| 16 | Q.  Do you see who this letter is addressed from on the bottom? |
| 17 | A.  Yes. |
| 18 | Q.  Understanding the spelling is wrong, again, are you the |
| 19 | only Donne Trotter, state senator of Illinois? |
| 02:11:45  20 | A.  I am the only one in the state of Illinois. |
| 21 | Q.  If we can go to the bottom of the letter, please. |
| 22 | First of all, this letter states -- did you authorize |
| 23 | the defendant to write this letter on your behalf? |
| 24 | A.  No, I did not. |
| 02:12:02  25 | Q.  Have you ever seen this letter before? |

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

162

```
          1    A.  Not before it was presented as evidence, no.
          2    Q.  I show you Government's Exhibit GT Email 13.  This is an
          3    email from the defendant to a woman named Jean dated January
          4    13, 2009.  Do you see that, sir?
02:12:36  5    A.  Yes.
          6    Q.  This would be after you came back from Zimbabwe in
          7    December?
          8    A.  Yes.
          9    Q.  Attached to this email is a letter, if we can go to the
02:12:44  10   second page.  Do you see that letter?
          11   A.  Yes, I do.
          12   Q.  Is that your letterhead?
          13   A.  It is my letterhead.
          14   Q.  Do you see who this letter is addressed to?
02:13:01  15   A.  President Mugabe, yes.
          16   Q.  President Mugabe, President of Zimbabwe?
          17   A.  Correct.
          18   Q.  Towards the bottom of the letter, please, do you see your
          19   name is there?
02:13:12  20   A.  Yes, I do.
          21   Q.  Is that your signature?
          22   A.  No, it is not.
          23   Q.  Have you ever seen this letter before it being shown to you
          24   by the government?  Have you ever seen this letter before?
02:13:23  25   A.  No.
```

                    MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

163

1    MR. JONAS:  If we can enlarge the first paragraph
2 please.
3 BY MR. JONAS:
4 Q.  It says, "After further discussions, Prince Asiel Ben
02:13:40    5 Israel and a few colleagues, I am prepared to lead a delegation
6 of elected officials to Zimbabwe January 23rd, 2009, through
7 January 26, 2009."
8    Were you planning to lead a delegation to Zimbabwe in
9 January of 2009?
02:13:57    10 A.  There were discussions, but there was no plan to do so.
11 Q.  The letter goes on to say, "This delegation will also serve
12 as a support group to lobby for President-Elect Barack Obama to
13 enter into discussions with President Mugabe with no
14 preconditions to discuss the country of Zimbabwe and its
02:14:18    15 current relationship with the United States of America."
16    So you said there were discussions about going back to
17 Zimbabwe.  Did these discussions include creating a support
18 group to lobby President-Elect Barack Obama regarding the
19 country of Zimbabwe?
02:14:32    20 A.  No.
21 Q.  Who did you have these discussions about going to Zimbabwe,
22 going back to Zimbabwe with?
23 A.  With Prince Asiel.
24 Q.  Did you tell the defendant, did you give the defendant this
02:14:41    25 letter?

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

164

1    A.  No, I did not.

2    Q.  Do you know where it came from?

3    A.  No, I do not.

4    Q.  Did you agree that you would serve as a support group or a

02:14:55   5    lobby to lobby President-Elect Barack Obama regarding Zimbabwe?

6    A.  No.

7    Q.  I show you GT Email 16.  This is an email from the

8    defendant to Jean dated January 22nd, 2009.  It's marked

9    confidential.  It says in the body of the email it's from C.G.

02:15:25  10    Turner, Esquire.

11         From the middle it says, "Please" -- I'm sorry.  The

12    beginning, "Please advise the Governor that there will be a

13    one-day delay on the arrival of the delegation, but was advised

14    by Prince Asiel who arrived in Johannesburg yesterday that

02:15:44  15    Senator Trotter and party will arrive tomorrow."

16         Did you have definitive plans to travel to Zimbabwe in

17    January of 2009?

18    A.  There was discussions for that to happen, yes.

19    Q.  Do you know who was supposed to travel on this trip?

02:16:00  20    A.  Not, no, I do not.

21    Q.  Who did you have those discussions with?

22    A.  Prince Asiel.

23    Q.  Where were these discussions?

24    A.  Back here in Chicago.

02:16:17  25    Q.  If we can go to Government's Exhibit GT Email 17.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

165

1       MR. JONAS:  Again, Your Honor, if I may publish?

2   BY MR. JONAS:

3   Q.  That is an email from the defendant to Jean again.  Do you

4   know who Jean is, by the way?

02:16:30    5   A.  No, I do not.

6   Q.  Do you recall meeting a secretary for Governor Gono when

7   you were in Zimbabwe, or secretary to the bank?

8   A.  I do not recall.

9   Q.  This is an email dated January 23rd, 2009.  If we can go to

02:16:41    10  the second page.

11      It's titled "Confidential memo to Governor Gono."

12      "Dear Governor."  And you see on the bottom it has the

13  defendant's name Gregory C. Turner, Esquire.

14      MR. JONAS:  If you can enlarge the fourth paragraph.

02:17:02    15  The one above that.

16  BY MR. JONAS:

17  Q.  It states, "Representative Ken Dunkin and Senator Trotter

18  will follow the visit of Dr. Adams and Prince Asiel to give the

19  Governor a firsthand report on the progress made and the

02:17:20    20  strategy recommended."

21      Were you planning on going back to Zimbabwe to give

22  the Governor a firsthand report on the progress made and the

23  strategy recommended?

24  A.  I was not given any formal assignment to come back and

02:17:31    25  report to the president.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1   Q.  This says "Governor."

2   A.  Governor.  Excuse me.

3   Q.  What progress, do you know what progress was being referred

4   to here?

02:17:43   5   A.  No.

6   Q.  Do you know what strategy, did you have a strategy to

7   recommend to Governor Gono about anything?

8   A.  None that was discussed or formulated.

9   Q.  Turning to Government's Exhibit GT Email 20.  This is the

02:18:04   10   email dated March 1st, 2009, from the defendant to Jean.  It

11   says "Victory is our only option."

12          Prior to testifying, prior to the government showing

13   you this email, have you seen this email before?

14   A.  No.

02:18:24   15          MR. JONAS:  If we can enlarge that first paragraph.

16   BY MR. JONAS:

17   Q.  It says, and I'm reading from the third line at the end,

18   well, in the middle, "We remain committed to Governor Gono

19   until he surrenders himself (smile).  Please advise the

02:18:43   20   Governor that based on the recent developments and the

21   President's desire for the unity government to push hard

22   against sanctions, we hope the work of Gideon's Army will not

23   be wasted new contacts have been made, and the MDC does not

24   have the relationship at our level in the Obama

02:18:57   25   administration."

          MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1    Senator Trotter, are you part of Gideon's Army?

2  A.  No.

3  Q.  Go to the bottom, the last one, above that.

4    It ends, "In short, Jean, we want the Governor to know

02:19:17  5  that the Chicago connection never surrenders or forgets its

6  friends."

7    Are you part of the Chicago connection?

8  A.  No.

9  Q.  Go to the signature block.  It says "Greetings from

02:19:30  10  Jerusalem.  Prince" -- That would be Prince Ben Israel?

11    Donne would be you.

12    Ken would be Ken Dunkin?

13  A.  I can only make --

14  Q.  That's context?

02:19:39  15  A.  Yes, in this context, that's true.

16  Q.  And "Yours truly, your world ambassador," since this is

17  coming from his email.

18    Did you authorize the defendant to send an email

19  signed by you with your name on the bottom to Jean saying that

02:19:52  20  you were part of Gideon's Army and that the Chicago connection

21  never surrenders?

22  A.  No.

23  Q.  Did you ever -- did the defendant ever ask you if he could

24  put your name on this email?

02:20:10  25  A.  No.


    MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

168

1    Q.  Did Ben Israel ever ask you?

2    A.  No.

3    Q.  Government's Exhibit GT Email 48.  It's an email from the

4    defendant to Chris dated September 29th, 2009.  If we go to the

02:20:30    5    third page.  I'm sorry, the next one.  Go to the second page

6    then.

7         Do you see this letter is on your letterhead?

8    A.  Yes.

9    Q.  And just to be clear, that is your letterhead?

02:20:55    10   A.  Yes, yes.

11   Q.  This is a letter to the Honorable President Robert Mugabe,

12   Republic of Zimbabwe, dated July 6, 2009.  Let's go to the

13   bottom, the signature block.

14        Is that your signature?

02:21:09    15   A.  It is a facsimile of it, yes.

16   Q.  Prior to testifying, prior to the government showing you

17   this letter, have you ever seen this letter before?

18   A.  No.

19   Q.  Go to the top, the first three paragraphs.

02:21:26    20        It states "In keeping with my commitment to you and

21   Governor Gono, I am writing to give you an update."

22        Did you have a commitment to Zimbabwe's president

23   Robert Mugabe?

24   A.  I was never given an assignment to report to anyone or a

02:21:41    25   commitment to do so.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

169

1    Q.  Would that be the same for Governor Gono as well?

2    A.  Yes, it would.

3    Q.  It says "Last month I joined Prince Asiel in Washington,

4    D.C. where we met with the prime minister and his delegation."

02:21:54    5    Assuming that's the prime minister of Zimbabwe, did

6    you ever meet with a prime minister in Washington, D.C. with

7    Prince Asiel in the month of June or July, or even May of 2009?

8    A.  I couldn't find a record that said that I did, no.

9    Q.  Do you recall if you did?

02:22:09    10    A.  No.  I would think I would.

11    Q.  I'm sorry?

12    A.  Yes, I would recall if I did.

13    Q.  Is it your recollection you did not meet with the prime

14    minister, any prime minister during that time period?

02:22:21    15    A.  In Washington, that's correct.

16    Q.  It goes on to state, "In our meeting I informed him that I

17    too am a committed member of the team supported by you working

18    towards the removal of sanctions placed on Zimbabwe."

19    Were you a committed member of the team supported by

02:22:37    20    Robert Mugabe working towards the removal of sanctions placed

21    on Zimbabwe?

22    A.  No.

23    Q.  The next paragraph talks about your position as a chairman

24    of the International Committee for the National Black Caucus of

02:22:55    25    State Legislators.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

170

1    Is that a position that's true, did you have that
2 position with the National Black Caucus of State Legislators?
3 A.  Yes, I did, and yes, I do.
4 Q.  "Because we've agreed to organize a delegation to travel to
5 Zimbabwe in September 2009."
6    Is that actually true?
7 A.  That's true.
8 Q.  It states "The firsthand assessment will enable us to
9 observe the effects of the economic sanctions and assist us in
10 providing the leadership needed to fight for the removal of the
11 sanctions."
12    Is that the purpose for leading a delegation of state
13 legislators to Zimbabwe, to fight for the removal of sanctions?
14 A.  No.
15 Q.  Go to the next paragraph.  It states, "I have asked your
16 ambassador in Washington, D.C. to look at your schedule and
17 arrange an appropriate time for us to meet."
18    Did you ask the Zimbabwe ambassador in Washington,
19 D.C. to look at his schedule and arrange an appropriate time to
20 meet?
21 A.  No, I did not.
22 Q.  Did you authorize anyone to write this letter?
23 A.  No.
24 Q.  I show you Government's Exhibit GT Email 103.  This is an
25 email from the defendant to the chief secretary of Zimbabwe,

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1    Robert Mugabe's chief secretary.  It states, "As per your

2    direction, we have advised Ambassador Moyo of the upcoming

3    support group coming to visit and confer with HE President RGM.

4    As explained at your office, these legislators are chosen by

02:24:44    5    Senator Trotter and briefed on the real issues concerning the

6    challenges Zimbabwe faces versus the newspaper accounts."

7         Did you choose delegates to go on this trip to the

8    National Black Caucus of State Legislators?

9    A.  Yes, I did.

02:24:57    10    Q.  Okay.  Did you brief them on the real issues concerning the

11    challenges Zimbabwe faces versus the newspaper accounts?

12    A.  I wouldn't interpret it that way.  We had discussions, but

13    this group was selected so they can go and make their own

14    objective opinions of what was going on.

02:25:22    15         MR. JONAS:  Scroll down, please, to where it says this

16    group is to arrive, in that paragraph.

17    BY MR. JONAS:

18    Q.  It says, "Again Senator Trotter, who leads the delegation,

19    has convinced these key lawmakers to support our epic struggle

02:25:42    20    to regain independence and most of all control of our land."

21         Did you convince key lawmakers to support an epic

22    struggle to maintain independence and control of land?

23    A.  No.

24    Q.  Did you saw authorize the defendant to say to so?

02:25:59    25    A.  No.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1  Q.  If we can pull up Government's Exhibit GT Email 67, please.

2  This is an email from the defendant to an individual named

3  Mumbengegwi.  Do you know who that is?

4  A.  Let me see the name.

02:26:33    5  Q.  Do you see that on the email account?

6  A.  No.

7  Q.  It's dated November 16, 2009.

8          It states, "Please be advised that the senator

9  delegation have agreed to journey to Zimbabwe on the 5th of

02:26:51   10  December for discussion and gain understanding on the issues

11  surrounding the inclusive government."

12          The prior emails talked about this trip occurring in

13  September.  This one says December, so was the trip delayed?

14  A.  It was delayed.

02:27:04   15  Q.  It goes on to state, "As you are aware, Senator Trotter is

16  in strong support of the removal of the sanctions and expressed

17  it to the Obama administration as well recently to you deputy

18  prime minister in Chicago."

19          Did you express to anyone in the Obama administration

02:27:21   20  your strong support for the removal of the sanctions?

21  A.  No, I did not.

22  Q.  Did you authorize the defendant to say that?

23  A.  No, I did not.

24  Q.  Did you express it to a deputy prime minister in Zimbabwe

02:27:30   25  in Chicago?

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1   A.  No, I did not.

2   Q.  Did you meet the deputy prime minister of Zimbabwe in

3  Chicago?

4   A.  Not to my recollection.

02:27:37   5   Q.  What is the National Black Caucus of State Legislators?

6   A.  It's a coalition of legislators, state legislators

7  throughout the country.

8   Q.  And you already said you're a member?

9   A.  That's correct.

02:28:03  10   Q.  How long have you been a member?

11   A.  About 24 years.

12   Q.  Do you hold any position within the Caucus?

13   A.  I am the chairman of the international committee.

14   Q.  What authority does the Caucus have when it comes to making

02:28:18  15  laws or -- as a Caucus, not as individual legislators?

16   A.  None.  You mean as far as our relationship with Congress or

17  making impact on that?

18   Q.  Correct.

19   A.  There is no binding relationship that we have.

02:28:33  20   Q.  Does the Caucus hold annual meetings?

21   A.  Yes, we do.

22   Q.  In December of 2009 did it hold its annual meeting?

23   A.  Yes, we did.

24   Q.  Where?

02:28:48  25   A.  In Florida.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1  Q.  In Florida?

2  A.  Yes.

3  Q.  Good place to hold it in December?

4  A.  It wasn't a bad place to have it in December.

02:28:56  5  Q.  Did Ben Israel appear at this Caucus?

6  A.  Yes, he did.

7  Q.  Was the defendant there as well?

8  A.  Yes, he was.

9  Q.  Why was Ben Israel and the defendant there?  At whose

02:29:07  10  invitation?

11  A.  By the invitation of the organization and myself as

12  chairman of the international committee.

13       MR. JONAS:  One second, Your Honor.

14     (Pause.)

02:29:23  15  BY MR. JONAS:

16  Q.  So the caucus in 2009 was in December, and one of the

17  emails you just looked at said this trip was going to be in

18  December.  So were they coinciding around the time of this

19  trip?

02:29:39  20  A.  That was the plan.  As a rule, many of our legislatures are

21  recessed during that time because of the holidays and so forth,

22  so if there was going to be a trip, this was, would have been

23  the window of opportunity for that to happen.

24  Q.  Prior to the caucus, was there planning being done for this

02:30:03  25  trip?

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

175

1    A.  I'm sorry?

2    Q.  Prior to the caucus -- I'm sorry, not prior to the caucus.

3    Prior to the conference of the Caucus in December of '09, was

4    there planning for the trip?

02:30:12    5    A.  Yes.

6    Q.  Who was involved in that planning?

7    A.  Prince Asiel, myself and other members of the committee.

8    Q.  What did you do with regard to planning this trip?  What

9    did you do?  What was your role with regard to planning the

02:30:27    10    trip?

11    A.  To look at who would be best suited to take this trip.  We

12    wanted, again as the chairman of the committee, I wanted people

13    that were interested in international affairs and not someone

14    who just wanted to go on a vacation to Africa.  So I, I sort of

02:30:45    15    did vetting of the individuals that would --

16    Q.  You wanted to make sure there was no boondoggle by

17    different legislators?

18    A.  It was a serious enough situation to do.

19    Q.  What was Prince Ben Israel's role in planning this trip?

02:30:59    20    A.  To see if it could be authorized to travel there and see if

21    we can find funding.

22    Q.  Authorized by whom?

23    A.  I guess we couldn't just go over there and speak to the

24    government.  Authorized by the Zimbabwean government.

02:31:15    25    Q.  And you said funding.  Funding by whom?

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1  A.  Whoever the funding could come from.  I didn't know if he

2  was going to self-pay or -- again, that wasn't the issue.  So

3  for the whole trip to come together, could we afford how many

4  people could afford, so the logistical kinds of things like

02:31:35  5  that.

6  Q.  You say self-pay.  Do you mean that the state legislator,

7  they would pay for themselves?

8  A.  That was discussed, yes.  Or some portion of it, whichever,

9  you know, could happen.  Some portion had to be paid.  It's not

02:31:54  10  unreasonable.

11  Q.  If we can pull up Government's Exhibit GT Email 104.  This

12  is an email from Greg Turner to the chief secretary for Robert

13  Mugabe dated November 24th, 2009.

14      It said, "Update on visit of Senator Trotter."  Do you

02:32:21  15  see that subject line?

16  A.  Yes, I do.

17  Q.  If we go to the second page.

18      Is this your letterhead again?

19  A.  Yes, it is.

02:32:29  20  Q.  This letter is dated November 23rd, 2009, to President of

21  Zimbabwe, do you see that?

22  A.  Yes.

23  Q.  This letter is on the signature block, has your name as

24  state senator.  Is that your signature?

02:32:43  25  A.  That's a facsimile of it, yes.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

177

1    Q.  Do you normally sign your name or it is only a --

2    A.  I normally sign it this way, but I know the difference.

3    This is from a stamp.

4    Q.  Did you authorize this letter to be stamped with your name?

02:32:58    5    A.  Can I see the letter again, sir?

6    Q.  Yes, sir.  If you want, there should be a hard copy in that

7    binder if that helps.

8    A.  I can see this.  Okay.

9         No, I did not.

02:33:15    10    Q.  It states in the second paragraph, it says, "Please know we

11    agree with and support lifting of the sanctions imposed upon

12    Zimbabwe."

13         Did you agree with and support the lifting of the

14    sanctions imposed upon Zimbabwe?

02:33:41    15    A.  No.

16    Q.  Did you ever tell that to Robert Mugabe?

17    A.  There were discussions talking about the sanctions and the

18    impact that they had, but I did not make any promises because I

19    don't have that kind of authority to get rid of the sanctions.

02:33:55    20    Q.  Is that because the sanctions are not imposed by the State

21    of Illinois?

22    A.  That's correct.

23    Q.  Imposed by the federal government?

24    A.  That's correct.

02:34:02    25    Q.  Did you authorize this letter to be sent out in your name?

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1    A.  No, I did not.

2    Q.  The letter goes on to talk about the delegation for, to

3    travel from December 6, 2009, to the end of 2009.  That's

4    accurate?  The delegation was --

02:34:20    5    A.  Yes.

6    Q.  Go to Government Exhibit GT Email 105.  This is the email

7    from the defendant to the same individual on the same day as

8    the prior email.

9         The next page, this is on your letterhead?

02:34:45    10   A.  Correct.

11   Q.  And you see the signature block?

12   A.  Yes.

13   Q.  Is that your signature?

14   A.  Yes.  Again, I can tell it's a stamp.

02:34:57    15   Q.  A stamp.  And this letter is to Gideon Gono, Governor of

16   Reserve Bank of Republic of Zimbabwe.

17        Did you write this letter?

18   A.  Can I see it again?

19   Q.  Yes, if we can pull back.  Take a look at it.

02:35:14    20   A.  No, I did not.

21   Q.  Did you authorize this letter?

22   A.  No, I did not.

23   Q.  Did you tell the defendant he could send this letter to the

24   chief secretary of the governor of Zimbabwe, Robert Mugabe's

02:35:29    25   chief secretary?  Did you tell the defendant that he could send

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1    this letter.

2    A.  No.

3    Q.  The letter states, "Prince Asiel Ben Israel continues to

4    sensitize African-American leadership regarding the plight of

02:35:50    5    the people of the Republic of Zimbabwe along with Ambassador

6    Mapuranga have been invited to join the executive board of

7    nationally elected state officials on December 4, 2009, to give

8    an update regarding the effect of the sanctions that have been

9    unjustly imposed upon the people of Zimbabwe."

02:36:09    10          Was Ben Israel invited to speak at the national state

11    legislators annual conference?

12    A.  Yes, sir.

13    Q.  Was Ambassador Mapuranga invited to speak?

14    A.  There were several people.  The actual invitations to the

02:36:25    15    meeting were handled by the committee themselves.  I put Prince

16    Asiel in touch with the selection committee.  So I don't know

17    who all they authorized.

18    Q.  So in this letter, which is signed by you, you have no

19    personal knowledge of whether or not this ambassador was

02:36:45    20    invited?

21    A.  No.

22    Q.  Go to the second paragraph.  It says, "Please know that we

23    applaud your efforts as you have, as Governor of the Reserve

24    Bank, led the fight to survive during this global economic

02:37:02    25    meltdown."

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1  Did you applaud the efforts of Gideon Gono?

2  A.  No.

3  Q.  It states, "While in Zimbabwe, we hope to meet with you to

4  further discuss how the sanctions have effected and affected

02:37:18  5  the country economically as we work to develop a strategy that

6  will end with the lifting of the sanctions."

7  Were you working to develop a strategy to end the

8  lifting of the sanctions?

9  A.  There were discussions talking about the sanctions, but I

02:37:31  10  was not part of a comprehensive plan to lift the sanctions, no.

11  Q.  Government's Exhibit GT Email 73.  This is a letter, an

12  email, sorry, from the defendant dated November 27, 2009.

13  Attached on the second page, you see there's a subject line

14  "Final delegation list, National Black Caucus of State

02:37:58  15  Legislators."

16  The second page is a list of senators,

17  representatives.  Are these some of the people that you

18  selected to go on this trip?

19  A.  Yes, they are.

02:38:14  20  Q.  It has delegation leader and has your name?

21  A.  Yes.

22  Q.  Delegation coordinator Prince Ben Israel, that's all

23  accurate?

24  A.  Well, it's not all accurate, but these are the names, yes.

02:38:25  25  Q.  Please explain what's not accurate.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1    A.  Well, Senator Nathaniel T. Oaks is delegate Oaks.  Senator

2    Almadge Branch is actually Thomas Branch.  There's some --

3    Q.  Typos?

4    A.  Well, yes, typos and title incorrections as well.  And

02:38:46    5    there's a Joe Armstrong is a state representative, Jewell

6    Williams was also a state representative.  Down the line.  So

7    there are several different titles for individuals and names

8    spelled wrong.  But it's, but I know who they are, yes.

9    Q.  If we can go to Government Exhibit GT Email 80.

02:39:19    10    Actually, before I ask you about this, did the trip

11    happen?

12    A.  No.

13    Q.  Why not?

14    A.  It could not be coordinated with, at the time, so it was

02:39:32    15    called off.

16    Q.  At the conference in December '09 in Florida, did Ben

17    Israel speak to any committees?

18    A.  Yes, he did.  He spoke before the international committee.

19    Q.  Were you there?  Did you hear him speak?

02:39:47    20    A.  No, I did not.

21    Q.  Do you know what he was supposed to speak about?

22    A.  Yes.

23    Q.  What was that?

24    A.  About the impact of sanctions on the country of Zimbabwe.

02:39:56    25    Q.  Did Ben Israel say anything during his speech or say

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1  anything during this conference that caused problems with

2  regard to this trip?

3  A.  It was, the trip itself was pretty structured.  Again, as I

4  pointed out, I wanted individuals that were knowledgeable of

02:40:22  5  the things that went on on the continent of Africa and

6  specifically what was going on in Zimbabwe.  During the meeting

7  many of the members got the impression that this was an open

8  trip to go to, so that caused a little disruption.  At least

9  different plans had to be thought about.

02:40:44  10  Q.  Did Ben Israel say anything that could have caused that

11  impression?

12  A.  I wasn't in the meeting itself other than --

13       MR. LEONARD:  I would object on hearsay ground, Judge.

14  There's no foundation.

02:40:56  15       THE COURT:  Foundation?

16  BY MR. JONAS:

17  Q.  Without saying what was said, was anything said by Ben

18  Israel that indicated that these other members would be invited

19  other than the ones you hand picked?

02:41:12  20       MR. LEONARD:  Objection, hearsay and foundation.

21       THE COURT:  Yes.

22       MR. JONAS:  I think that's where I'm going with the

23  foundation.

24       THE COURT:  That wasn't the question.

02:41:20  25       MR. JONAS:  Let me withdraw the question.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

183

BY MR. JONAS:

Q.  Did Ben Israel ever talk to you about inviting additional members?

A.  No.

Q.  But the trip didn't happen?

A.  No, it did not.

Q.  At the time of the conference, did you issue a resolution regarding Zimbabwe?

A.  As one of the action items that we took up as a committee, yes, we included Zimbabwe as one of the countries in the diaspora that we wanted to look at further.

Q.  What do you mean by look at further?

A.  Well, just to see if there was interest.  We, like a lot of ethnic groups, have concerns about what's going on in the African diaspora, in this case what was going on in Haiti, why there was such a what we felt was a slow response to the hurricane that hit, what was going on in Cuba, their problems of, again, sustainability, in this case also Zimbabwe.  It was something that we had to further at least look at before we went any further with any action as citizens.

Q.  Who brought Zimbabwe to the table for your committee to even look at?

A.  Besides myself?

Q.  Besides yourself.

A.  It was an issue that was asked by Prince Asiel that could

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

184

1    we in fact discuss this at our meeting.

2    Q.  Turn to Government Exhibit GT Email 80.  This is an email

3    from the defendant to bbjsolar where he says "Please download

4    and bring clean copy of this resolution.  Make sure it's in

02:43:13    5    color and clean.  Then deliver to Denise to our cheap ass gov

6    to know failure is not an option with the Chicago mob."

7              Senator Trotter, are you a member of the Chicago mob?

8    A.  No.

9    Q.  And I'm not meaning in an organized crime --

02:43:27    10    A.  Yes, I know.  No.

11    Q.  Go to the next page, please.  What is this document?

12    A.  That's seemingly an invitation.  Can you bring it a --

13    Q.  Enlarge the top part?

14    A.  No, right there.

02:43:55    15              This looks like, this is the resolution that we put

16    together.

17    Q.  This is what you talked about a few moments ago?

18    A.  Yes.  This was a letter of invitation to speak at the

19    meetings, which was held in Fort Lauderdale, Florida, and the

02:44:21    20    intentions of what our -- the areas that we will cover in our

21    committee, formal letter to the organization.

22    Q.  Did you write this letter?

23    A.  It was probably written by my staff, correct.

24    Q.  Do you see your signature on the bottom above your name?

02:44:42    25    A.  Right.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1  Q.  Is that your signature?

2  A.  That looks like one of my --

3  Q.  Electronic?

4  A.  Thank you.

02:44:50  5  Q.  Electronic signature?

6  A.  Yes.

7  Q.  Attached at the next page it says, "Resolution 04-31."

8       What is this?

9  A.  The resolution itself?

02:45:10  10  Q.  Yes, if we can -- maybe it would be easier if I hand you a

11  paper copy of this.

12  A.  No, I can see it now.

13       These are the rest of the subjects that we took up in

14  our international committee meeting, and as part of the

02:45:31  15  procedure, if we want further action to be taken by the body as

16  a whole, we present our discussions in this form, in this

17  resolution form and submit it to the executive committee.

18  Q.  Okay.  Do you see the date on this one?

19  A.  December 1st, it talks about -- this is in '03.

02:46:03  20  Q.  Is this an older resolution?

21  A.  Yes.

22  Q.  This is not the resolution issued in 2009, is that correct?

23  A.  That's correct.

24  Q.  Okay.

02:46:21  25       MR. JONAS:  Your Honor, I'm showing the witness the

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1    rest of this one, I think it may go easier.

2    BY MR. JONAS:

3    Q.  Senator Trotter, if you can flip through the rest of the

4    pages of this exhibit that were attached to the email.  Were

02:46:35    5    any of them the resolution issued in 2009?

6    A.  And what is your question again, sir?

7    Q.  Are any of these the resolutions that you just discussed

8    being passed in 2009?

9    A.  Parts of them, yes.

02:47:15    10    Q.  How are parts of them?

11    A.  Well, it doesn't get too far away from what we talked about

12    in '09.  It talks about the relationship of the Caucus to the

13    continent of Africa, and it does mention here Zimbabwe along

14    with the Congo, Liberia, Sierra Leone, Angola, Uganda, Ivory

02:47:40    15    Coast.  So it does mention essentially our relationship and the

16    reason why we were focused on Africa.

17         It also, in one of them, it talks about, as we did in

18    '09, the relationship with Haiti as well.  So many of these

19    things we looked at in '09 were just revisited from what we had

02:48:06    20    talked about before.

21    Q.  So somewhat the subject matter would be the same, but these

22    were older resolutions?

23    A.  Correct.

24    Q.  Okay.  Turn your attention to Government Exhibit GT Email

02:48:14    25    86.  Do you see that on the screen, Senator?  This is an email

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

187

1   to the defendant to someone named Walter Mzembi.

2          Do you know who Walter yes?

3   A.  No, I do not.

4   Q.  The email says, "Please peruse these drafts of the official

02:48:41   5   invitations and advise if they are to your approval," approval

6   being in all caps.  "If so, I will bring signed copies on

7   letterhead for your presentation to Parliament."

8          If you go to the third page of this exhibit, do you

9   see it on the screen, Senator?

02:48:53   10   A.  Yes.

11  Q.  This is a letter dated, or a draft of a letter because it

12  says "draft" across the middle, dated January 3rd, 2010,

13  Honorable Walter Mzembi, Minister of Tourism, Republic of

14  Zimbabwe.

02:49:07   15          Toward the bottom you see the signature block.  The

16  signature block has your name, is that correct?

17  A.  That's my name, yes.

18  Q.  Go back to the letter, please.

19          First of all, did you authorize this draft being

02:49:23   20  written?

21  A.  No.

22  Q.  Did you tell anybody that they should take this draft --

23  did you tell the defendant that he should take this draft to

24  Minister Mzembi for his approval?

02:49:31   25  A.  No.


            MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

188

1   Q.  Go to the third paragraph of this draft.

2          "It is our hope that this official call for the

3   lifting of the sanctions by our 600 plus legislators will

4   culminate with the Obama administration actually lifting the

02:49:57   5   sanctions in March 2010, thus permitting Zimbabwe to reenter

6   the world financial community."

7          Was it the hope -- first of all, how many legislators

8   are in the National Black Caucus.

9   A.  That might be an accurate number, give or take.

02:50:13   10   Q.  And was it the hope of the Caucus that the Obama

11   administration would lift the sanctions in March 2010?

12   A.  That discussion was never had of any definitive date that

13   anything was supposed to have been done.

14   Q.  Turn to Government Exhibit GT 89, GT Email 89.  This is a

02:50:39   15   letter from the -- I'm sorry -- an email to the defendant to

16   someone named Annieqsyed.  If we can go to the third page of

17   this document.

18          This is on your letterhead?

19   A.  That's my letterhead.

02:50:58   20   Q.  It's a letter dated February 10, 2010, to the Honorable

21   Walter Mzembi, Minister of Tourism.

22          Take a quick look at this letter, and let us know if

23   it looks like the draft we have just discussed so we don't have

24   to go through the body again.

02:51:19   25   A.  Yes.

         MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

189

1  Q.  It's a signed copy of the draft that was sent from the

2  defendant to Walter Mzembi.

3         Is that your signature on the bottom?

4  A.  No, it is not.

02:51:26   5  Q.  Did you authorize anyone to sign this letter on your

6  behalf?

7  A.  No, I did not.

8  Q.  Do you authorize this letter?

9  A.  No, I did not.

02:51:36  10  Q.  Did the defendant ever talk to you about sending this

11  letter out to Walter Mzembi?

12  A.  No.

13  Q.  Have you seen this letter prior to the government showing

14  it to you?

02:51:43  15  A.  No.

16  Q.  Go to Government Exhibit GT Email 92.  This is an email

17  from the defendant to Prince Asiel dated May 19, 2010.

18         It says, "Here we go."

19         If we can go to the bottom part of this email, the

02:52:07  20  defendant is writing, where it says "Gregory Turner wrote," "As

21  per requested the members of your Chicago lobby team."  It

22  lists a number of individuals.

23         The second name down Senator Donne Trotter, Chairman

24  of the Appropriations Committee, Illinois legislator.

02:52:26  25         Were you a member of the Chicago lobby team?

           MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1    A.  No.

2    Q.  Did you authorize the defendant to say you were a member of

3    the Chicago lobby team?

4    A.  No.

02:52:35    5    Q.  Were you chairman of the appropriations committee?

6    A.  Yes.

7    Q.  So that's an accurate title?

8            But you never authorized the defendant to say you were

9    a member of the Chicago lobby team?

02:52:46    10    A.  No.

11    Q.  Do you consider yourself to be a member of the Chicago

12    lobby team?

13    A.  No.

14    Q.  Did you ever lobby on behalf of Zimbabwe?

02:52:53    15    A.  No.

16    Q.  Did you ever reach out the federal government to discuss

17    with anybody lifting of the sanctions against Zimbabwe?

18    A.  No.

19    Q.  Outside of the meetings you discussed in November 2008 when

02:53:08    20    you met with Mugabe in South Africa and December of 2008, did

21    you have any other meetings with Gideon Gono or Robert Mugabe?

22    I'm not talking about the first one.

23    A.  Not in '02.  Yes.  No.

24    Q.  Did you yourself ever send him an email or a letter?

02:53:25    25    A.  No.

MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

1    Q.  Or send one to anyone who was working in your office?

2    A.  No.

3    Q.  Did you write letters to anybody regarding the removal of

4    the Zimbabwe sanctions?

02:53:34    5    A.  No, I did not.

6    Q.  Did you set up any meetings with anyone from Zimbabwe

7    regarding the removal of the sanctions?

8    A.  No, I did not.

9    Q.  Did you do anything regarding the removal of the US

02:53:45    10    sanctions against Zimbabwe?

11    A.  No, I did not.

12    Q.  Did you ever receive money from any Zimbabwe official?

13    A.  No.

14    Q.  Did you provide any services to Robert Mugabe or Gideon

02:53:52    15    Gono?

16    A.  No.

17    Q.  Same question as to any other member of the Zimbabwe

18    government.

19    A.  No.

02:54:07    20         MR. JONAS:  One moment, Your Honor.

21       (Pause.)

22    BY MR. JONAS:

23    Q.  Prior to going to Zimbabwe in November of -- prior to going

24    to Zimbabwe in December of 2008, did Ben Israel ever tell you

02:54:26    25    he was getting paid from the government of Zimbabwe?

         MICHAEL P. SNYDER, Official Court reporter

Trotter - direct by Jonas

192

1   A.  No.

2   Q.  Did the defendant ever tell you that?

3   A.  No.

4   Q.  At any point did either of them ever tell you that he was

02:54:37  5   getting money from Zimbabwe?

6   A.  No.

7   Q.  That the defendant was chasing cash?  Did you he ever tell

8   you that?

9           MR. LEONARD:  Objection, Judge.

02:54:44  10          THE COURT:  He may answer.

11  BY MR. JONAS:

12  Q.  Do you want me to repeat the question.

13  A.  No, I believe not.

14  Q.  That he ever told you that?

02:54:50  15  A.  That he was chasing cash, no.

16          MR. JONAS:  Your Honor, no further questions.

17          THE COURT:  All right.  We'll take a break.

18       (Recess.  Jury out.)

19          THE COURT:  How are we doing in terms of time on this

03:12:20  20  trial?

21          MR. JONAS:  This is likely our last witness.  I would

22  ask, given the late time of the day and there is still cross,

23  that if we can just end the day when this witness is done, and

24  then we can come in on Monday and confirm.

03:12:34  25          THE COURT:  Okay.  And then how long do you think

            MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

193

1    yours will be?

2          MR. LEONARD:  We have to make some decisions, Judge.

3    Anywhere from, you know, one to three or four days.  But we

4    have to make some decisions about that.

03:12:50   5          THE COURT:  All right.

6          Okay.  We are ready.

7       (Jury in.)

8          THE COURT:  Please be seated.

9                        CROSS-EXAMINATION

03:15:12   10   BY MR. LEONARD:

11   Q.  Good afternoon, Senator Trotter.

12   A.  Good afternoon.

13   Q.  I'd like to talk to you a little bit about your

14   relationship with Prince Ben Israel.

03:15:21   15          I think you indicated that you had known him for quite

16   a long period of time, correct?

17   A.  Correct.

18   Q.  How many years do you fellows go back together?

19   A.  Back in the seventies, so about 35 years plus.

03:15:32   20   Q.  All right.  And I think you indicated that in '08 you took

21   the trip with Prince Ben Israel to South Africa, and I want to

22   talk about Prince prior to that date.

23   A.  Certainly.

24   Q.  Is it fair to say that the two of you were travel partners?

03:15:49   25   A.  Correct.

               MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

1   Q.  You would go various places together?

2   A.  Yes.

3   Q.  And prior to '08, were some of the places you went to

4   together in Africa?

03:15:59  5   A.  Yes.

6   Q.  And also as travel partners prior to '08, you went to

7   places with Prince Ben Israel or the defendant outside of

8   Africa, is that fair to say?

9   A.  That's correct as well.

03:16:11  10   Q.  And when you went on those trips with him, it is fair to

11   say there was nothing unusual about Prince Ben Israel paying

12   your way, correct?

13   A.  That's correct.

14   Q.  That was a common occurrence, wasn't it?

03:16:22  15   A.  It was.

16   Q.  Because you were friends, right?

17   A.  Yes.

18   Q.  And you would do these trips to get a little R&R, rest and

19   relaxation together, right?

03:16:32  20   A.  In large part that was it.

21   Q.  And the reality is that he was in a little different

22   financial situation because he's a businessman, right?

23   A.  Yes.

24   Q.  And one of the things he does, he's a restaurant owner,

03:16:44  25   right?

MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

195

1    A.  Yes.

2    Q.  And he's been doing that for a long time too?

3    A.  Yes.

4    Q.  And you indicated that, I think you said in response to

03:16:53    5    counsel's questions that I think 2002 was the first time that

6    you personally went over to Zimbabwe?

7    A.  That's correct.

8    Q.  And if you could remind us of the circumstances of that

9    trip.

03:17:06    10    A.  It was a delegation that was put together --

11            MR. JONAS:  Objection, Judge.  He said 2002 on that

12    trip.  It went further than that, and this is now going outside

13    the scope.  Reminding us of what?  He didn't testify about it,

14    so it's not relevant.

03:17:21    15            THE COURT:  Sustained.

16    BY MR. LEONARD:

17    Q.  When you were in Zimbabwe in 2002, did you have any

18    opportunity the view the countryside like you talked about

19    doing years later?

03:17:32    20            MR. JONAS:  Objection.

21            THE COURT:  Sustained.

22    BY MR. LEONARD:

23    Q.  Let's talk about your trip in 2008 that you took with

24    Prince Ben Israel.

03:17:46    25            That was where the two of you went to South Africa?

MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

1    A.  Yes.

2    Q.  And that was one of what we just talked about, one of those

3    R&R getaway trips that the two of you took together as travel

4    partners, right?

03:17:58   5    A.  Yes.

6    Q.  And you had the Obama issue to celebrate on the one hand?

7    A.  Yes.

8    Q.  Reconvene, reconnect with friends?

9    A.  Correct.

03:18:07   10   Q.  And also from the Zimbabwe standpoint see some of the

11   people you had seen years ago?

12   A.  That was somewhat correct, yes.  I mean, there were --

13   Q.  You indicated on the '08 trip, of course, Prince Ben paid

14   like he'd done so many times in the past, right?

03:18:23   15   A.  Yes.

16   Q.  And you would agree, there's no quid pro quo there?  Do you

17   know what I mean by that?

18   A.  There was none whatsoever.

19   Q.  And what I'm getting at is the fact that Prince Ben paid

03:18:34   20   for a trip for you as a friend, you didn't feel that you were

21   indebted to do something for him in return politically or

22   otherwise, right, sir?

23   A.  That's correct.

24   Q.  And you, of course, wouldn't do that because that's not

03:18:45   25   allowed, right, sir?

                MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

197

1   A.  That's correct.

2   Q.  And, obviously, when you have been in the political game as

3   long as you, your integrity is more important than doing

4   something for a friend, right?

03:18:55   5   A.  That's correct.

6   Q.  And on the '08 trip to South Africa, if you could remind

7   us, when you met with Prince Ben Israel, and Mr. Turner was

8   there too, right?

9   A.  Yes.

03:19:08   10   Q.  Who was the official you met with that time?

11   A.  President Mugabe.

12   Q.  Okay.  Was Mugabe one of the people you were familiar with

13   from years before or was he new?

14   A.  He was new.

03:19:20   15   Q.  And is it fair to say that when you went on that particular

16   trip and got to meet with some of the officials from Zimbabwe,

17   you had a legitimate interest in kind of finding out what was

18   going on there?

19   A.  Yes.

03:19:31   20   Q.  And one of the things that sort of piqued your interest was

21   obviously you would see news reports and things of that nature?

22   A.  Yes.

23   Q.  And also your friend Prince Ben Israel told you some things

24   about what was going on in the nation, correct?

03:19:45   25   A.  Correct.

MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

1  Q.  So it was really kind of important for you to figure out,

2  get some sense of what was really going on in terms of all the

3  rhetoric you were hearing from all sorts of different topics?

4  A.  Yes.

03:19:55    5  Q.  And at the meeting you went to in '08, Greg Turner was

6  there, but he was really not very active at the meeting, was

7  he?

8  A.  No, he was not.

9  Q.  Is it fair to say you don't even really recall him

03:20:08   10  speaking?

11  A.  That's -- yes.

12  Q.  And at that meeting, nobody tried to get you to agree to do

13  anything for them, did they, sir?

14  A.  There was no ask.

03:20:19   15  Q.  Nothing like that?

16  A.  No.

17  Q.  And really for you it was a nice time to learn some more

18  factual information and talk about some of the humanitarian

19  issues that were going on in the country and some of the needs

03:20:31   20  in Zimbabwe, right?

21  A.  Yes.

22        MR. JONAS:  Objection.

23  BY MR. LEONARD:

24  Q.  And you had a chance to observe Prince Ben's conduct when

03:20:43   25  you were on that trip in '08, didn't you?

MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

199

1    A.  Repeat your question.

2    Q.  Sure.  Sometimes my questions aren't great, so you could

3    just let me know.

4            But you had a chance to observe Prince Ben's conduct

03:20:58    5    during the days that you went to South Africa and talked to the

6    Zimbabwe folks, right?

7    A.  Yes.

8    Q.  Obviously you could see close up what Prince Ben was up to,

9    correct?

03:21:07    10   A.  No.

11   Q.  I mean, you were face-to-face with him at the meeting.  He

12   was there with you, right?

13   A.  Yes.

14   Q.  So you had a great chance to observe his actions?

03:21:15    15   A.  Yes.

16   Q.  And he didn't give you any reason to believe that these

17   folks in Zimbabwe were controlling him, did they, sir?

18   A.  No.

19   Q.  In fact, Prince Ben, you know him pretty well, he's not the

03:21:28    20   type of guy that can be controlled like that, can he?

21   A.  Not the Prince that I know.

22   Q.  He's kind of what we would call the ultimate entrepreneur,

23   free agent, right?

24   A.  He's his own man.

03:21:41    25   Q.  He's not beholden to anybody, right?

MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

200

1        MR. JONAS:  Objection.

2        THE COURT:  Sustained.

3   BY MR. LEONARD:

4   Q.  And with regard to Mr. Turner, while you were there in

03:21:51  5   South Africa, including with these meetings with the folks from

6   Zimbabwe, you had a chance to observe the conduct and behavior

7   of Mr. Turner, right?

8   A.  I saw him, yes.

9   Q.  And, Senator, he gave you no reason to believe that he was

03:22:06  10  being controlled or directed by the folks in Zimbabwe, did he?

11  A.  No.

12  Q.  And you know a little bit about Greg Turner, don't you?

13  A.  I do know him, yes.

14  Q.  And you know him, not nearly as close as Prince Ben, but

03:22:20  15  you've known him for a number of years, correct, sir?

16  A.  Yes.

17  Q.  And Turner, like Ben Israel, he's not the type of guy you

18  can direct and control, is he, sir?

19       MR. JONAS:  Objection.

03:22:31  20       THE COURT:  Sustained.

21  BY MR. LEONARD:

22  Q.  And when the meeting ended in '08 and you were going to

23  come back to Illinois with your friend, Prince Ben Israel,

24  there was no agreement about you, Senator, coming back here and

03:22:46  25  doing anything in particular, nothing that you agreed to do for

MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

1   these folks in Zimbabwe, was there?

2   A.  No.

3   Q.  And then you indicated I believe, sir, that the second trip

4   you actually went to the country of Zimbabwe, and that was '09,

03:23:05   5   right?

6   A.  Yes.

7   Q.  And was that sort of a little more in-depth opportunity to

8   see the country?

9   A.  It would have been, yes.

03:23:11   10   Q.  I think you said one of the things that you were actually

11   interested in was kind of poking around a little bit and seeing

12   the countryside, seeing the farms, seeing what was going on

13   there, right?

14   A.  Yes.

03:23:23   15   Q.  And, Senator, that's just because you had a legitimate

16   interest in what was happening in the nation, right?

17   A.  That's correct.

18   Q.  It's not because somebody told you you had to do it, right?

19   A.  No.

03:23:32   20   Q.  It's not because Prince Ben Israel said "Donne, you've got

21   to do this for me," right?

22   A.  That's correct.

23   Q.  It was something you were interest, and you had a keen

24   interest in international affairs, right?

03:23:40   25   A.  Yes.

MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

202

1    Q.  Even though you were a state senator, international affairs

2    are important to you?

3    A.  They are.

4    Q.  And I know that you said that was one of the things you

03:23:50    5    wanted to explore while you were in Zimbabwe in 2009.  Did you

6    get the chance to get out of the typical government buildings

7    in the city and see a little bit of the country?

8    A.  Yes, we did.

9    Q.  How much time did you spend doing that, Senator?

03:24:02    10    A.  It was the bulk of the day.

11    Q.  I'm sorry?

12    A.  The bulk of the day.

13    Q.  Okay.

14    A.  A good part of the day.

03:24:09    15    Q.  And was that the part of the day that preceded the meeting

16    or was it after the meeting?

17    A.  It was after the meeting.

18    Q.  Can you tell us what you were able to observe while you

19    were there?

03:24:17    20            MR. JONAS:  Objection.

21            THE COURT:  Sustained.

22    BY MR. LEONARD:

23    Q.  And after you spent some time touring the country, so to

24    speak, did you still have some of the same concerns that you

03:24:28    25    had based upon your '08 visit to the country?

MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

203

1    MR. JONAS:  Objection.

2    THE COURT:  Sustained.

3  BY MR. LEONARD:

4  Q.  Let's talk about the meeting you had with the folks in

03:24:40   5  Zimbabwe in 2009.

6    Could you just remind me again who the people on

7  behalf of the government of Zimbabwe who were there at that '09

8  meeting?

9  A.  I don't recall any names, but there were ministers of

03:24:55  10  agriculture, health, banking, finance.

11  Q.  Okay.  Different people that were officials that sort of

12  looked official?

13  A.  They were introduced that way, yes.

14  Q.  Okay.  And you had a chance on that trip again to see

03:25:11  15  really up close and personal Prince Ben's interaction with

16  these folks from the country, right?

17    MR. JONAS:  I'm going to object, Judge, and I think --

18  there's been no testimony that there was a trip in '09.

19  BY MR. LEONARD:

03:25:28  20  Q.  I'm sorry.  I got the date wrong, sir.  '08 was the second

21  trip, right?

22  A.  Yes.

23  Q.  Okay.  I'm sorry about that.

24    MR. JONAS:  I'm going to object still because Mr.

03:25:36  25  Leonard already -- asked and answered.  He asked questions

MICHAEL P. SNYDER, Official Court reporter

1    about the trip to Zimbabwe in '08, and he's moving on to

2    another trip.

3         MR. LEONARD:  No, I asked about the South Africa trip

4    in '08.  Now I'm talking about the Zimbabwe trip in '08.

03:25:45    5         THE COURT:  You said Zimbabwe.

6         MR. LEONARD:  I said it by mistake, Judge.  We talked

7    about the first trip, which was to South Africa.  The second

8    trip he actually got into the country of Zimbabwe.

9         THE COURT:  All right.  You actually I think said

03:25:55   10    Zimbabwe.  Maybe that isn't what you meant.

11    BY MR. LEONARD:

12    Q.  So just so we are clear, we are talking about the second

13    trip where you actually went to the nation of Zimbabwe as

14    opposed to the first trip where you were not in the nation, and

03:26:06   15    I want to focus on what you observed in the second trip in I

16    think you said December of '08?

17    A.  It was around that time, yes.

18    Q.  And that second trip with the second set of meetings with

19    the folks from Zimbabwe, Greg Turner and Prince Ben were, of

03:26:22   20    course, there?

21    A.  Yes.

22    Q.  And let's talk about Prince again first.

23         Senator, you had the opportunity to observe the

24    conduct of Prince Ben throughout the trip including at the

03:26:29   25    meeting with these Zimbabwean officials, correct, sir?

            MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

205

A.  Yes.

Q.  And, again, it's fair to say, Senator, that Prince Ben gave you absolutely no indication that these people were directing, controlling, telling him what to do, correct?

03:26:44

MR. JONAS:  Objection.

THE COURT:  Sustained.

BY MR. LEONARD:

Q.  Did you get any sense that he was taking orders from them?

MR. JONAS:  Objection.

03:26:54

THE COURT:  Sustained.

MR. LEONARD:  Judge, could I be heard at sidebar?

THE COURT:  Yes, you may.

(Proceedings at sidebar.)

MR. LEONARD:  How could it not be relevant, Judge?

03:27:20

THE COURT:  Well, initially I sustained it because it seemed like you were asking, asking him what the jury after it's instructed will have to decide under the law.

MR. LEONARD:  How about if we call it, instead of saying legalistic, I just say directions or orders?  That's not

03:27:42

what the law says.  He's there.  How can he not be able to comment on what he sees?  How can they cut us off at the knees. He's a key witness.  He's in the country, he's observing.  They are saying that Prince Ben is taking orders and directions from these people.  He's an eyewitness and saying it never happened.

03:27:58

Come on.

MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

206

1    THE COURT:  But that doesn't say that at all.  I mean,
2  I suppose you could say -- I don't know what it means there.
3    MR. JONAS:  He's asking for an opinion of the witness,
4  which really is an ultimate issue of fact for the jury.
03:28:13   5    THE COURT:  That's what it seemed like to me.
6    MR. LEONARD:  It's his own personal observations of
7  the conduct of the people.
8    THE COURT:  No, then it's a different thing.  I mean,
9  you can ask I suppose a specific question.
03:28:23  10    MR. LEONARD:  Did you see him take any orders from
11  them?  Did you see him take any directions from them?  That's
12  what I was attempting to do.
13    THE COURT:  What does that mean?
14    MR. LEONARD:  Judge, it means that he's not being
03:28:36  15  under their --
16    THE COURT:  I think you're just not going to be able
17  to do that because I don't see how you can do that without
18  asking him -- either we don't know what it means or, I mean,
19  the jury is going to have to decide were they acting as his
03:28:54  20  agent.
21    MR. LEONARD:  But he's there and can't comment on what
22  they are doing?
23    MR. JONAS:  That's not what you're asking.
24    MR. LEONARD:  We have eyewitnesses who were there who
03:29:02  25  can see the interactions with the officials and give their

MICHAEL P. SNYDER, Official Court reporter

Case: 1:13-cr-00572 Document #: 254 Filed: 04/16/15 Page 207 of 221 PageID #:2465
Trotter - cross by Leonard
207

1  observations, their visual observations of what they hear and

2  see.  That's all we are asking to do.

3       THE COURT:  Why don't you just ask him what he heard

4  and saw.

03:29:15  5       MR. LEONARD:  Sure, but then I am allowed, this is

6  cross, especially why can't I say did they take any orders from

7  them, did they take any directions?  How can those questions be

8  relevant for the first meeting but not the second?  You let

9  them all the same questions.

03:29:28  10      MR. JONAS:  Then that's my bad.  It doesn't mean it's

11  allowed.

12       Your Honor, I agree that factually, what did you hear

13  Gideon Gono say to the defendant, what did you hear Gideon Gono

14  say to Ben Israel, that's a fact that's been asked.  But to ask

03:29:47  15  this witness --

16       MR. LEONARD:  It's cross.

17       MR. JONAS:  -- to ask -- so you ask in a leading way

18  but to ask this witness his opinion as to whether or not the

19  defendant --

03:29:55  20      THE COURT:  Yes.  You can't do that.

21       MR. JONAS:  It's ultimate issue.

22       MR. LEONARD:  Judge, let me ask this.  Can I say did

23  they take any directions from --

24       THE COURT:  No.

03:30:02  25      MR. LEONARD:  That's not a legal opinion.

        MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

208

1     We've got to be able to put on a defense, Judge.

2     You're not letting us put on a defense.

3          THE COURT:  Oh, come on.

4          MR. LEONARD:  You're not.

03:30:11   5     (End of discussion at sidebar.)

6     BY MR. LEONARD:

7     Q.  Sir, we were talking about this second meeting in December

8     of 2008 with the Zimbabwean officials that you sort of

9     generally identified us to earlier.

03:30:47   10     During the course of that meeting, you were able to

11    hear what they said, of course?

12    A.  Yes.

13    Q.  And you were able to hear what Greg and Prince Ben said

14    back to them?

03:30:57   15    A.  Yes.

16    Q.  Did any of the Zimbabwean officials ever tell Greg or Ben

17    to do anything for them?

18    A.  No.

19    Q.  Did any of them tell you to do something for them?

03:31:06   20    A.  No.

21    Q.  When that second meeting was over, there was no agreement

22    that you had to do anything for anyone, right, sir?

23    A.  That's right.

24    Q.  But it's fair to say that after the second meeting, you

03:31:20   25    were still keenly interested in the country of Zimbabwe and the

MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

1     humanitarian issues faced in that nation, right?

2     A.  Yes.

3             MR. JONAS:  Objection.

4             THE COURT:  He answered it.  Okay.

03:31:32  5     BY MR. LEONARD:

6     Q.  Correct?

7     A.  Yes.

8     Q.  Okay.  And that's why, when we go forward in time after the

9     second meeting in 2009, counsel asked you about some additional

03:31:43  10    things that happened in terms of a resolution, things of that

11    nature, do you recall that?

12    A.  Yes.

13    Q.  And your activities after the second trip were a result of

14    your continued interest in the nation, right?

03:31:56  15    A.  Correct.

16    Q.  Not because someone was telling you what to do including

17    your friends, right?

18            MR. JONAS:  Objection.  This is not relevant.

19            MR. LEONARD:  They made it relevant, Judge.  They went

03:32:14  20    into this whole time period in detail.

21            THE COURT:  He may answer that.

22    BY THE WITNESS:

23    A.  I did have a continued interest in what was going on.

24    BY MR. LEONARD:

03:32:32  25    Q.  And one of the things that counsel talked to you about,

MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

210

1    just to make sure we all understand, they went through some

2    documents with you with this resolution that was put in place,

3    was that 2010 or 2009?

4    A.  That was '9.

03:32:47    5    Q.  Okay.

6    A.  That was '9.

7    Q.  And just so we are all on to the same page, that

8    resolution, that was issued by what organization?

9    A.  The National Black Caucus of State Legislators.

03:32:58    10    Q.  And you'd been a member of that organization for about how

11    long?

12    A.  About 24 years.

13    Q.  And when you act for them, you take your duties seriously,

14    don't you, Senator?

03:33:08    15            MR. JONAS:  Objection.

16            THE COURT:  He may answer.

17    BY MR. LEONARD:

18    Q.  Right?

19    A.  Yes.

03:33:16    20    Q.  And you don't just do something on behalf of that

21    organization because your friend or someone else tells you to

22    do it, correct?

23    A.  That's correct.

24    Q.  You do it if you stand behind it, right, Senator?

03:33:30    25    A.  That and within the parameters of what we could do, yes.

MICHAEL P. SNYDER, Official Court reporter

Trotter - cross by Leonard

1  Q.  Sure.  And you can't, you can't dictate to the organization

2  everything that you want to happen, but in cooperation with the

3  other members, you can bring about resolutions and issues,

4  can't you?

03:33:45  5  A.  Yes.

6  Q.  And that's what you were attempting to do with the Zimbabwe

7  resolution, correct?

8  A.  Yes.

9  Q.  You believed in it, didn't you, sir?

03:33:53  10  A.  In the resolution there was issues that needed to be

11  addressed or at least looked at, yes.

12  Q.  Yes.  You thought that there were still important issues to

13  look at in the country of Zimbabwe?

14  A.  Yes.

03:34:07  15  Q.  Right?  And that's why you lent your name and your stature

16  to something like that, correct?

17  A.  Correct.

18  Q.  There's no quid pro quo where someone is giving you

19  something in return for doing that, was there, sir?

03:34:20  20  A.  No.

21  Q.  And, again, even though you weren't acting as a senator,

22  you don't do quid pro quos for other organizations, do you,

23  sir?

24  A.  No.

03:34:56  25          MR. LEONARD:  Could I have one moment, Judge?

          MICHAEL P. SNYDER, Official Court reporter

|  |  |  |
|---|---|---|
|  | 1 | THE COURT:  Yes. |
|  | 2 | (Pause.) |
|  | 3 | MR. LEONARD:  Nothing further at this time, Judge. |
|  | 4 | MR. JONAS:  Redirect? |
| 03:35:12 | 5 | REDIRECT EXAMINATION |
|  | 6 | BY MR. JONAS: |
|  | 7 | Q.  Mr. Trotter, you were asked by Mr. Leonard about the |
|  | 8 | meeting in 2008, in December of 2008 in Zimbabwe.  Do you |
|  | 9 | recall he asked you questions? |
| 03:35:32 | 10 | A.  Yes. |
|  | 11 | Q.  And he asked you about if you saw any -- let me get the |
|  | 12 | word right -- directions given from anyone in Zimbabwe to the |
|  | 13 | defendant during that meeting, is that correct? |
|  | 14 | A.  Yes. |
| 03:35:43 | 15 | Q.  Do you know if the defendant met with anyone else from the |
|  | 16 | government of Zimbabwe outside of that meeting that you were at |
|  | 17 | in 2008? |
|  | 18 | A.  Not that I was aware. |
|  | 19 | MR. LEONARD:  Objection, foundation, calls for |
| 03:35:53 | 20 | speculation. |
|  | 21 | MR. JONAS:  I'm asking if he knows. |
|  | 22 | THE COURT:  He may answer. |
|  | 23 | BY THE WITNESS: |
|  | 24 | A.  No. |
| 03:35:58 | 25 | BY MR. JONAS: |

MICHAEL P. SNYDER, Official Court reporter

Trotter - redirect by Jonas

213

1    Q.  Do you know?

2    A.  No.

3    Q.  So you don't know if the defendant had other meetings?

4    A.  No.

03:36:02    5    MR. LEONARD:  Objection.  It calls for speculation, no

6    foundation, asked and answered.

7    MR. JONAS:  I withdraw it.

8    BY MR. JONAS:

9    Q.  Did defendant Ben Israel ever tell you he picked up $90,000

03:36:14    10    in Botswana from the account of a Zimbabwe government official?

11    A.  No.

12    Q.  Mr. Leonard asked you about your belief in the resolution

13    that you signed or, I'm sorry, that the committee that you were

14    a member of issued in December 2009, correct?

03:36:30    15    A.  Yes.

16    Q.  Did the resolution call for the lifting of the sanctions

17    against Zimbabwe?

18    A.  For direct lifting of the sanctions --

19    Q.  Lifting the sanctions against Zimbabwe.  What did the

03:36:41    20    resolution call for?

21    A.  One, that it was something that we needed to further study

22    and look at and see what was going on.

23    Q.  Further study, okay.

24    Where did you get your information about Zimbabwe?

03:36:52    25    Where did you get your information from?

MICHAEL P. SNYDER, Official Court reporter

Trotter - redirect by Jonas

214

1   A.  The initial information or the information for the --

2   Q.  Well, all right.

3   A.  -- resolution?

4   Q.  Let me rephrase the question.

03:37:04    5       You're aware that there are sanctions against

6   Zimbabwe, correct?

7   A.  That's correct.

8   Q.  How did you learn about those?

9   A.  Through the news, general news and then after finding or

03:37:15   10   discussing it with other interested people.

11   Q.  I'm sorry.  I'm having a hard time hearing you.

12   A.  After discussing it with other interested people.  I do

13   know people who live in America that are from Zimbabwe, so I

14   had information on what was going in Zimbabwe before I even

03:37:32   15   went.

16   Q.  Okay.  And did these people ever discuss with you

17   humanitarian issues?

18   A.  Yes.

19   Q.  Did they ever discuss with you human rights issues?

03:37:42   20   A.  Yes.

21   Q.  So there's a lot going on in this picture of Zimbabwe,

22   correct?

23   A.  There's a lot going on in Zimbabwe.

24   Q.  And you wanted to know more?

03:37:49   25   A.  Yes.

MICHAEL P. SNYDER, Official Court reporter

Trotter - redirect by Jonas

215

1  Q.  But you weren't advocating lifting of the sanctions, were
2  you?
3  A.  I could not say that was the sole reason for the problems
4  that Zimbabwe was dealing with.

03:38:02
5  Q.  So the letters that I showed you that you said you didn't
6  authorize where it was, purportedly you were saying that you
7  were going to Barack Obama and advocating for the lifting of
8  the sanctions, none of that is true?
9  A.  I didn't have that kind of relationship with the President

03:38:20
10 to make that, no.
11 Q.  But even if you did, would you have advocated the lifting
12 of the sanctions?
13 A.  No.
14       MR. LEONARD:  Objection, relevance, and it's beyond

03:38:28
15 the scope.
16       MR. JONAS:  This goes to the resolution that they
17 asked him about.
18       THE COURT:  He's answered it.  I'll let it stand.
19 BY MR. JONAS:

03:38:38
20 Q.  Did you, prior to issuing this resolution, contact anyone
21 from the White House regarding why there were sanctions against
22 Zimbabwe?
23 A.  No.
24 Q.  Did you contact anyone from the state department as to why

03:38:50
25 there were sanctions against Zimbabwe?

MICHAEL P. SNYDER, Official Court reporter

1  A.  No.

2  Q.  How about Treasury?

3  A.  No.

4  Q.  And you know these sanctions are from the federal

5  government?

6  A.  That's correct.

7  Q.  So you didn't contact anyone from the federal government to

8  find out why there were these sanctions?

9  A.  No one.

10        MR. JONAS:  No further questions.

11        MR. LEONARD:  Nothing based upon that.

12        THE COURT:  All right.  You may be excused.

13    (Witness excused.)

14        MR. JONAS:  Sidebar, Judge?

15        THE COURT:  Yes.

16    (Discussion on the record at sidebar.)

17        MR. JONAS:  We are likely to rest, we would like to be

18  able to do that Monday morning so we are sure all the exhibits

19  are in and anything else that we want to do.

20        THE COURT:  Okay.  I've been told --

21        MR. LEONARD:  I couldn't hear that.

22        MR. JONAS:  We are likely to rest.  We are asking if

23  we can do it Monday morning so we can and make sure our

24  exhibits are in.

25        MR. LEONARD:  Sure.

        MICHAEL P. SNYDER, Official Court reporter

1    THE COURT:  All right.  The jury I guess had asked the

2    CSO, one of them wanted to know how long they thought the case

3    might last next week.  So I guess I just won't answer that or

4    say --

03:40:07

5    MR. LEONARD:  How long it will last?  Well, it swings

6    depending upon, of course, Mr. Turner's situation.  Right now

7    we think that he -- we don't know.

8    MR. TUNICK:  We have to talk.

9    MR. LEONARD:  We have to figure that out.  We have one

03:40:23

10   witness that is sort of evading a subpoena, so we'll see if we

11   can get her.  And then we have another witness who hopefully

12   will be here.

13   MR. JONAS:  Can I ask two requests?  What if, are any

14   of these witnesses you're referring to not on the list you

03:40:41

15   provided to the government?

16   MR. LEONARD:  No, they are.

17   MR. JONAS:  Okay.  The other one is during a sidebar

18   when Miss McKoy was testifying, the defense indicated they

19   wanted to call her in their case in chief.  She lives in

03:40:52

20   California.  She desperately wants to get home.  She is an

21   emotional wreck.  We made her cry, you guys made her cry.

22   MR. LEONARD:  We made her cry?

23   MR. JONAS:  She cried after talking to you, she cried

24   after talking to us.  I am not accusing you of anything.  The

03:41:07

25   point is I think it would be wise to let her go home, and if

MICHAEL P. SNYDER, Official Court reporter

1  they want to call her, then bring her back, understanding that

2  even if she doesn't go back and continues to stay in Chicago

3  waiting for the call, it's going to be on their dime.  The US

4  Attorney's office is not obligated to pay anymore.

03:41:22   5  MR. LEONARD:  We are not paying for witnesses, Judge.

6  That's not our obligation.

7  MR. JONAS:  I don't mean out of your pocket.  CJA

8  funds.

9  MR. LEONARD:  Oh.  I don't know what to say in

03:41:32   10  response to that.

11  MR. JONAS:  I guess my request is to let her go home.

12  THE COURT:  Okay.  We can get let the jury go home,

13  and you can talk about her, whether you are calling her or not.

14  The jury, by the way, said they wanted to ask

03:41:45   15  questions.

16  MR. LEONARD:  What was that, Judge?  I'm sorry.

17  THE COURT:  When we were over at the last sidebar, the

18  jury said that they want to ask questions.

19  MR. LEONARD:  To the witness?

03:41:57   20  THE COURT:  Obviously the answer is going to be "No."

21  MR. LEONARD:  Well, we would have supported it.  I

22  like that.  I'm not just saying it for objection.  We've had

23  weird rules, but I think that's useful.  That's for another

24  day's discussion.

03:42:12   25  MR. JONAS:  Let's excuse them.

MICHAEL P. SNYDER, Official Court reporter

1    THE COURT:  Okay.

2    MR. LEONARD:  Judge, just so I understand, how did

3  they communicate that they wanted to ask questions?

4    THE COURT:  I guess they said something to the CSO and

03:42:22   5  he just came -- Gordon, he just came up to me as I was going

6  back on and said that they would like to ask questions.  I said

7  no.

8    MR. LEONARD:  You mean they asked the bailiff?

9    THE COURT:  Yes.

03:42:33   10    MR. LEONARD:  That was during Trotter's testimony?

11    MS. ALEXAKIS:  It was during our last sidebar.

12    MR. LEONARD:  Do you know which witness was on the

13  stand?

14    MS. ALEXAKIS:  It was our last.

03:42:43   15    MR. LEONARD:  Did they say what questions?

16    THE COURT:  No.  I don't know what they were.

17    MR. LEONARD:  I just want to understand what happened.

18  I get it, Judge.

19      (End of discussion at sidebar.)

03:43:06   20    THE COURT:  We are going to adjourn for the day, so I

21  will see you Monday morning.

22      I can't tell you at this point how long the trial will

23  last.  I understand that you had asked that.

24      I will remind you a couple things.  You may not talk

03:43:22   25  to anyone or among yourselves or anybody else about the case

MICHAEL P. SNYDER, Official Court reporter

1    until you've heard all the evidence and the closing arguments

2    and I instruct you as to the law that you must follow.  And you

3    must avoid any coverage, any press coverage or anything.

4            So have a nice weekend, I hope the weather is good,

5    and I will see you Monday morning.

6            Oh, you already know to leave those in the jury room.

7         (Jury out.)

8            THE COURT:  Okay.  Is there any issue?  What is it?

9    We have to discuss about this.

10           MR. JONAS:  Judge, I'm just suggesting that we let

11   Miss McKoy go home.  I don't want to be accused of sending a

12   witness outside the district that they want to call.  I think

13   she needs a break.

14           MR. LEONARD:  She can go.  We are releasing her.

15           MR. JONAS:  End of story.  Thank you.

16           MR. LEONARD:  Did you say what time on Monday?

17           THE COURT:  I said 9:30, but that means 9:20 for you.

18           MR. LEONARD:  We'll be here.

19           THE COURT:  For all of you, just because you always

20   seem to come up with more.

21           MR. LEONARD:  Hopefully we can celebrate your

22   birthday.

23           THE COURT:  Maybe we should do jury instructions.  Oh,

24   I have a really long day of things tomorrow.  I suppose we

25   could do them right now.

             MICHAEL P. SNYDER, Official Court reporter

221

1        MR. JONAS:  Judge, can we not?

2        MR. LEONARD:  Could we just do them Monday?

3        THE COURT:  I guess.  All right.

4        MR. LEONARD:  Thank you.

03:45:24   5        MR. JONAS:  Thank you, Judge.

6        THE COURT:  Okay.

7        (Proceedings adjourned from 3:45 p.m. to 9:20 a.m.,

8     October 6, 2014.)

9                    C E R T I F I C A T E

10         I, Michael P. Snyder, do hereby certify that the

11    foregoing is a complete, true, and accurate transcript of the

12    proceedings had in the above-entitled case before the Honorable

13    ELAINE E. BUCKLO, one of the judges of said Court, at Chicago,

14    Illinois, on October 2, 2014.

15

16                         /s/ Michael P. Snyder

17                         Official Court Reporter

18                         United States District Court

19                         Northern District of Illinois

03:45:27  20                         Eastern Division

21

22

23

24

25

        MICHAEL P. SNYDER, Official Court reporter